ACCEPTED
04-15-00110-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
7/6/2015 2:40:01 PM
KEITH HOTTLE
CLERK

# No. 04-15-0110-CV

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

07/06/15 2:40:01 PM

KEITH E. HOTTLE
Clerk

In the Court of Appeals
for the Fourth District of Texas
Sitting at San Antonio

**IN RE THE ESTATE OF
WILLIAM H. MCNUTT, DECEASED**

On Appeal from the County Court of Kimble County, Texas
Sitting in Matters Probate; Cause No. 2284
Hon. Joe H. Loving, presiding

**Brief of Appellants
McNutt Ranch, Ltd., DMK Ranching, L.L.C., and
McNutt Management, L. L. C.,  Gen. Ptnr. McNutt Ranch, Ltd.**

Craig L. White
State Bar No. 21292400
Law Office of Craig L. White
111 W. Olmos Dr.
San Antonio, TX 78212
210.829.7183/F: 210.829.0734
craigwhite@111westolmos.com

Jeff Small
State Bar No. 00793027
Law Office of Jeff Small
12451 Starcrest, Suite 100
San Antonio, TX 78216.2988
210.496.0611/F: 210.579.1399
jdslaw@satx.rr.com

Counsel for Appellants

**ORAL ARGUMENT REQUESTED**

## INTERESTED PARTIES & COUNSEL

*Plaintiff/Appellee*:

    Sherry McNutt

*Counsel for Plaintiff/Appellee*:

    John F. Nichols, Sr.
    State Bar No. 14996000
    5020 Montrose Blvd., Suite 400
    Houston, TX 77006
    713.654.0708/F: 713.654.0706
    john@nicholslaw.com

*Defendants/Appellants*:

    McNutt Ranch, Ltd.

    DMK Ranching, L.L.C.

    McNutt Management, L. L. C.,
    Gen. Ptnr. McNutt Ranch, Ltd.

| *Counsel for Defendants/Appellants*: | *Trial and Appellate Counsel for Defendants/Appellants in Previous Trial and Appeal*: |
|---|---|
| Craig L. White | |
| Jeff Small | J. Ken Nunley |
| Allen J. Ahlschwede | Dennis Bujnoch |
| 522 Main St. | |
| Junction, Texas | |
| 325.446.9425/F: 325.446.2378 | |
| ajalaw@ahlschwedelaw.com | |

# TABLE OF CONTENTS

INTERESTED PARTIES & COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . xvi

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvii

Issue No. 1: The trial court erred by failing to grant a directed verdict or judgment notwithstanding the verdict.. . . . . . . . . . . . . xvii

Issue No. 2: The trial court improperly awarded "½ the north side" to Sherry based on a theory unrecognized in the law that some land must automatically accompany the gift of a house without requiring compliance with some exception to the statute of frauds.. . . . . . . . xvii

Issue No. 3: Question No. 2 in the Charge of the Court erroneously failed to identify with specificity the "plot of land" Sherry claimed to have been given by Bill in 1983 and it permitted the jury to make an award of real estate to Sherry without requiring her to establish an exception to the Statute of Frauds by proving the elements of an oral gift of real estate... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvii

Issue No. 4: The evidence was legally and factually insufficient to prove by clear and convincing evidence – that is, to produce a firm belief or conviction that the fact or finding was true — that in 1983 Bill made an oral gift to Sherry of the Foreman's House or any real estate to go with the Foreman's House.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvii

Issue No. 5: A juror injected outside information not contained in the evidence in the record into the jury deliberations when he stated to other members of the jury that he knew what Bill McNutt would have wanted and was not going to move from his position. Another juror admitted to the trial court "there was no way he could have put Sherry McNutt out on the street." Were those actions material and harmful jury misconduct?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvii

STATEMENT OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.     All transfers of real estate, including by gift, are subject to the statute of frauds, which requires that the conveyance be in writing, unless it is subject to an exception.. . . . . . . . . . . . . . . . 14

II.     The trial court erred by improperly instructing the jury and by failing to grant a directed verdict or judgment notwithstanding the verdict... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A.     Standards of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1.     Refusing to grant a directed verdict or JNOV.. . . . 16

2.     Charge Error.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

B.     Question No. 2 was immaterial and, thus, harmful because it is legally incorrect in that it did not specifically identify the property supposedly gifted to her nor did it satisfy any exception to the statute of frauds by requiring Sherry to prove the elements of an oral gift of real estate... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1.     Question No. 2 was legally incorrect... . . . . . . . . . . 19

2.     The Ranch Entities were entitled to a jury charge consistent with the law of the statute of frauds and the equitable exceptions thereto.. . . . . . . . . . . . . . . . . . . . . 23

C.     The legal principles of the "law of the case," res judicata, and collateral estoppel preclude the trial court from giving effect to the jury's answer to Question No. 2 because of this Court's 2013 judgment holding as a matter of law that Sherry failed to prove an oral gift of the 2000 acre/ North Side of the Ranch.. . . . . . . . . 25

1. The law of *this* case precludes retrying an oral gift of the 2000 acres/North Side of the Ranch or any significant part thereof ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2. Res judicata and collateral estoppel prevent the relitigation of claims or issues resolved in a prior dispute and, as a consequence, preclude a judgment in Sherry's favor on Question No. 2.. . . . . . . . . . . . . . . . . . . . . . . . 27

D. The jury's answer to Question No. 2 is immaterial for the additional reason that it does not conform to the pleadings.. 28

III. The jury's verdict is not supported by legally or factually sufficient clear and convincing evidence that would produce a firm belief or conviction that Bill gave Sherry the Foreman's House or any other part of the ranch in 1983.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A. Standard of Review for clear and convincing evidence.. 37

1. Legal Sufficiency. . . . . . . . . . . . . . . . . . . . . . . . . . 37

2. Factual Sufficiency.. . . . . . . . . . . . . . . . . . . . . . . . 39

B. As an exception to the statute of frauds, the rules for proving the elements of an oral gift of real estate are strictly enforced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1. The Foreman's House.. . . . . . . . . . . . . . . . . . . . . . 42

2. Answer to Question No. 2 — "½ of North Side".. 46

a. The evidence was insufficient to produce a firm belief or conviction in a reasonable person based on the jury question that *should have been* asked.. . 47

b. The evidence was insufficient to produce a firm belief or conviction in a reasonable person based on the jury question as it was *actually* asked.. . . . . . 50

IV.     Jurors engaged in misconduct by ignoring the trial court's instruction not to let bias or sympathy play any part in their deliberations and by considering and discussing facts outside the record evidence in this case.. . . . . . . . . . . . . . . . . . . . . . . . . 52

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

APPENDIX

FINAL JUDGMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 1

CHARGE OF THE COURT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 2

Harry Adams' 2005 Letter to Sherry (RR6/PX 4). . . . . . . . . . . . . Tab 3

PRETRIAL MOTIONS REPORTER'S RECORD DTD Feb. 7, 2014. . . . . . . Tab 4

Sherry's THIRTEENTH AMENDED PETITION. . . . . . . . . . . . . . . . . . . Tab 5

2011 *Final Judgment*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 6

2013 Opinion, Dissent, & Judgment in *McNutt I*.. . . . . . . . . . . . Tab 7

*In re Estate of McNutt*,
        405 S.W.3d 194 (Tex. App. San Antonio 2013, no pet.).. . . Tab 8

## INDEX OF AUTHORITIES

### <u>Cases</u>

*Akin v. Akin*,
     649 S.W.2d 700 (Tex. App.— Ft. Worth 1983, writ ref'd n.r.e.). . . . 40

*Alamo Cmty. College Dist. v. Browning Constr. Co.*,
     131 S.W.3d 146 (Tex. App. — San Antonio 2004, pet. denied) .. . . . . 17

*Barr v. Resolution Trust Corp.*,
     837 S.W.2d 627 (Tex. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Boatland of Houston, Inc. v. Bailey*,
     609 S.W.2d 743 (Tex. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Briscoe v. Goodmark Corp.*,
     102 S.W.3d 714 (Tex. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Brown v. Bank of Galveston, N. A.*,
963 S.W.2d 511 (Tex. 1998), abrogated on other grounds,
*Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007). . . . . . . . . . . . . . 17

*C. & R. Transport, Inc. v. Campbell*,
     406 S.W.2d 191 (Tex. 1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*City of Brownsville v. Alvarado*,
     897 S.W.2d 750 (Tex. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*City of Keller v. Wilson*,
     168 S.W.3d 802 (Tex. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 45

*City of San Antonio v. Rodriguez*,
     No. 04-13-0116-CV, 2013 Tex. App. LEXIS 11169
     2013 WL 4682192 (Tex. App.— San Antonio
     Aug. 30, 2013, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Columbia Rio Grande Healthcare, L.P. v. Hawley*,
     284 S.W.3d 851 (Tex. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Conner v. Johnson*,
No. 02-03-0316-CV, 2004 Tex. App. LEXIS 9633,
(Tex. App.-Fort Worth 2004, pet. denied) (mem. op.). . . . . . . . . . . 21

*Cont'l Cas. Co. v. Street*,
379 S.W.2d 648 (Tex. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dawson v. Tumlinson*,
150 Tex. 451, 242 S.W.2d 191 (Tex. 1951). . . . . . . . . . . . . . . 14, 40, 47

*Diamond Shamrock Refining & Mktg. Co. v. Mendez*,
844 S.W.2d 198 (Tex. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Dorman v. Arnold*,
932 S.W.2d 225 (Tex. App.— Texarkana 1996, no writ). . . . . . . . . . 37

*Dynegy, Inc. v. Yates*,
422 S.W.3d 638 (Tex. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Edlund v. Bounds*,
842 S.W.2d 719 (Tex. App.— Dallas 1992, writ denied) . . . . . . . . . . 16

*Examination Mgmt. Servs. v. Kersh Risk Mgmt.*,
367 S.W.3d 835 (Tex. App.— Dallas 2012, no pet.) . . . . . . . . . . . . . 51

*Fleet v. Fleet*,
711 S.W.2d 1 (Tex. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Flores v. Flores*,
225 S.W.3d 651 (Tex. App.— El Paso 2006, pet. denied). . . . . . . . . . 14

*Fort Bend County Drainage Dist. v. Sbrusch*,
818 S.W.2d 392 (Tex. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Golden Eagle Archery, Inc. v. Jackson*,
24 S.W.3d 362 (Tex. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Grimsley v. Grimsley,*
    632 S.W.2d 174 (Tex. App.— Corpus Christi 1982, no writ) . . . . . . . . 41

*Hammerly Oaks, Inc. v. Edwards,*
    958 S.W.2d 387 (Tex. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Harkey v. Tex. Employers' Ins. Ass'n,*
    146 Tex. 504, 208 S.W.2d 919 (1948). . . . . . . . . . . . . . . . . . . . . . . 29

*Harmon v. Schmitz,*
    39 S.W.2d 587 (Tex. Comm'n. App. 1931, judgm't adopted). . . . . . . . 41

*Harris County v. Smith,*
    96 S.W.3d 230 (Tex. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hayes v. Rinehart,*
    65 S.W.3d 286 (Tex. App.— Eastland 2001, no pet.) . . . . . . . . . . . 37

*Henry v. Masson (In re Henry),*
    388 S.W.3d 719, 728 (Tex. App. —
    Houston [1st Dist.] 2012, pet. denied). . . . . . . . . . . . . . . . . . . . 25, 26

*Holland v. Lovelace,*
    352 S.W.3d 777 (Tex. App.—Dallas 2011, no pet.). . . . . . . . . . . . . . 51

*Hyundai Motor Co. v. Rodriguez,*
    995 S.W.2d 661 (Tex. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re C.H.,*
    89 S.W.3d 17 (Tex. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Estate of McNutt,*
    405 S.W.3d 194 (Tex. App.— San Antonio 2013, no pet.) . . . . . xiv, 4, 5,
                                                 19, 22, 27, 49

*In re J.F.C.,*
    96 S.W.3d 256 (Tex. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Prudential Ins. Co. of Am.,*
     148 S.W.3d 124 (Tex. 2004) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23

*In re V.L.K.,*
     24 S.W.3d 338 (Tex. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*John Masek Corp. v. Davis,*
     848 S.W.2d 170 (Tex. App.— Houston
     [1st Dist.] 1992, writ denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Juliette Fowler Homes, Inc. v. Welch Assocs.,*
     793 S.W.2d 660 (Tex. 1990) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Nguyen v. Yovan,*
     317 S.W.3d 261 (Tex. App. —
     Houston [1st Dist.] 2009, pet. denied). . . . . . . . . . . . . . . . . . . . . 15

*Nipp v. Broumley,*
     285 S.W.3d 552 Tex. App. – Waco 2009, no pet.). . . . . . . . . . . . . 37

*Oilfield Haulers Ass'n v. R. R. Comm'n of Tex.,*
     381 S.W.2d 183 (Tex. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Osterberg v. Peca,*
     12 S.W.3d 31 (Tex. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Peterson v. Weiner,*
     71 S.W.2d 544 (Tex. Civ. App.— San Antonio, 1934, writ ref'd). . . . 40

*Pick v. Bartel,*
     659 S.W.2d 636 (Tex. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Purina Mills, Inc. v. Odell,*
     948 S.W.2d 927 (Tex. App.–
     Texarkana 1997, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Redinger v. Living Inc.,*
     689 S.W.2d 415 (Tex. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Republic Nat'l Bank v. Stetson,*
      390 S.W.2d 257 (Tex. 1965). . . . . . . . . . . . . . . . . . . . . . . . 15, 40, 41, 47

*Rowson v. Rowson,*
      275 S.W.2d 468 (1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Salinas v. Rafati,*
      948 S.W.2d 286 (Tex. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Shearer's, Inc. v. Lyall,*
      717 S.W.2d 128 (Tex. App.— Houston
      [14th Dist.] 1986, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Spencer v. Eagle Star Ins. Co. of Am.,*
      876 S.W.2d 154 (Tex. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*State Dep't of Highways v. Payne,*
      838 S.W.2d 235 (Tex. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sw. Bell Tel. Co. v. Garza,*
      164 S.W.3d 607 (Tex. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 37-39

*Tex. Dep't of Human Servs. v. E.B.,*
      802 S.W.2d 647 (Tex. 1990) (op. on reh'g). . . . . . . . . . . . . . . . . 17

*Thompson v. Dart,*
      746 S.W.2d 821 (Tex. App.— San Antonio 1988, no writ). . . . . . . . 40

*Thompson v. Lawson,*
      793 S.W.2d 94 (Tex. App.— Eastland 1990, writ denied). . . . . . . . 40

*Transcon. Ins. Co. v. Crump,*
      330 S.W.3d 211 (Tex. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*UPS, Inc. v. Tasdemiroglu,*
      25 S.W.3d 914 (Tex. App.– Houston
      [14th Dist.] 2000, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Walker v. Gutierrez,*
        111 S.W.3d 56 (Tex. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Walker v. Packer,*
        827 S.W.2d 833 (Tex. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Wendell v. Central Power & Light Co.,*
        677 S.W.2d 610 (Tex. App.—
        Corpus Christi 1984, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . 29

*Zenith Star Ins. Co. v. Wilkerson,*
        150 S.W.3d 525 (Tex. App.— Austin 2004, no pet.). . . . . . . . . . . . . . 16

## Statutes

TEX. BUS. & COM. CODE 26.01(a), (b)(4). . . . . . . . . . . . . . . . . . . . . . . . . 14, 40

TEX. PROP. CODE ANN. § 5.021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## Rules

TEX. R. APP. P. 44.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

TEX. R. CIV. P. 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 28

## Other Authorities

Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,*
        38 TEX. L. REV. 361 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**STATEMENT OF THE CASE**

***Nature of the case***. In 2007, Appellee Sherry McNutt sued her father William H. McNutt — later supplanted by his estate. *See* RR6/DX 12 (PLAINTIFF'S ORIGINAL PETITION). Sherry later added her sister Dawn Keller, her sister's children, and related Ranch Entities as defendants. The Ranch Entities — McNutt Ranch, Ltd., DMK Ranching, L.L.C., and McNutt Management, L.L.C., general partner of McNutt Ranch, Ltd. — are the only parties against whom judgment was rendered and are the only appellants herein. CR 3/1259 (FINAL JUDGMENT) App'x Tab 1.

Sherry initially claimed that her father, William H. ("Bill") McNutt, made an oral testamentary gift of the "North Side" of the McNutt Ranch to her in 1989. RR6/DX 12. During the course of proceedings Sherry changed her allegations to assert that Bill made the oral "gift" to her to take effect in 1983. *Compare* CR6/DX12, at ¶4.2 (PLAINTIFF'S ORIGINAL PETITION) ("In 1989 . . ."), *with* CR1/14, 16 Sherry's EIGHTH AMENDED PETITION, at 3 ("In the Spring of 1983 . . .") *and* Sherry's THIRTEENTH AMENDED PETITION, at 3 (same).[1]

***Course of proceedings in the 2011 trial and appeal***. This matter was previously tried to the bench in July 2011, with the Honorable Joe H.

---

[1] A request to supplement the appellate record with Sherry's Thirteenth Amended Petition was sent to the trial court clerk on July 2, 2015.

Loving, presiding. CR1/12. In that trial the court concluded Sherry had failed to prove an oral gift of 2000 acres. Instead, it rendered judgment that Sherry had proven an oral gift of the *"Foreman's House"* which sits on the 2000 acres. *In re Estate of McNutt*, 405 S.W.3d 194, 196-97 (Tex. App.— San Antonio 2013, no pet.) (hereafter *"McNutt I"*) (App'x Tab 7); 2011 *Final Judgment* (App'x Tab 6). Going further, the trial court presumed that the gift of the house automatically had to include some land to go along with the house and it awarded Sherry an unidentified 5 acres to provide highway and water access, even though it recognized there were no pleadings or evidence to support such an award. Final Judgment (App'x Tab 6); RR 2/267:10-11.

On appeal in cause 04-11-0924-CV,[2] this Court agreed with the trial court's finding that Sherry had failed to prove an oral gift of the 2000 acres. Additionally, because the legal theory as to the trial court's second finding of *"an oral gift as to the house and 5 acres of land . . . was not fully developed at trial"* this Court remanded only that issue to the trial court for further development. *McNutt I*, 405 S.W.3d at 197.

***Course of proceedings on remand.*** On retrial, a jury found that William H. McNutt had made an oral gift of the *"foreman's"* house to Sherry

_____

[2] *In re Estate of McNutt*, 405 S.W.3d 194 (Tex. App.— San Antonio 2013, no pet.)

McNutt in 1983. CR 3/996. As a separate finding, the jury found that "½ of North Side" was the "amount of land . . . necessary for Sherry McNutt to have full use and enjoyment of the 'foreman's'" house." CR 3/997.

***Trial court disposition on remand.*** The trial court rendered judgment on February 20, 2015 , in accord with the jury's verdict against only the Ranch Entities. CR 3/1259 et seq. The trial court overruled Appellants' timely filed motions for judgment notwithstanding the verdict and new trial on February 2, 2015. RR 5/45:12 ; 54:23-25. Appellants filed their notice of appeal on February 27, 2015. Supp. CR 1274.

**STATEMENT REGARDING ORAL ARGUMENT**

This Court should grant oral argument because it would clarify the factual background and the written arguments in the briefing. Because of the complexities that developed in the retrial of this case after this Court's remand (a retrial the scope of which went well beyond the limits of this Court's remand), oral argument would aid the Court in its decisional process.

# ISSUES PRESENTED

*Issue No. 1*:       The trial court erred by failing to grant a directed verdict or judgment notwithstanding the verdict.

*Issue No. 2*:       The trial court improperly awarded *"½ the north side"* to Sherry based on a theory unrecognized in the law that some land must automatically accompany the gift of a house without requiring compliance with some exception to the statute of frauds.

*Issue No. 3:*       Question No. 2 in the Charge of the Court erroneously failed to identify with specificity the *"plot of land"* Sherry claimed to have been given by Bill in 1983 and it permitted the jury to make an award of real estate to Sherry without requiring her to establish an exception to the Statute of Frauds by proving the elements of an oral gift of real estate.

*Issue No. 4:*       The evidence was legally and factually insufficient to prove by clear and convincing evidence – that is, to produce a firm belief or conviction that the fact or finding was true — that in 1983 Bill made an oral gift to Sherry of the Foreman's House or any real estate to go with the Foreman's House.

*Issue No. 5:*       A juror injected outside information not contained in the evidence in the record into the jury deliberations when he stated to other members of the jury that he knew what Bill McNutt would have wanted and was not going to move from his position. Another juror admitted to the trial court *"there was no way he could have put Sherry McNutt out on the street."*

Were those actions material and harmful jury misconduct?

**STATEMENT OF FACTS**

### A. Background

The McNutt Ranch comprises 3,841.44 acres in Kerr and Kimble Counties. The Ranch is divided by Interstate 10, with approximately 2000 acres lying to the north of the highway. Originally, Sherry claimed ownership of that portion of the Ranch north of the highway based on an alleged testamentary oral gift of real estate to her from her father, Bill McNutt. CR6/DX12. On remand, she amended her claim to allege that in 1983 Bill McNutt made an oral gift to her in 1983 of the Foreman's House, plus five acres surrounding that house and "Pasture 9" neither of which was ever defined in the evidence. *See, e.g.*, RR2/265:21-266:3.

### B. Sherry's story changed as time went by

At the outset, in her Plaintiff's Original Petition Sherry alleged (RR 6/DX 12, at ¶¶4.3, 4.4; RR 3/103:18-24; *see also* 2011 RR2/259:6-12)[3] that she came back from Colorado in 1989 to run the Ranch at Bill McNutt's behest and in exchange he promised to give her the north side of the ranch upon his *death*.

---

[3] RR V/PPP:LL designates the Reporter's Record by volume/page:line

2011 RR V/PPP:LL designates the Reporter's Record from the 2011 trial in this Court's file 04-11-0924-CV.

CR V/PPP designates the Clerk's Record by volume and page or exhibit number.

RR 3/104: 19- 105:20 (quoting Sherry's original petition to allege "Sherry will receive . . ."); *see also* 2011 RR 2/296:15; 297:3 ("When he died."). For purposes of the initial temporary injunction hearing in front of Judge Charles Sherrill in 2007 regarding her access to the North Side of the Ranch, Sherry's sworn pleadings asserted the same thing – Bill made the alleged gift in 1989. RR3/101:21-102:16; 2011RR2/281:18-283:6; *see also, e.g.,* 2011 RR 263:14- 272:11 et seq. (Sherry testifying in 2011 that she never corrected her lawyer during 2007 injunction hearing that 1989 was wrong date).

Later, after being educated on what is required to prove an oral gift of real estate necessary to satisfy an exception to the statute of frauds and that a future gift of real estate was no gift at all, Sherry's allegations and her testimony at the 2011 trial changed to assert that Bill gave her the 2000-acre/North Side of the Ranch effective in 1983. *Compare* CR6/DX12, at ¶4.2 (PLAINTIFF'S ORIGINAL PETITION) ("In 1989 . . ."), *with* CR1/14, 16 (Sherry's EIGHTH AMENDED PETITION, at p. 3 of 7) ("In the Spring of 1983 . . ."); *see* CR 1/69, 94, 113, 132 (each subsequent amended petition through the Thirteenth claimed that the alleged gift was made in1983); THIRTEENTH AMENDED PETITION, at 3 (App'x Tab 5); *compare* RR2/228:10-17, *with* CR 6/DX 12; *see also* RR3/101: 22-105:20 (use of 1989 date in sworn pleading was a

"mistake"); 3/103:18-104:16) (failure to correct "wrong" date in sworn allegations was an "oversight"); 2011 RR2/263:14-266:4, 275:14-20.

Incredibly, Sherry has changed her story, yet again, merely to accommodate the issues remanded by this Court. *See* THIRTEENTH AMENDED PETITION (App'x Tab 5) Going into this trial she claimed that instead of promising to give her the entire North Side of the McNutt Ranch in 1983 in exchange for coming back and running the day-to-day operations, Bill supposedly promised her the Foreman's House; five acres surrounding the house, and Pasture 9 as an appropriate amount of land for the full use and enjoyment of the Foreman's House. *See id.*

The idea that in 1983 Bill orally gave Sherry the Foreman's House and 5 acres surrounding the house and Pasture 9 or any "small bit" of land to accompany the house in 1983 is a fiction created by Sherry from the trial court's 2011 ruling evidenced by the trial court's exposition of the rationale for its ruling from the bench. RR2/267:1-7, 271:16-18, 271:23-272:4. In fact, during a mid-trial bench conference in the 2014 trial, in relation to Sherry's claim in her Thirteenth Amended Petition that in 1983 Bill had gifted her five acres surrounding the Foreman's House and Pasture 9, the trial court observed, "you can't prove one bit of that, and you know it. . . . He never said

that; you know it." RR2/271:12-14.

**C.    In 2011, the trial court rendered judgment making an award to Sherry on a theory that had not been pled or proved.**

After a trial to the bench, the court entered judgment holding that while Sherry had NOT proved an oral gift of the 2000-acre/North Side of the Ranch, she had proved an oral gift of real estate "limited to a permanent residence structure existing on the five (5) acres of land, with water. The Five (5) acre tract, includes access to the highway I-10 Service Rd." 2011 *Final Judgment* (App'x Tab 6). This Court agreed with "the trial court's finding that Sherry failed to meet her burden of proving an oral gift as to the 2000 acres." *McNutt I*, 405 S.W.3d at 197.

In reversing the trial court's award to Sherry of the Foreman's House and an undefined five acres, Chief Justice Stone noted the trial court's express recognition that the legal theory on which it based its ruling had neither been pled for nor developed at trial. *Id.*

**D.    The trial court's rationale for the 2011 award of 5 Acres was to provide Sherry a "little bit" of land on which the house could sit with access to water and IH-10.**

It is readily apparent from the trial court's explanation of its rationale for its ruling at the end of the 2011 trial, that it never intended for Sherry to be awarded anything more than a small "plot of land . . . surrounding the house

4

. . . . upon which that house can sit."[4] The trial court stated repeatedly at the time and during the course of the subsequent proceedings on remand that its premise in awarding the "five-acre tract" was to ensure Sherry had a "little bit of land" on which the house sits "but only the fact that there is access to the water and that it includes access to highway ten, I-10 services road." *McNutt I*, 405 S.W.3d at 196 n.1.

## E.  The Remand

This Court has already decided that, as to the 2000 acre/North Side of the Ranch, Sherry failed to prove her "possession which evidence[d] a surrender of ownership and control" by Bill. *Id*. at 196-97. The remand called for a new trial solely on the "legal theory of an oral gift of a house and the necessary plot of land surrounding the house for full use and enjoyment of the house." *Id*. at 197.

The trial court made it abundantly clear from the February 7, 2014 pre-trial hearing onward that "the San Antonio Court of Appeals upheld the decision rendered by this Court that there was no oral gift of the 2000-acre

---

[4] 2011 RR Day 3, at 9 ("plot of land on which that house *sits*"); at 12 ("Ms. Sherry McNutt should have 5 acres of land upon which the house can *sit*"); at 12 ("plot of land *surrounding* the house"); at 14 ("there was an oral gift that meets that requirement of the house and 5 acres and the 5 acres  and the 5 acres is upon which the house may *sit*"); and at 16 ("there was an oral gift of the house and 5 acres of land upon which the house could sit").

ranch, and, therefore, they sustained that. So that appears to this Court at this time to be a settled fact that is not to be retried." PRETRIAL MOTIONS REPORTER'S RECORD dtd February 7, 2014,[5] at 16:20-25, 44:6-18.

And while this case went to trial in 2011 on Sherry's Eighth Amended Petition, it was not until after numerous objections, revisions, and rulings of the trial court that Sherry complied with the trial court's ruling that an oral gift of the North Side was not going to be retried and amended her petition to specifically identify what land had supposedly been gifted to her in 1983 for the use and enjoyment of the Foreman's House. THIRTEENTH AMENDED PETITION. Three weeks before the 2014 trial Sherry finally complied with the trial court's repeated directives to amend her pleadings to comport with the findings of this Court and its own rulings that she would not be permitted to retry the issue of an oral gift of the 2000-acre/North Side of the Ranch. Sherry's live pleading at trial alleged that in 1983 Bill McNutt made an "oral gift of the Foreman's House and the surrounding five acres of land and a specific amount of land, being Pasture 9, [to her] for the full use and enjoyment of the house." THIRTEENTH AMENDED PETITION ¶ 5, at 2-3 (App'x Tab 5). Ironically, Sherry never testified at trial to what she pled for in her live

---

[5] Hereafter "PRETRIAL MTNS RR dtd 2.7.14" (App'x Tab 4).

pleading.

Prior to her briefing and argument in the court of appeals in *McNutt I*, Sherry had never asserted that her father had given her anything less than the entire North Side of the ranch and certainly not just the Foreman's House and the five acres surrounding it. She did so then only in the alternative because the trial court had made an award based on that theory even though it had never been pled. As noted by Chief Justice Stone, there were never any pleadings or evidence of a gift by Bill McNutt to Sherry of the Foreman's House and any five acre tract of land.

## F.  The 2014 retrial

The trial court submitted the case to the six-person jury on two questions:

QUESTION NO. 1

Do you find from clear and convincing evidence that William H. McNutt made an oral gift of the "foreman's" house to Sherry McNutt in 1983?

**Answer "Yes" or "No"**

Answer:  "Yes"

QUESTION NO. 2

What amount of land, if any, do you find from clear and convincing evidence to be necessary for Sherry McNutt to have full use

7

and enjoyment of the "foreman's" house?

Answer:    "½ of North Side"

CR 3/996-97 (CHARGE OF THE COURT at 4-5) (App'x Tab 2).

## F.    Juror Misconduct

The Charge of the Court explicitly instructed the jury: "do not let bias, prejudice or sympathy play any part in your deliberations" and that the jury must "not consider or discuss anything that is not represented by the evidence in this case." CR 3/993.

Jury Foreman Aubrey Kothmann injected facts outside the evidence contained in the record, ignoring the trial court's instructions, when he stated to other jurors "that he knew Bill McNutt in the year 2000 and that Bill McNutt didn't know what he was doing and was not mentally competent." He stated further that "David Boland instigated the problems and that somehow he influenced Mr. McNutt's decision-making in kicking Sherry off the ranch." CR3/1198-99.

Kothmann went on to say that irrespective of the evidence, his mind was made up and that Sherry deserved the entire north side of the ranch because "he [Kothmann] knew what Bill McNutt would have wanted to have happened with his ranch and that he [Kothmann] was not going to move from his

8

position." CR3/1199. The jurors traded answers "[w]hen it was evident that Mr. Kothmann was not going to follow the evidence and/or Court's instructions" in an effort to bring deliberations to a close in that the jurors "knew that we couldn't get out of deliberations unless we compromised and no one was happy about compromising." CR 3/ 1199.

Furthermore, Juror Gary Gardner admitted to the trial court during a closed-door session with the judge after the trial that he also disregarded the trial court's instructions to set aside bias, prejudice, or sympathy when he stated to the trial court in the presence of the other jurors that "there was no way he could have put Sherry McNutt out on the street." CR 3/1199.

## G. This appeal followed

The trial court overruled Appellants' motions and amended motions for judgment notwithstanding the verdict and new trial on February 2, 2015. RR5/45:10-12; 54:23-25. It then entered judgment on February 20, 2015, for Sherry and against the Ranch Entities in accordance with the verdict awarding her the Foreman's House and an undefined one-half of the North Side of the Ranch. CR3/1259- 62.

This appeal followed. Supp. CR 1274 (NOTICE OF APPEAL).

9

## SUMMARY OF THE ARGUMENT

The concept of an *"oral gift of real estate"* arises only as an exception to the statute of frauds requirement that a conveyance of real estate be made in writing. To prove an oral gift of realty, the claimant must prove (1) that the gift took effect immediately, (2) the recipient took immediate possession of the gift with the acquiescence of the donor, and (3) the recipient made permanent and valuable improvements to the gifted property.

The trial court erroneously submitted this cause to the jury, in part, on a theory unknown to the law, that being – if a person is given an oral gift of a house it is automatically presumed that *"someone needs a little bit of land to enjoy the property they were given"* without requiring proof of the elements of an oral gift of real estate as to that land. RR2/271:17-18 (Trial Court: "someone needs a little bit of land") (emphasis added); PRETRIAL MTNS RR dtd 2.7.14, at 4:21-23 (gift of a house must "by nature" include some amount of property).

The trial court required Sherry to prove the elements of an oral gift of real estate in order for the jury to answer *"yes"* that Bill had given her the Foreman's House in 1983. But it did not impose the same requirement in the second question. Question No. 2 did not even identify or define the "plot of

land" Sherry claimed, instead, it asked only "what amount of land, if any, do you find to be necessary for Sherry McNutt to have full use and enjoyment of the foreman's house."[6] An oral gift of real estate is subject to the same specificity requirements that are imposed upon any other transfer of real estate. Absent that specificity, any purported transfer is void and unenforceable.

This Court's remand of this cause did not change real property law in Texas. Hence, to take the gift Bill supposedly made to Sherry in 1983 out from under the writing strictures imposed by the statute of frauds, Sherry was required to show all the elements of an oral gift of real estate not only as to the Foreman's House but as to any accompanying acreage. She failed to carry her burden, in large part, because, at her behest and with her acquiescence (PRETRIAL MTNS RR dtd 2.7.14, at 15:20-25, 32:10-11), the trial court submitted the issue to the jury in improper form.

No matter how the issues were submitted to the jury, however, the evidence was legally and factually insufficient to show clearly and convincingly that (1) Bill made an oral gift to Sherry in 1983 of the Foreman's House, (2) Bill also made an oral gift to Sherry in 1983 of the 5 acres surrounding the

---

[6] CR3/993, 997 (CHARGE OF THE COURT, Question No. 2) (App'x Tab 2).

11

Foreman's House and Pasture 9 as claimed in her Thirteenth Amended Petition, and/or (3) that Bill gave her any other specific acreage in 1983 or why any of it would be "necessary for the full use and enjoyment of the foreman's house."

The jury's award of "½ the North Side," which is approximately 1000 acres, is simply not supported by Sherry's pleadings or by legally or factually sufficient evidence. In fact, the only way that terminology entered into the discussion, over a multitude of objections by counsel for the Ranch Entities, is because of Sherry's improper interjection into the deliberations of a "gift of the northside," which had already been decided adversely to her as a matter of law.

This Court gave Sherry an opportunity on remand to develop the theory of an oral gift of the Foreman's House AND an appropriate amount of acreage for the full use and enjoyment of that house. Even so, she ignored the numerous admonitions of the trial court to not inject into the retrial the issue of the gift of the 2000 acre/North Side, which had already been tried and decided against her. Thus, she failed to develop the only theory upon which the case was remanded.

Accordingly, because the case was submitted to the jury on a theory

unknown to Texas law with her acquiescence and because, even at that, Sherry failed to provide legally and/or factually sufficient clear and convincing evidence to support any theory, the judgment of the trial court should be reversed and judgment rendered that Sherry take nothing.

**ARGUMENT**

**I.    All transfers of real estate, including by gift, are subject to the statute of frauds, which requires that the conveyance be in writing, unless it is subject to an exception.**

"Generally, the statute of frauds prohibits enforcement of an oral conveyance of real property." *Flores v. Flores*, 225 S.W.3d 651, 655 (Tex. App.— El Paso 2006, pet. denied) (citing TEX. BUS. & COM. CODE 26.01(a), (b)(4)). A party who relies on an exception to the statute of frauds to prove the validity of a transaction must request and obtain a jury finding on the exception. *See Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 641 (Tex. 2013) (citation omitted). To prove an oral gift of real estate as an exception to the statute of frauds the claimant must show a present gift, taking immediate possession, and making permanent and valuable improvements to the gift all with the acquiescence of the donor. *Dawson v. Tumlinson*, 150 Tex. 451, 242 S.W.2d 191, 192-93 (Tex. 1951).

The rule for describing parol gifts of real property is the same as that for describing parol sales. *Dawson*, 242 S.W.2d at 192. It is settled law that the description in a written conveyance must furnish within itself or by reference to some other existing writing, the means or data by which the particular land conveyed can be identified. *Rowson v. Rowson*, 275 S.W.2d 468, 470 (1955).

Oral gifts are no different. *Republic Nat'l Bank v. Stetson*, 390 S.W.2d 257, 262-63 (Tex. 1965).

"We can think of no reason that the description of land which is the subject of a parol gift should not be governed by the settled rule for written conveyances." *Stetson*, 390 S.W.2d at 262-63 (finding oral gift of land void that did not include adequate description); *see Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983). If a conveyance of an interest in real property does not sufficiently describe the land to be conveyed, it is void and unenforceable under the statute of frauds. *Nguyen v. Yovan*, 317 S.W.3d 261, 267 (Tex. App. — Houston [1st Dist.] 2009, pet. denied) (citing *Stetson*, 390 S.W.2d at 261).

## II. The trial court erred by improperly instructing the jury and by failing to grant a directed verdict or judgment notwithstanding the verdict.

A court may disregard the jury's answers if a legal principle precludes the party's recovery and justifies a judgment notwithstanding the verdict. *UPS, Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 n. 4 (Tex. App.– Houston [14th Dist.] 2000, pet. denied); *Purina Mills, Inc. v. Odell,* 948 S.W.2d 927, 932 (Tex. App.– Texarkana 1997, pet. denied). A court may also disregard the jury's answers to immaterial questions. *Salinas v. Rafati*, 948 S.W.2d 286, 288 (Tex. 1997); *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157

(Tex. 1994). A jury finding is immaterial if, among other reasons, the jury question was improperly submitted. *Salinas*, 948 S.W.2d at 288; *Spencer*, 876 S.W.2d at 157.

### A. Standards of Review

### 1. Refusing to grant a directed verdict or JNOV

A judgment non obstante veredicto/JNOV is proper when a directed verdict would have been proper. TEX. R. CIV. P. 301; *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). A directed or instructed verdict is proper when (1) a defect in the opponent's pleadings makes them insufficient to support a judgment; (2) the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law; (3) the evidence offered on a cause of action is insufficient to raise an issue of fact; or (4) a legal principle precludes recovery. *John Masek Corp. v. Davis*, 848 S.W.2d 170, 173 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (element #4); *Edlund v. Bounds*, 842 S.W.2d 719, 723-24 (Tex. App.— Dallas 1992, writ denied) (elements # 1,2, & 3).

Whether a legal principle precludes recovery is reviewed de novo. *See Zenith Star Ins. Co. v. Wilkerson*, 150 S.W.3d 525, 530 (Tex. App.— Austin 2004, no pet.). A trial court's decision to deny a motion for a directed verdict

or a JNOV on evidentiary issues is reviewed under the legal sufficiency standard of review. *See Brown v. Bank of Galveston, N. A.*, 963 S.W.2d 511, 513 (Tex. 1998), abrogated on other grounds, *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007). All the evidence is viewed in the light most favorable to the fact challenged or the finding found by the jury and if a reasonable trier of fact could not have formed a firm belief or conviction that the fact or finding was true, a directed verdict and/or a JNOV is proper. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

### 2. Charge Error

The standard of review for jury charge error is abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g). However, "[w]hether a charge submits the controlling issues in a case" and submits them correctly is a question of law reviewed de novo. *See Alamo Cmty. College Dist. v. Browning Constr. Co.*, 131 S.W.3d 146, 160 (Tex. App. — San Antonio 2004, pet. denied) (citing *Cont'l Cas. Co. v. Street*, 379 S.W.2d 648, 651 (Tex. 1964)). A trial court abuses its discretion by acting arbitrarily, unreasonably, or without consideration of guiding principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003).

While a trial court has broad discretion in fashioning the jury charge, it must be legally correct. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). "A trial court has no 'discretion' in determining what the law is or applying the law to the facts, even when the law is unsettled." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (internal quotes omitted) (quoting *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

Charge error is generally considered harmful, when as here, it relates to a contested, critical issue. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). Charge error is reversible if it "probably caused the rendition of an improper judgment." *See* TEX. R. APP. P. 44.1.

> **B. Question No. 2 was immaterial and, thus, harmful because it is legally incorrect in that it did not specifically identify the property supposedly gifted to Sherry nor did it satisfy any exception to the statute of frauds by requiring her to prove the elements of an oral gift of real estate.**

A jury question and its answer are immaterial when (1) the question was defective and should not have been submitted, and/or (2) the answer cannot alter the effect of the verdict. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995) (citing *Fleet v. Fleet*, 711 S.W.2d 1, 2 (Tex. 1986) and *C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966)).

Submission of an immaterial question is harmful, among other reasons, when it confuses or misleads the jury. *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980).

### 1. Question No. 2 was legally incorrect.

Question No. 2 was harmful because it permitted the jury to find that Sherry was entitled to some unidentified, undefined amount of acreage without satisfying any exception to the statute of frauds by proving the elements of an oral gift of real estate.

In rendering its 2011 judgment that Sherry failed to prove the oral gift of the 2000 acres but that she had proved an oral gift of the Foreman's House, the trial court observed that:

> it must be commonly understood . . . that a person must have a significant enough plot of land surrounding the house to enjoy the full aspect of the house.

*McNutt I*, 405 S.W.3d at 204.

Based on that observation and that Bill had reserved five acres surrounding his home to himself when he conveyed the rest of the Ranch, except for his home and that 5 acres, to McNutt Ranch, Ltd. in 2007 for estate planning purposes, the trial court also awarded Sherry five acres surrounding the Foreman's House. RR2/267:4-7 (Trial Court: "since Mr. McNutt reserved

19

5 acres for his whole house, I'm going to go ahead and give 5 acres. That was my ruling."); 2/271:16-18 (Trial Court: *"It's only a presumption that someone needs a little bit of land to enjoy the property they were given.")* (emphasis added). The trial court made that award even though it acknowledged that no one had pled or proved that theory. RR 2/267:10-11.

On remand, the trial court understood this Court's opinion and its statement of the issue to be determined on remand as an affirmation of the trial court's presumption that the gift of a house *automatically* included some amount of land to go with it. RR dtd Feb. 7, 2014, at 4:20-23 (Trial Court: *"*[T]he gift of a house must by nature carry with it a reasonable amount or – – of property for full use and enjoyment of that house*")*; 17:22-25 (*"*[I]t would seem to be necessary that there would be at least some amount of property that would be understood to go with the house for the full use and enjoyment of the house*")*; PRETRIAL MTNS RR dtd 2.7.14, at 5:3-12 (trial court expressed opinion that this Court agreed with trial court's view of the case and remanded two separate issues rather than determination of one issue — theory of gift of house AND accompanying land); 19:1-6 (same).

But there is no legal authority for such a presumption and, in fact, the only authority this writer finds that comes close to addressing that issue is to

the contrary. *See Conner v. Johnson*, No. 02-03-0316-CV, 2004 Tex. App. LEXIS 9633, at*1 (Tex. App.-Fort Worth 2004, pet. denied) (mem. op.) ("Janice [Claimant] bought the small house located on part of the land but not the land itself. She contends Lora Lee [her mother] gave her the plot on which the house is located, as well as the 10 acres adjacent to it.").

The oral gift of real estate claimant in *Connor* bought a small house and leased the 70' by 70' plot of land on which the house sat and the adjoining 10 acres. *Id. at *1-2.* On the death of her mother, claimant asserted that her mother had orally gifted her with the plot on which the house sat and the 10 acres. *Id.* To the contrary, however, her mom had executed a written deed conveying the property to claimant's nephew. *Id.* The house and the land on which it sat owned by different people. *Id.*

The jury heard testimony referring to the disputed realty as "[claimant's] land" and testimony by the claimant's brother that "mom told me she had given [claimant] the land that went with the house" and "that there wasn't any dispute in the family about this and 'it was hers.'" *Id.* at *19. Even so, the jury found that this evidence was NOT clear and convincing and there was NO ORAL GIFT of the plot of land on which claimant's home sat or the adjoining 10 acres. *Id.* at *19, 24.

Here, the trial court read the remanded issue disjunctively as two separate issues to be determined rather than as one question as it should have — the development of the *"legal theory of an oral gift of a house **AND** the necessary plot of land surrounding the house." McNutt I*, 405 S.W.3d at 197 (emphasis added). The trial court understood the question to be determined on remand as: (1) whether there was an oral gift to Sherry of the Foreman's House; and, if so (2) what would constitute *"the necessary plot of land surrounding the house for the full use and enjoyment of the house."* PRETRIAL MTNS RR dtd 2.7.14, at 5:6-12 (*"for consideration on the further development of the *two* issues"*) (emphasis added); PRETRIAL MTNS RR dtd 2.7.14, at 19:1-6. And that is how the trial court submitted the questions to the jury. It did not require Sherry to identify the gift she claimed or present proof as to the elements of an oral gift regarding that acreage.

Thus, the trial court's improper submission permitted the jury to make an award to Sherry without her ever having testified to or having identified in the question to the jury what was allegedly gifted to her by Bill in 1983. RR 3/42:10-17. And, fatally, Question No. 2 did not satisfy any exception to the statute of frauds because it did not require proof of the elements of an oral gift

22

of real estate. Accordingly, this Court should reverse the judgment of the trial court and render judgment that Sherry take nothing.

**2.    The Ranch Entities were entitled to a jury charge consistent with the law of the statute of frauds and the equitable exceptions thereto.**

The court is required to ensure that what it submits is legally correct. *In re Prudential*, 148 S.W.3d at 135. A failure to do so is an abuse of discretion. *See id.* A trial court's refusal to submit the particular items in the charge is reviewed for an abuse of discretion. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000).

The question proposed to the trial court for submission by the Ranch Entities asked:

> Do you find by clear and convincing evidence that William H. McNutt, Jr. [sic][7] made an oral gift of the "foreman's" house and the necessary plot of land surrounding the house for the full use and enjoyment of the house, consisting of 5 acres more particularly described as *[fill in description of gifted property]*, and Pasture #9 consisting of approximately 700 acres to Sherry McNutt?

CR 3/974; RR 4/16:12-18.

The trial court reversibly erred by refusing to submit the Ranch Entities' proposed jury question, which asked about an oral gift of the Foreman's

---

[7] Bill McNutt was not a Jr.

House and the necessary plot of land in one question requiring specific identification of the "plot of land" claimed and proof of the elements of an oral gift of real estate as to the house AND the plot of land.

The Ranch Entities objected to the defects in the trial court's proposed charge, submitted their own proposed question in substantially correct form (CR 3/974), and obtained a ruling denying the submission of that proposed question (RR4/ 17:1 -21). *See Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 227 (Tex. 2010) (citing *State Dep't of Highways v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) for the proper means by which to preserve jury charge error on an erroneous question).

The trial court's failure to submit the Ranch Entities' proposed question improperly permitted the jury to make an award to Sherry without her ever having identified the specific property gifted to her and without her having to satisfy an exception to the statute of frauds by proving the elements of an oral gift of real estate. *See* RR 4/10:4-11, 22-24. The trial court's erroneous refusal to submit the Ranch Entities' proposed question was an abuse of discretion and harmful because it probably led to the rendition of an improper judgment. TEX. R. APP. P. 44.1; *see Harris County v. Smith*, 96 S.W.3d 230, 234-35 (Tex. 2002).

Because Sherry asked for the question to be submitted as it was (RR4/ 14:21-15:7), she cannot now ask for a third bite at the apple. Accordingly, this Court should reverse the judgment of the trial court and render judgment that Sherry take nothing.

**C. The legal principles of the "law of the case," res judicata, and collateral estoppel preclude the trial court from giving effect to the jury's answer to Question No. 2 because of this Court's 2013 judgment holding as a matter of law that Sherry failed to prove an oral gift of the 2000-acre/North Side of the Ranch.**

**1. The law of *this* case precludes retrying an oral gift of the 2000 acres/North Side of the Ranch or any significant part thereof .**

"Under the law of the case doctrine, 'questions of law decided on appeal . . . will govern the case throughout its subsequent stages' and therefore 'a court of appeals is ordinarily bound by its initial decision if there is a subsequent appeal in the same case.'" *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003). While it is generally true that the "law of the case" doctrine is limited to questions of law decided on appeal by a court of last resort, it also applies to decisions of a court of appeals in instances where neither party files for a motion for rehearing in the court of appeals or petition for review challenging the holding in question. *Henry v. Masson (In re*

*Henry)*, 388 S.W.3d 719, 728 (Tex. App.— Houston [1st Dist.] 2012, pet. denied).

Sherry is, thereby, precluded by the *"law of the case"* from arguing and proving that the *"necessary plot of land surrounding the house"* is the 2000-acre/ North Side of the Ranch or that any significant part of it was gifted to her because that issue has previously been resolved as a matter of law. *See id.* at 728 (issue already decided as a matter of law, thus, no fact issue to be determined).

Had there been sufficient evidence presented in the previous trial to substantiate the elements of an oral gift as to a significant portion of the North Side of the Ranch, including the Foreman's House, this Court would have reversed the previous judgment of the trial court and found for Sherry in 2013 on her initial claim of an oral gift of the entire North Side of the Ranch . But it did not do that. Thus, Sherry cannot re-argue and retry an oral gift of the 2000 acres or any significant portion of it because this Court has already adjudicated that issue and found that Sherry failed to prove her "possession" of the 2000 acre/ North Side of the Ranch. *McNutt I*, 405 S.W.3d at 196-97.

Instead, having decided that there was no gift of the 2000 acres, this Court remanded this cause for the possible development of the theory of an

oral gift of the "Foreman's House" and a "little bit" of land surrounding it on which the house could sit for its full use and enjoyment, not for a retrial of the previously decided issue. *See id.*

This Court's opinion and judgment in the 2013 appeal is the law of the case and no claim or issue determined there may be retried here. Hence, the issue of an oral gift of the 2000 acres or any significant part of it, which was previously adjudicated, cannot be retried by consent even if counsel had "opened the door," which the trial court ruled he had not. *See id.*; *see also* RR 2/197:14-15, 219:12-14.

> **2. Res judicata and collateral estoppel prevent the relitigation of claims or issues resolved in a prior dispute and, as a consequence, preclude a judgment in Sherry's favor on Question No. 2.**

Res judicata prevents the relitigation of a claim or cause of action that has been finally adjudicated in a prior lawsuit. *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex. 1992). This Court affirmed the trial court's judgment that Sherry failed to prove an oral gift of the 2000-acre/ North Side of the Ranch at the 2011 trial. *McNutt I*, 405 S.W.3d at 197. Despite Sherry's consistent violation of the trial court's numerous admonitions not to inject the issue of a gift of the 2000-acre, North Side into this retrial, the trial court was

precluded from entering judgment for Sherry for any substantial part of the 2000-acre, North Side of the Ranch and it reversibly erred by doing otherwise.

Similarly, the legal concept of collateral estoppel, also known as issue preclusion, "prevents the relitigation of a fact issue resolved in a prior dispute" as a matter of law. *Barr*, 837 S.W.2d at 628. The fact issues of whether Sherry took dominion and control of the 2000-acre, North Side of the Ranch in 1983 and from that time forward to the exclusion of Bill have already been decided adversely to her and, therefore, cannot be re-litigated and decided differently here.

Thus, the trial court was precluded from giving effect to the jury's answer to Question No. 2 by the legal principles of relating to (a) the law of the case; (b) res judicata; and (c) collateral estoppel. Accordingly, this Court should reverse the judgment of the trial court and render judgment that Sherry take nothing.

### D. The jury's answer to Question No. 2 is immaterial for the additional reason that it does not conform to the pleadings.

It is elementary that a judgment must conform to the pleadings and proof. TEX. R. CIV. P. 301. A plaintiff may not be granted relief not requested by her pleadings unless there has been trial by consent. *Oilfield Haulers Ass'n*

28

*v. R. R. Comm'n of Tex.*, 381 S.W.2d 183, 191 (Tex. 1964). The mere introduction of testimony on a given issue does not amount to trial by consent. *Wendell v. Central Power & Light Co.*, 677 S.W.2d 610, 618 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.) (quoting *Harkey v. Tex. Employers' Ins. Ass'n*, 146 Tex. 504, 208 S.W.2d 919, 922 (1948)). Important to the analysis here is that Sherry never pled for "½ of North Side." Even if she had, however, the trial court's judgment is defective on its face because it does not define what constitutes "½ of North Side."

Besides, the Ranch Entities repeatedly and vehemently objected to the injection of the issue of a gift of the North Side. Sherry cannot now claim that issue was tried by consent or because the Ranch Entities' counsel supposedly "opened the door." *See Wendell*, 677 S.W.2d at 618. Even if parties do not object to the testimony, which the Ranch Entities strenuously did here, an issue cannot be regarded as impliedly being tried by consent when that party's objection to the submission of that issue — a gift of the 2000-acre North Side — is made clear to the trial court. *See, e.g.*, RR2/155:6, 194:11, 200:20, 262:14.

More than that the trial court summarily rejected Sherry's counsel's claims that counsel for the Ranch Entities had opened the door to a discussion of a gift of the North Side observing that, instead, counsel's mention of the

North Side amounted to an attempt to impeach Sherry on her changing allegations. RR 2/197:13-24 (Court: "Nothing he said opened that door – not as far as a gift of the north side. . . . Only that she claimed it – a number of years before she changed her claim. There is a world of difference between that."); RR2/218:9-16 ("anyone can be impeached by prior testimony," RR2/219:1-5 (sworn pleadings are judicial admissions).

Sherry's purposeful and persistent attempts to infect the jury deliberations with claims of a gift of the "North Side" violated this Court's opinion and judgment, the motions in limine, and the trial court's numerous and repeated admonitions that the issue of the oral gift of the "North Side" or the "2000 acres" could not even be mentioned much less be retried. RR 2/ 194: 20-21 (Court: "no reference to a gift of the 2,000 acres is to be mentioned, period");RR2/155:11- 156:17, 194:13-195:12, 196:17-200:14, 263:5- 274:24; *see also* PRETRIAL MTNS RR dtd 2.7.14, at 42:21-43:2, 43:8-11, 44:6-18, 45:4-6.

Sherry presented two other witnesses at trial besides herself, David Ross and Tom Mayo. Her intentional violations of the Motion in Limine began with her first witness, David Ross. The trial court repeatedly admonished Sherry's counsel about staying away from discussion of any gift of or any statements

about the North Side as is seen by the example set out below. Sherry's counsel assured the Court that he was going to avoid reference to the North Side, but he did not.

> Court: But not any gift of or any statements about the north side . . .
>
> Sherry's counsel: I'm going to avoid the north side.

RR 2/153:2-5.

Sherry's counsel then attempted to elicit testimony from her witness, Mr. Ross, about the gift of the North Side.

> Q. All right. Now, did he ever make any comments to you, if he did, regarding the acreage on the north side of the ranch?
>
> A. Yes. He –
>
> Ranch Counsel: Objection, Your Honor.
>
> Court: Sustained.
>
> Q. (By Sherry's counsel) Okay. Okay. That's on the north side of I-10?
>
> A. Yes. He referred to that –
>
> Ranch Counsel: Objection, Your Honor. Right there. That's a violation of Motion in Limine 17 and 18.
>
> Court: Approach the bench.
>
> (At the bench out of the hearing of the jury.)

| | |
|---|---|
| Court: | You're about to let him go into talking about giving her the north side. |
| Ranch Counsel: | Yeah. |
| Court: | You can't do that. |
| Sherry's counsel: | Yeah. Okay. Well, the question that you have in – |
| Court: | I know, but I know what he's going to answer too, and it's objectionable. It's improper under my rules on – and Motion in Limine – |
| Sherry's counsel: | Uh-huh. |
| Court: | -- and so you can't go into it at this time. |
| Sherry's counsel: | Well, Judge, I'm – I'm going to refrain from using the words, and the words in the Motion in Limine were "the north side." I'm going to talk about acreage on the north side for the necessary use of the house. |
| Court: | That's not what is being asked. |
| Sherry's counsel: | Okay. Okay. |
| Court: | You didn't ask it that way – |
| Sherry's counsel: | Okay. |
| Court: | --and you asked it in a way that would let him testify – |
| Sherry's counsel: | All right. |
| Court: | --the whole 2,000 acres has been given to her. We've already ruled on that. |

RR 2/154:21-156:13.

Sherry's counsel continued to ignore the trial court's warnings and also

violated the Motion in Limine with Sherry's second witness, Tom Mayo:

Q.     [Sherry's counsel] All right, and what – did he ever refer to any restrictions on Sherry's use, occupation, possession of that acreage on the north side of I-10?

A.     No.  It was her place.

Q.     Okay.

       Ranch Counsel:   Objection, Your Honor.  I mean, we're talking about "it was her place," the home?  Because we're – what he's doing is he's baiting him in to violation Motion in Limine 17 and 18.

       Sherry's counsel:        No.

Court:      Let me ask the jury to step out – the jurors will step out for just a few moments.

                    (The jury left Courtroom.)

Court:              Mr. Nichols:

Sherry's counsel:       Yes.

Court:              Unless you want to avoid a mistrial in this case, you must let your witnesses know no reference to a gift of the 2,000 acres is to be mentioned, period.

RR 2/194:3-21.

The trial court noted that an instruction to the jury to disregard the

objectionable question and answer wouldn't cure the prejudice inflicted upon the opposing party. RR 2/195:5.

Sherry was the third witness called to testify. Her counsel made another attempt at injecting the gift of the North Side into the deliberations by asking Sherry about her attempts to pay taxes on the pastures on the north side of IH 10. RR 2/238:10-22. Sherry intentionally violated the trial court's previous cautions and warnings when asked by her counsel what property she would need for the full use and enjoyment of the house by answering she "had full use of all the pastures on the north side." RR 2/262:9-14. At that point Ranch Counsel objected that she was violating "Motion in Limine 17 and 18," whereupon the trial court, again, admonished Sherry's counsel:

Court:    If you continue to try to get in what historically from the beginning of this appeal has been ruled by the appellate courts, has been ruled upon by me that you cannot go into, I don't care what else happens in this case, at the end of it I'm going to give a directed verdict in favor of the Defendants. Now, I'm just telling you right now what I'm going to do.

RR 2/263:5-12.

Court:    -- I don't know how many times I have to go through this. I don't think you fully understood or you're refusing to understand the appellate court's decision.

That decision is that they are giving you one opportunity to do what I have found about an oral gift of the house, and in

34

my findings I said there should be a reasonable amount of land to enjoy that. I have no idea from the testimony, but since Mr. McNutt reserved five acres for his whole house, I'm going to go ahead and give five acres. That was my ruling.

RR 2/266:22-267:7.

Court: But the fact is, you can – you cannot go into specific pieces of – of pastures. Now, whether you want to go into a specific amount of acreage and have her explain how – it's subject to cross-examination of course.

RR 2/267:25-268:6.

The trial court acknowledged the prejudicial effect of Sherry's repeated violations of the motions in limine and her continuous attempts to interject a gift of the North Side into this trial when it stated in reference to those violations, "the cat's out of the bag, so to speak." RR 2/269:20. Further, the trial court warned Sherry, as it had earlier in the day, that it was getting to the point where the court had no other choice but to declare a mistrial. RR 2/270:2-6.

Despite the trial court's multiplicity of admonitions and warnings starting at the February 2014 pretrial hearings and continuing through the trial itself for all of which Sherry was in attendance, she intentionally violated the Motion in Limine at her first opportunity under cross-examination. RR 3/42:10-17. Ranch Counsel specifically asked her about her conversation with

her father only about his supposed gift to her of the "foreman's house" and she immediately injected the issue of a gift of the entire North Side of the ranch. RR 3/42:10-17.

The Ranch Entities repeatedly objected to Sherry's persistent attempts to interject the issue of a gift of the North Side/2000 acres into this trial. RR2/155:6, 194:11, 200:20, 262:14. And the trial court continuously warned Sherry of the adverse consequences of her actions. RR2/194: 18-20, 263:2-12, 270:2-6. Nonetheless, she intentionally infected the jury's deliberations by ignoring all the prior orders and warnings. *See, e.g.*, RR 3/42:16-17 ("he would give me half the ranch").

The effect of Sherry's and her witnesses' improper injection of the issue of the gift of the North Side into this trial is evident from the jury's answer to Question No. 2. The only reason the jury would have to use the phrase "½ of North Side" in response to Question No. 2 is because of Sherry's continued interjection of the "North Side" into this case and her ongoing disobedience of the trial court's explicit rulings on the motions in limine and its definitive instructions to the contrary. *See, e.g.*, RR 2/194:3-21 (Court: "no reference to a gift of the 2,000 acres is to be mentioned, period").

Question No. 2 was improper because it submitted an issue to the jury

based on a theory unknown to the law and, thus, the jury's answer to that question is immaterial. Moreover, the legal principles of scope of the remand, law of the case, res judicata, and collateral estoppel preclude any award to Sherry based on the jury's answer to Question No. 2.

Accordingly, because Sherry failed to develop the theory of an oral gift of the Foreman's House AND an appropriate amount of acreage for the full use and enjoyment of that house, this Court should reverse the judgment of the trial court and render judgment that Sherry take nothing.

**III. The jury's verdict is not supported by legally or factually sufficient clear and convincing evidence that would produce a firm belief or conviction that Bill gave Sherry the Foreman's House or any other part of the ranch in 1983.**

**A.  Standard of Review for clear and convincing evidence.**

**1.  Legal Sufficiency**

A person claiming an inter vivos gift must prove the gift by clear and convincing evidence. *Nipp v. Broumley*, 285 S.W.3d 552, 558-59 Tex. App. – Waco 2009, no pet.) (citing *Hayes v. Rinehart*, 65 S.W.3d 286, 289 (Tex. App.— Eastland 2001, no pet.) and *Dorman v. Arnold*, 932 S.W.2d 225, 228 (Tex. App.— Texarkana 1996, no writ)). Because of this elevated burden of proof at trial, an elevated standard of review also applies on appeal. *Sw. Bell*

*Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004).

No evidence points of error must be upheld when the record discloses: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence established conclusively the opposite of the vital fact; or because the evidence is too weak. *Garza*, 164 S.W.3d at 627 & n.30; *Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 666 n.9 (Tex. 1990) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362-63 (1960) (hereafter "Calvert").

*"No evidence"* means not only a complete absence of evidence but also evidence which cannot be given legal effect, either because the law does not permit it or because the evidence is too weak. *Garza*, 164 S.W.3d at 627 & n.30 (citing Calvert). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is, in legal effect, no evidence, and will not support a verdict or judgment." *Garza*, 164 S.W.3d at 627 & n. 31.

But when proof of an allegation must be clear and convincing, even evidence that does more than raise surmise and suspicion will not suffice

unless it is capable of producing a firm belief or conviction that the allegation is true. *Id.* "As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "Evidence of lesser quality is, in legal effect, no evidence. Whether evidence is of such quality is thus a question of law." *Garza*, 164 S.W.3d at 621.

## 2. Factual Sufficiency

The traditional factual sufficiency standard "is inadequate when evidence is more than a preponderance (more likely than not) but is not clear and convincing." *In re J.F.C.*, 96 S.W.3d at 264. To be factually sufficient evidence under the heightened clear and convincing standard, the evidence must have been of such quality that the jury could determine that the existence of the fact at issue was "highly probable." *In re C.H.*, 89 S.W.3d at 19. That is, "the evidence [must be] sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." *Id.*

**B.     As an exception to the statute of frauds, the rules for proving  the elements of an oral gift of real estate are strictly enforced.**

An oral gift of real estate is an exception to the writing requirement in the Property Code and the statute of frauds. TEX. PROP. CODE ANN. § 5.021; see TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(4); *Stetson*, 390 S.W.2d at 262 (exception to writing requirements in conveyances are strictly enforced). To satisfy the Property Code and take an oral gift of real estate from under the ambit of the statute of frauds, a claimant must prove: (1) a gift "in praesenti," that is, a gift that takes effect immediately; (2) immediate possession of the gift by the donee with the donor's consent; and (3) permanent and valuable improvements or the existence of such facts as would make it a fraud upon the donee not to enforce the gift. *Thompson v. Dart*, 746 S.W.2d 821, 825 (Tex. App.— San Antonio 1988, no writ); *see Dawson*, 242 S.W.2d at 192-93.The intent of the donor is the principal issue in determining whether a gift has been made. *Thompson v. Lawson*, 793 S.W.2d 94, 96 (Tex. App.— Eastland 1990, writ denied).

"To constitute a gift inter vivos there must not only be a donative intention, but also a complete stripping of the donor of all dominion or control over the thing given."*Peterson v. Weiner*, 71 S.W.2d 544, 546 (Tex. Civ. App.-

San Antonio, 1934, writ ref'd). "[A]n inter vivos gift can have no reference to the future, but must go into immediate and absolute effect."*Akin v. Akin*, 649 S.W.2d 700, 704 (Tex. App.—Ft. Worth 1983, writ ref'd n.r.e.). A donee's possession must be in the nature of an owner's right to control. *Dawson*, 242 S.W.2d at 194.

"A mere intention to make a gift, however clearly expressed, which has not been carried into effect, amounts to nothing, and enforces no rights in the subject matter of the proposed gift upon the intended donee. The intention must be effective by complete and unconditional delivery." *Grimsley v. Grimsley*, 632 S.W.2d 174, 178 (Tex. App.— Corpus Christi 1982, no writ) (quoting *Harmon v. Schmitz*, 39 S.W.2d 587, 589 (Tex. Comm'n. App. 1931, judgm't adopted)).

Moreover, as stated earlier, "the description of land which is the subject of a parol gift should . . . be governed by the settled rule for written conveyances." *Stetson*, 390 S.W.2d at 263. Thus, because "a written conveyance must furnish within itself or by reference to some other existing writing, the means or data by which the particular land conveyed can be identified," the claim of an oral gift of real estate must do the same. *Id*. An oral gift of undescribed land is void. Id. at 261, 263 (finding parol gift of land void

because it lacked a description).

## 1. The Foreman's House

Sherry presented no more evidence on retrial than what she had presented in the original trial to the bench, which on appeal in 2013 this Court thought was insufficient to affirm the judgment of the trial court. She offered a 2005 letter from Bill McNutt's attorney to her referring to the Foreman's House as "your home." RR 6/PX4 (Harry Adams' Letter to Sherry) (App'x Tab 3). Rather, to the contrary, that very letter, which Sherry contends is some evidence of her ownership of the Foreman's House, sets out Bill's rules "which will be enforced" if Sherry intended to continue "*staying at his ranch*." RR6/PX4 (emphasis added). In fact, Sherry testified she complied with Bill's rules as mandated by that letter. RR 3/108:22. ("Q. Okay, and – and you abided by those rules, didn't you?" Sherry: "A. Yes, I did."). Bill certainly didn't think he had given the house or any of "his ranch" to Sherry.

The only other evidence that could conceivably be argued to be evidence of Sherry's ownership of the Foreman's House and a gift of it to her by Bill is the testimony of two of Sherry's friends neither of whom met her until 1994 or 1995 — 11 or 12 years after the supposed gift was made. David Ross testified when asked about the house on the North Side of the McNutt Ranch that "it

was the previous ranch foreman's house and that it was given to Sherry." RR 2/153:23-24; 154:20. Mr. Ross stated that he assisted Sherry in doing some undescribed remodeling of the house. But he specifically disclaimed any knowledge of *when* the supposed gift of the Foreman's House was allegedly made to Sherry. RR2/165:7. Tom Mayo, who also did not meet Sherry until long after the 1983 gift was supposedly made, testified similarly to nothing more than that he had heard the Foreman's House referred to as Sherry's. RR 2/191:6-8.

While the foregoing may arguably be a scintilla, that is not sufficient here because the standard is clear and convincing evidence, which requires a greater quantum of proof. The evidence is not legally or factually sufficient to constitute clear and convincing evidence satisfactory to produce a firm belief or conviction in a reasonable person that Bill gifted the Foreman's House or any other part of the Ranch to Sherry in 1983. The evidence to the contrary is overwhelming.

When Bill conveyed all of the Ranch except for his house and the surrounding 5 acres to the Ranch Entities for estate planning purposes in 2007, he did not except out the Foreman's House as already having been given to Sherry. Just as telling as the foregoing, the evidence shows Bill was

43

extraordinarily meticulous in his record-keeping and very diligent in adhering to his reporting requirements. RR 3/156:9. This is significant because Bill gifted a four-plex in Colorado to Sherry in 1983 and filed a gift tax return with the IRS reflecting the gift with that year's return. RR3/153:17-154:6; DX 31. He never filed a gift tax return at any time showing that he gave Sherry the Foreman's House or any real estate at the Ranch. RR3/156:14-15 (filing a gift tax return as to one gift and not as to another "would have been completely out of character for [Bill]").

As at the last trial, the testimony, particularly Sherry's, showed overwhelmingly that Bill paid for all of the improvements to the North Side, INCLUDING the Foreman's House. *See, e.g.*, RR 3/44:13-14, 17 ; 45:25; 46:3, 6. Sherry never produced one receipt or any other original documentation to substantiate her claim that she had paid for *"some"* of the repairs on the Foreman's House. RR 3/44:24-45:18 (Sherry: "I haven't showed you anything. No, sir."); 3/46:20 (Sherry: "No [receipts] sir. No, sir.").

Sherry, again, failed to prove that Bill gave up dominion and control of the Foreman's House as of 1983. The mere references to the Foreman's House as *"your home"* or *"Sherry's house"* are just as likely to be a shorthand reference to a place where a person lives or stays, such as *"Sherry's apartment"*

44

or "trial counsel's room at the Best Western Motel" as it is to denote ownership. In fact, referring to the building at issue as the "Foreman's House" proves the point in that the foreman lived in that house and it was referred to as the "Foreman's House," but he did not own it.

The Supreme Court of Texas has held that when "only meager circumstantial evidence suggests what happened, we cannot disregard other meager evidence of equally likely causes." *City of Keller*, 168 S.W.3d at 814. Where the circumstances "are equally consistent with either of two facts . . . neither fact may be inferred." *Id.* Indeed, under the equal inference rule evidence of circumstances equally consistent with two facts is legally insufficient to prove either. *See City of San Antonio v. Rodriguez*, No. 04-13-0116-CV, 2013 Tex. App. LEXIS 11169, at*11, 2013 WL 4682192 (Tex. App.—San Antonio Aug. 30, 2013, pet. denied) (citing *City of Keller*, 168 S.W.3d at 813 and *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)).

Because the reference to the Foreman's House as "Sherry's home" is as equally consistent with it simply being the place she stayed as it is to a place she owned, the evidence is so meager it could not produce a firm belief or conviction in a reasonable person that Bill gifted the Foreman's House to Sherry in 1983. The meager circumstantial evidence presented here by Sherry

is legally insufficient because "jurors would have to guess whether a vital fact exists." *City of Keller*, 168 S.W.3d at 813. Such limited evidence does not make it "highly probable" that the fact sought to be proved is true. Accordingly, the judgment of the trial court should be reversed and this Court should render judgment that Sherry take nothing.

### 2. Answer to Question No. 2 — "½ of North Side"

When a charge is submitted to the jury without objection, the sufficiency of the evidence is measured against the charge that was given. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). However, when a charge is defective and a complaining party makes its objection known to the court, the sufficiency of the evidence is measured against the charge that should have been given. *See Diamond Shamrock Refining & Mktg. Co. v. Mendez*, 844 S.W.2d 198, 200 (Tex. 1992) (reviewing sufficiency of the evidence against a proper definition of the cause of action at issue).

Out of an abundance of caution the Ranch Entities will discuss the sufficiency of the evidence both as it relates to the charge that should have been given as well as the charge that was given.

### a. The evidence was insufficient to produce a firm belief or conviction in a reasonable person based on the jury question that *should have been* asked.

As set out in detail in sections I and II. B., above, Sherry was required to specifically identify the real property allegedly orally gifted to her by Bill in 1983. *See Stetson*, 390 S.W.2d at 261. Further, to satisfy an exception to the statute of frauds, which requires all conveyances of real estate to be in writing, Sherry was required to prove the elements of an oral gift of real estate made to her by Bill in 1983 not only as to the Foreman's House but also as to the "necessary plot of land" for the full use and enjoyment of the house. *Dawson*, 242 S.W.2d at 192-93.

The question the trial court should have asked was:

> Do you find by clear and convincing evidence that William H. McNutt, Jr. [sic] made an oral gift of the "foreman's" house and the necessary plot of land surrounding the house for the full use and enjoyment of the house, consisting of 5 acres more particularly described as [*fill in description of gifted property*], and Pasture #9 consisting of approximately 700 acres to Sherry McNutt?

CR3/974 (Ranch Entities' proposed jury question).

As can be seen by reference to the pleadings, Sherry asserted in her Thirteenth Amended Petition that in 1983 Bill gave her the Foreman's House, 5 acres surrounding the house, and Pasture 9. App'x Tab 5 (THIRTEENTH

AMENDED PETITION). However, there was no description of the 5 acres surrounding the house or of Pasture 9 in the pleadings, the evidence, or the question to the jury.

Therefore, the evidence is legally and factually insufficient in that regard because it would require the jury to speculate as to what was gifted to Sherry. The open-ended manner Question No. 2 was submitted to the jury asking only, "How much land?" is akin to the jury finding in answer to a predicate question, "Yes, Sherry was given a necklace" and then being asked as a follow up in a second question, "Which necklace?"

The insufficiency of the evidence regarding the elements of an oral gift as to the Foreman's House have been discussed above and need not be repeated here. What was missing in the trial court's submission of Question No. 2 was a requirement that, for the jury to find for Sherry, she had to prove the elements of an oral gift of real estate as to a specifically defined "plot of land" that supposedly accompanied the gift of the house.

In relation to Sherry's pleading that, in addition to the Foreman's House, Bill gave her five acres and Pasture 9 in 1983, the trial court aptly observed:

Court:     [Y]ou can't prove one bit of that, and you know it. You can prove he gave her the house maybe by this testimony that you're trying to present. You can't show one bit of testimony he said, Sherry McNutt, you can have five acres and Pasture

48

|  |  | 9. He never said that; you know it. |
| --- | --- | --- |
| Sherry's Counsel: | | What about five acres? |
| Court: | | He never said that. It's only [a] presumption that someone needs a little bit of land to enjoy the property they were given. |

RR2/271:12-18.

Ironically, Sherry never mentioned the 5 acres or Pasture 9 in her testimony. There is no evidence Sherry can point to, testimonial or otherwise, that in 1983 Bill gave her five acres surrounding the Foreman's House and Pasture 9. More than that, because neither the five acres nor Pasture 9 is defined Sherry cannot show she exercised dominion or control over it or that she made permanent and valuable improvements to something that has no definite location. Moreover, it has already been determined as a matter of law that Sherry did not demonstrate possession of the 2000 acres/North Side of the Ranch by exercising control of it to the exclusion of Bill. *McNutt I*, 405 S.W.3d 196-97.

Consequently, Sherry's claim is legally and factually insufficient as to the question as it should have been submitted in that it is impossible for the finder of fact to develop a firm belief or conviction as to the basic elements necessary to prove an oral gift of real estate. Thus, this Court should reverse the

49

judgment of the trial court and render judgment that Sherry take nothing.

### b. The evidence was insufficient to produce a firm belief or conviction in a reasonable person based on the jury question as it was *actually* asked.

In Question No. 2, the trial court asked the jury:

What amount of land, if any, do you find from clear and convincing evidence to be necessary for Sherry McNutt to have full use and enjoyment of the "foreman's" house?

CR 3/997.

When Sherry's counsel asked her the $64,000 question during trial — "What do you feel would be necessary for you to have for the full use and enjoyment of that house over there on the north side of I-10?" — Sherry answered, "acreage enough to run those operations," referring to raising cattle, sheep, goats, and hunting deer, wild game or exotic game. RR 3/10:14-11:2. She never testified to what she pled in her Thirteenth Amended Petition nor did Sherry testified to a specific amount of acreage necessary for the full use and enjoyment of the Foreman's House.

Sherry's entire thesis was that she needed enough land to *make a living*, not simply enough land for the full use and enjoyment of the house. RR 3/11:12-16.Her counsel, in response to an objection by the Ranch Entities' counsel, made it abundantly clear that Sherry's objective was to be awarded

50

enough property to make a living as opposed to just enough to enjoy the Foreman's House when he stated, "I think most houses are negative cash flow pieces of property that have electricity, upkeep, maintenance, and all that require money, and money requires income, and that's the basis for the question." RR 3/11:12-16.

Because of the lack of evidence as to the identity or amount of what was being claimed, the jury was left no choice but to improperly speculate as to what amount of land would be necessary for Sherry to have for the full use and enjoyment of the Foreman's House. While a jury has the discretion to make an award within the range of the evidence presented so long as there is a rational basis for its calculation, it cannot "arbitrarily fix an amount neither authorized nor supported by the evidence." *Shearer's, Inc. v. Lyall*, 717 S.W.2d 128, 130, (Tex. App.— Houston [14th Dist.] 1986, no writ); *see Holland v. Lovelace*, 352 S.W.3d 777, 792 (Tex. App.—Dallas 2011, no pet.).

There is no evidence here from which the jury could answer "½ of North Side" other than to base its answer on rank speculation. *See Examination Mgmt. Servs. v. Kersh Risk Mgmt.*, 367 S.W.3d 835, 844, (Tex. App.— Dallas 2012, no pet.) (reversing judgment because plaintiff failed to provide "reliable, non-speculative" testimony from which damages could be determined with

51

"reasonable certainty").

Because there is no legally or factually sufficient evidence from which the jury could form a firm conviction and belief as to any specific "amount of land . . . to be necessary for Sherry McNutt to have full use and enjoyment of the 'foreman's' house," this Court should reverse the judgment of the trial court and render judgment that Sherry take nothing.

**IV.  Jurors engaged in misconduct by ignoring the trial court's instruction not to let bias or sympathy play any part in their deliberations and by considering and discussing facts outside the record evidence in this case.**

A court should grant a new trial if the jury engaged in misconduct, the misconduct was material, and the misconduct caused injury. *See Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000); *Redinger v. Living Inc.*, 689 S.W.2d 415, 419 (Tex. 1985).The Charge of the Court explicitly instructed the jury: "do not let bias, prejudice or sympathy play any part in your deliberations."CR 3/ 993, at ¶ 1 ( Charge of the Court). The Court further instructed the jury that it must "not consider or discuss anything that is not represented by the evidence in this case" (CR 3/993, at¶ 2.), cautioning the jurors that if they have "disregarded any of these instructions, it will be jury misconduct" (CR 3/994, at ¶ 6).

Certain members of the jury panel responded to voir dire questions with

52

untruthful, erroneous, or incomplete answers and violated the trial court's instructions not to let bias or sympathy play into the rendition of their verdict. Members of the jury also engaged in misconduct by ignoring the Charge of the Court and improperly injecting outside information into the deliberations.

Specifically, Jury Foreman Aubrey Kothmann injected facts outside the evidence contained in the record and ignored the trial court's instructions to the jury when he stated to other jurors that "he knew Bill McNutt in the year 2000 and that Bill McNutt didn't know what he was doing and was not mentally competent." *See* CR 3/1198 (Affidavit of Juror Daniel Meyer). He stated further that "David Boland instigated the problems and that somehow he influenced Mr. McNutt's decision-making in kicking Sherry off the ranch." CR 3/1198-99, 1201 (Affidavits of Jurors Daniel Meyer and Dale Gipson).

Kothmann stated, further, that irrespective of the evidence his mind was made up and that Sherry deserved the entire north side of the ranch because "he [Kothmann] knew what Bill McNutt would have wanted to have happened with his ranch and that he [Kothmann] had made up his mind and was not going to move from his position." CR 3/ 1199, 1201.

Because of the adamance of Jury Foreman Kothmann and his willingness to disregard the evidence, the jurors traded answers in an effort

53

to bring deliberations to a close in that the jurors "knew that we couldn't get out of deliberations unless we compromised and no one was happy about compromising." CR 3/ 1199.

The Affidavit of Juror Daniel Meyer also shows that Juror Gary Gardner admitted to the trial court during a closed-door session after the trial was over that he also disregarded the trial court's instructions to set aside bias, prejudice, or sympathy when he stated to the trial court that "there was no way he could have put Sherry McNutt out on the street." CR 3/1198.

This rationale for disobeying the instructions of the trial court is particularly ironic in light of the fact that the credible evidence shows without exception that Sherry did not live on the Ranch at the time of trial and had not lived there in the since her mother died in 2006. RR2/170:7-8 ("Q. When was the last time that Sherry McNutt lived in that house, sir?" Sherry's witness, David Ross: "A. I don't know. I would guess that it was six or seven years ago maybe."); RR3/98:14-100:13; RR6/DX 10 (photographs dtd May 14, 2014 on inside of Foreman's House showing refrigerator with spoiled food and animal feces throughout the house);

**CONCLUSION**

Because the theory upon which the trial court rendered judgment at the

2011 trial was not fully developed in that it had neither been pled nor proved, this Court remanded this cause of action for a new trial for Sherry to develop the "legal theory of an oral gift of a house AND the necessary plot of land surrounding the house for the full use and enjoyment of the house." *McNutt I*, 405 S.W.3d at 197. But Sherry failed to do so.

Instead, Sherry attempted to relitigate the issue that had already been decided against her by this Court as a matter of law in the first appeal — the oral gift of the 2000-acre , North Side of the McNutt Ranch. By violating the law of the case and the orders of the trial court to not inject the issue of a gift of the North Side into the retrial, Sherry failed to take advantage of the opportunity presented to her to prove the oral gift of the Foreman's House and some little bit of land surrounding that house on which it could set.

With Sherry's acquiescence and encouragement, the case was submitted to the jury on a theory unknown to the law, that is you automatically get some small amount of land with the gift of a house without proving the elements of an oral gift of real estate or even identifying the confines of that "plot of land." Even so, Sherry failed to prove that Bill gave her the Foreman's House in 1983 and she also failed to prove that she was given any amount of land in 1983 by any standard, whether it was as the question should have been submitted or

as it actually was submitted.

**PRAYER**

Accordingly, this Court should reverse the judgment of the trial court and render judgment that Sherry take nothing. In the alternative, this Court should reverse the judgment of the trial court and remand this cause for a new trial, with instructions that Sherry be required to prove the elements of an oral gift of real estate both as to the Foreman's House and as to any explicitly defined plot of land she claims is necessary for the full use and enjoyment of the Foreman's House but not as a means to make a living.

Respectfully submitted,

/S/ *Jeff Small*

| | |
|---|---|
| Craig L. White | Jeff Small |
| State Bar No. 21292400 | State Bar No. 00793027 |
| LAW OFFICE OF CRAIG L. WHITE | LAW OFFICE OF JEFF SMALL |
| 111 West Olmos Drive | 12451 Starcrest Dr, Suite 100 |
| San Antonio, Texas 78212 | San Antonio, TX 78216.2988 |
| 210. 829.7183/f: 210. 829.0734 | 210.496.0611/f: 210.579.1399 |
| craigwhite@111westolmos.com | jdslaw@satx.rr.com |

Counsel for Appellants

**CERTIFICATE OF COMPLIANCE**

In accordance with Texas Rule of Appellate Procedure 9.4, by signature below I certify that the foregoing computer-generated brief contains 12,396 words.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of July, 2015, a true and correct copy of the Brief of Appellants was served on counsel of record/interested parties in accordance with the Texas Rules of Civil Procedure.

John F. Nichols, Sr.
State Bar No. 14996000
NICHOLS LAW, PLLC
5020 Montrose, Suite 400
Houston, Texas 77006
713.654.0708/F: 713.654.0706
john@nicholslaw.com

/S/ *Jeff Small*

Jeff Small
Craig L. White

# No. 04-15-0110-CV

In the Court of Appeals
for the Fourth District of Texas
Sitting at San Antonio

**IN RE THE ESTATE OF
WILLIAM H. MCNUTT, DECEASED**

On Appeal from the County Court of Kimble County, Texas
Sitting in Matters Probate; Cause No. 2284
Hon. Joe H. Loving, presiding

**Appendix to Brief of Appellants
McNutt Ranch, Ltd., DMK Ranching, L.L.C., and
McNutt Management, L. L. C.,  Gen. Ptnr. McNutt Ranch, Ltd.**

Craig L. White
State Bar No. 21292400
Law Office of Craig L. White
111 W. Olmos Dr.
San Antonio, TX 78212
210.829.7183/F: 210.829.0734
craigwhite@111westolmos.com

Jeff Small
State Bar No. 00793027
Law Office of Jeff Small
12451 Starcrest, Suite 100
San Antonio, TX 78216.2988
210.496.0611/F: 210.579.1399
jdslaw@satx.rr.com

Counsel for Appellants

# TAB 1

## NO. 2284

| | | |
|---|---|---|
| IN RE THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| WILLIAM H. McNUTT, | § | OF |
| | § | |
| DECEASED | § | KIMBLE COUNTY, TEXAS |

## FINAL JUDGMENT

Be it remembered that on November 17, 2014, came on for consideration the jury trial, on the merits, in the captioned cause.

**I. Announcements** - Sherry McNutt, appeared in person and through counsel, John F. Nichols, Sr., of Nichols Law, Houston, Texas, announced "ready" for trial. Defendants, McNutt Ranch, Ltd.., DMK Ranching, L.L.C., and McNutt Management, L.L.C., the General Partner of McNutt Ranch, Ltd., by and through their counsel, Craig White, Allen J. Ahlschwede, and Jeffrey D. Small, also announced "ready" for trial.

The trial was reported by Lisa C. Greernwalt, of Greenwalt Court Reporting.

**II. Jury Selection** - A panel of venire were sworn in and a six-person Kimble County, Texas, jury of five (5) men and one (1) woman were selected, consisting of:

1. Mr. Aubrey Kothmann - Foreman;
2. Ms. Bethany Martin;
3. Mr. Gary Neisemeir;
4. Mr. Jack "Gary" Gardner, Jr.;
5. Mr. Dale Gipson; and
6. Mr. Daniel Meyer.

**III. Opening Statements** - Opening statements were made by John Nichols, Sr., for the Plaintiff, Sherry McNutt, and by Craig White for the Defendants.

**IV. Case-in-Chief** - As counsel for Plaintiff Sherry McNutt, John Nichols, Sr., called the following live witnesses: 1) David Ross, 2) Tom Mayo, and 3) Sherry McNutt; and, introduced testimony on the issues, as well as the offer and admission of Plaintiff's Exhibits 1 and 2, and Defendants' Exhibit 3. Cross-examination of Plaintiff's witnesses was conducted by Craig White for the Defendants. After presentation of the witnesses and exhibits, Plaintiff, Sherry McNutt, rested her case-in-chief.

**V. Case-In-Defense** - As counsel for Defendants, McNutt Ranch, Ltd., DMK Ranching, L.L.C., and McNutt Management, L.L.C., the General Partner of McNutt Ranch, Ltd., Craig White called David Boland, Executor of the William H. McNutt Estate, as a live witness and introduced testimony through David Boland on the issues as well as the offer and admissions of Defendants' Exhibits.

John Nichols, Sr., cross-examined David Boland.

**VI. Rebuttal Evidence** - Sherry McNutt was called as a rebuttal witness by John Nichols, Sr., and examined in rebuttal on the issues, and then rested.

**VII. Evidence Closed** - After the presentation of rebuttal witness, Plaintiff Sherry McNutt, she rested, and all evidence was closed.

**VIII. Charge Conference** - After the close of all evidence, the Court conducted the Charge Conference, which resulted in the Charge of the Court. Objections to the charge were made by Defendants' attorney, Jeff Small, and reported by the Official Court Reporter, Lisa C. Greenwalt.

**IX. Jury Argument** - Jury argument was made by John Nichols, Sr., for Plaintiff, Sherry McNutt, who fully opened, and by Craig White for the Defendants, who fully closed. Rebuttal argument was made by John Nichols, Sr.

**X. Official Court Reporter** - Lisa C. Greenwalt served as the Official Court Reporter in this case on 1) voir dire examination, 2) opening statements, 3) case-in-chief and defense, 4) the charge conference, and 5) final arguments.

**XI. Deliberations and Rendition** - After final arguments, the jury deliberated and thereafter sent a request for the Plat of the McNutt Ranch used in the trial as a demonstrative aid, which request was denied by the Court. Thereafter, the jury rendered its verdict on the Charge of the Court, in open Court through the jury foreman, Aubrey Kothmann, on the two (2) jury questions, who announced to the Court that the verdict was unanimous on both jury questions, as follows:

QUESTION NO. 1

Do you find from clear and convincing evidence that William H. McNutt made an oral gift of the "foreman's" house to Sherry McNutt in 1983?

Answer "Yes" or "No"

Answer:        Yes

If you have answered Question 1, "yes" then answer Question No. 2; otherwise, do not answer Question Two.

QUESTION NO. 2

What amount of land, if any, do you find from clear and convincing evidence to be necessary for Sherry McNutt to have full use and enjoyment of the "foreman's" house?

Answer:        ½ of North Side

1261

**XII. Costs of Court** - It is ORDERED, ADJUDGED AND DECREED that this is the Final Judgment in this cause and that all costs of Court in the trial of this matter are adjudged against and shall be paid by the Defendants, McNutt Ranch, Ltd., DMK Ranching, L.L.C., and McNutt Management, L.L.C., the General Partner of McNutt Ranch, Ltd.

Signed on the _20th_ day of _February_, 2015.

_____
Joe H. Loving, Judge Presiding

APPROVED AS TO FORM:

NICHOLS LAW

_____
John F. Nichols, Sr.
State Bar No. 14996000
5020 Montrose Boulevard, Suite 400
Houston, Texas 77006
(713) 654-0708
(713) 654-0706 Facsimile

Attorney for Plaintiff, Sherry McNutt

LAW OFFICE OF CRAIG L. WHITE

_____
Craig L. White
State Bar No. 21292400
111 West Olmos Drive
San Antonio, Texas 78212
(210) 829-7183
(210) 829-0734 Facsimile

Attorney for Defendants

Filed _Feb 23 2015_,
at _11:37_ o'clock _A_ M

_____
Haydee Torres, County Clerk, Kimble County, Texas

# TAB 2

CAUSE NO. 2284

| | | |
|---|---|---|
| IN THE ESTATE OF: | § | IN THE COUNTY COURT |
| | § | |
| WILLIAM H. McNUTT | § | OF |
| | § | |
| DECEASED | § | KIMBLE COUNTY, TEXAS |

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this jury, you will observe all the instructions which you should carefully and strictly follow during your deliberations.

1.    Do not let bias, prejudice or sympathy play any part in your deliberations.

2.    In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the court, that is, what you have seen and heard in this courtroom, together with the law as given you by the Court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3.    Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

4.    You must not decide who should win and then try to answer the questions accordingly. Simply answer the question, and do not discuss nor concern yourselves with the affect of your answer.

5.    You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do no return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the numbers of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

Jury Charge

993

6.    You may render your verdict upon the vote of five or more members of the jury. The same five or more of you must agree upon all of the answers made and to the entire verdict. You will not, therefore, enter into an agreement to be bound by a majority of any other vote of less than five jurors. If the verdict and all of the answers therein are reached by unanimous agreement, the presiding juror shall sign the verdict for the entire jury. If any juror disagrees as to any answer made by the verdict, those jurors who agree to all findings shall each sign the verdict.

These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the Judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and if may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

When words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on the applicable standard of evidence, clear and convincing evidence, as instructed. If you do not find that the applicable standard of evidence supports a "Yes" answer, then answer "No."

Whenever a question requires an answer other than "Yes" or "No," you must still base you answers on clear and convincing evidence with respect to each matter inquired about in the question.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement; if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

## SPECIAL INSTRUCTIONS

Circumstantial Evidence

You are instructed that a fact may be established by direct or by circumstantial evidence or by both. A fact is established by direct evidence when proved by witnesses who saw the act

Jury Charge                                  2

994

done or heard words spoken or by documentary evidence. A fact may be established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved in the case. In general, direct evidence is not required by law, but facts to be proved may be established by circumstantial evidence. Neither classification of evidence, either as direct or as circumstantial, necessarily possesses greater weight than the other.

You are further instructed that, if a party has control over a piece of evidence and fails to retain or produce it, the jury should presume that the evidence would be unfavorable to the party who controlled it.

## Standard of Proof:

You are instructed that the standard of proof in this case is clear and convincing evidence. "Clear and convincing evidence" is that measure or degree of proof that produces a firm belief or conviction that the allegations sought to be established are true.

## Burden of Proof

You are instructed that the burden of proof in this case is on the Plaintiff.

## Admissible Evidence

You are instructed that at times throughout the trial, the court has been called to rule on the question of whether or not certain offered evidence might properly be admitted. You are not to draw inferences from the court's ruling. Whether offered evidence is admissible is purely a question of law. In admitting evidence to which an objection is made, the court does not determine what weight should be given such evidence nor does it pass on the credibility of the witness. As to any matter to which an objection was sustained, you must not speculate as to what the answer might have been or as to the reason for the objection.

## Opinion of the Court

You are instructed that you are not to allow yourselves to be influenced to any degree whatsoever by what you may think or surmise the opinion of the court to be. The court has no right by any word or any act to indicate any opinion regarding any matter of fact involved in this case, nor to indicate any desire regarding its outcome. The court has not intended to express any opinion upon any matter of fact in this case, and if you have observed anything which you have interpreted or anything which you may interpret as the court's opinion upon any matter of fact in this case, you must wholly disregard it.

Jury Charge 3

## Statements of Counsel

You are instructed that any statements of counsel made during the course of this trial or during argument, which statements are not supported by evidence, are to be wholly disregarded. Further, you are instructed that any statements of law made by counsel, which statements are not in harmony with the law as stated to you by the court in these instructions are to be wholly disregarded.

## Parties

The Plaintiff in the case is Sherry McNutt.

The Defendants are William H. McNutt, Deceased and as Limited Partner of McNutt, Ltd.; McNutt Ranch, Ltd.; and McNutt Management, LLC, the General Partner of McNutt, Ltd, and as Limited Partner of McNutt Ranch.

## INSTRUCTIONS:

To establish an oral gift of the "foreman's" house Sherry McNutt must show: (1) a present gift to her by William H. McNutt; (2) that she took immediate possession of the described property with William H. McNutt's consent; and (3) she made permanent and valuable improvements to the described property with William H. McNutt's knowledge and consent.

To be a present gift, William H. McNutt must have intended at the time he made the gift to Sherry McNutt, if any, to immediately divest himself of the rights of ownership and for those rights to immediately vest in Sherry McNutt. William must have released all dominion and control over the described property at the time he made the gift, if any.

## QUESTION NO. 1

Do you find from clear and convincing evidence that William H. McNutt made an oral gift of the "foreman's" house to Sherry McNutt in 1983?

**Answer "Yes" or "No"**

Answer: _Yes_

Jury Charge                                       4

If you have answered Question No. 1, "yes" then answer Question No. 2; otherwise, do not answer Question Two.

## QUESTION NO. 2

What amount of land, if any, do you find from clear and convincing evidence to be necessary for Sherry McNutt to have full use and enjoyment of the "foreman's" house?

Answer: *½ of North Side*

INSTRUCTION:

After you have retired to the jury room, you will select your own Presiding Juror. The first action the Presiding Juror will take is to have this complete charge read aloud and then you will deliberate upon your answers to the questions asked.

It is the duty of the Presiding Juror:

1.     to preside during your deliberations;
2.     to see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge;
3.     to write out and hand to the bailiff any communication concerning the case which you desire to have delivered to the judge;
4.     to vote on the issues;
5.     to write your answers to the issues in the space provided; and,
6.     to certify to the verdict in the space provided for the Presiding Juror's signature.

After you have retired to consider your verdict, no one has any authority to communicate with you except the bailiff of this court. You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before a verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

When you have answered all the foregoing questions which you are required to answer under the instructions of the judge, and your Presiding Juror has placed your answers in the space provided and signed the verdict as Presiding Juror, you will advise the bailiff at the door of the jury room that you have reached a verdict, and then you will return into the courtroom with your verdict.

_____
JUDGE PRESIDING

Jury Charge                                    5

997

# CERTIFICATE

We, the Jury, have answered the above and foregoing questions as herein indicated, and herewith return same into the court as our verdict.

(To be signed by the Presiding Juror if
unanimous.)

_Aubrey Kothmann_
PRESIDING JUROR

(To be signed by those rendering the verdict if not unanimous.)

_Gary Neismier_
JUROR'S SIGNATURE

Gary Neismier
JUROR'S PRINTED NAME

_Jack G. Gardner Jr. (Gary)_
JUROR'S SIGNATURE

Jack G. Gardner, Jr.
JUROR'S PRINTED NAME

_Daniel Meyer_
JUROR'S SIGNATURE

Daniel Meyer
JUROR'S PRINTED NAME

_Dale Gipson_
JUROR'S SIGNATURE

Dale Gipson
JUROR'S PRINTED NAME

_Bethany Martin_
JUROR'S SIGNATURE

Bethany Martin
JUROR'S PRINTED NAME

## ACCEPTANCE OF VERDICT

_Joe Loring_
PRESIDING JUDGE

Jury Charge                     6

TAB 3

# ADAMS & FLAKE, INC.

### ATTORNEYS AT LAW
1001 Pat Booker Road, Suite 200
Universal City, TX 78148-4199

Harry B. Adams III

Telephone: (210) 658-5305
Facsimile: (210) 658-1855

October 18, 2005

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED:**
**NO. 7002 2030 0003 5477 2471**
**& VIA FIRST CLASS MAIL**
Miss. Sherry D. McNutt
McNutt Ranch
445 McNutt Lane
Mountain Home, Texas 78058

Re:     W.H. McNutt Ranch

Dear Miss. McNutt:

Our firm has been retained by your father to represent him in certain matters concerning your staying at his ranch. Your father has asked that I advise you and as he has in the past of certain rules, which will be enforced.

1.  You are to have no guests on the ranch, except at your home.

2.  There will be no hunters allowed on the ranch by invitation or by payment authorized by you.

3.  You are not to participate in the ranch management in any manner, either with regards to hunting or operations.

4.  You are not to interfere with anyone who may be hired to perform certain jobs on the ranch including but not limited to the trapping or sale of domestic or exotic animals.

5.  You are to stay in the area of your home or your mother's home for the visits to her.

If the foregoing rules are not adhered to, copiously by you, your father will have no choice but to have you evicted from the ranch.

Your father and I sincerely regret the necessary of writing this letter but feel that your recent activities leave no choice.

Very truly yours,

Harry B. Adams, III

/lmw



PLAINTIFF'S
EXHIBIT
4
11/17/14

EXHIBIT
DH 3
7/8/11

# TAB 4

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. 2284

IN RE:                          § IN THE COUNTY COURT
                                §
ESTATE OF WILLIAM H. McNUTT     § OF
                                §
DECEASED                        § KIMBLE COUNTY, TEXAS

*****

*** **PRETRIAL MOTIONS** ***

*****

On the 7th day of February, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Joe H. Loving, Jr., Statutory Probate Judge presiding, sitting by assignment held in Junction, Kimble County, Texas;

Proceedings reported by machine shorthand.

A P P E A R A N C E S

FOR THE PLAINTIFF, SHERRY McNUTT:
       Mr. John F. Nichols, Sr.
       SBOT NO. 14996000
       NICHOLS LAW, P.L.L.C.
       5020 Montrose Boulevard
       Suite 400
       Houston, Texas 77006-6550
       (713) 654-0708
       Fax:  (713) 654-0706
       john@nicholslaw.com

FOR THE DEFENDANTS, DAWN KELLER, McNUTT RANCH, LTD.,
DMK RANCHING, L.L.C., AND McNUTT MANAGEMENT, L.L.C.,
THE GENERAL PARTNER OF McNUTT RANCH, LTD.:
       Mr. Dennis J. Bujnoch
       SBOT NO. 03319500
       BUJNOCH LAW OFFICES, P.L.L.C.
       211 N Main Street
       Boerne, Texas 78006-2035
       (830) 816-2727

FOR THE EXECUTOR, JAMES DAVID BOLAND:
       Mr. Jeffrey D. Small
       SBOT NO. 00793027
       LAW OFFICE OF JEFFREY D. SMALL
       12451 Starcrest Drive
       Suite 100
       San Antonio, Texas 78216
       (210) 496-0611
       Fax: (210) 579-1399
       jdslaw@satx.rr.com

INDEX
PRETRIAL MOTIONS

February 7, 2014                                    PAGE

Case called. . . . . . . . . . . . . . . . . .    4

Announcements by the Court . . . . . . . . . . .    4

Interpretation of Issues to be Retried
        By Plaintiff. . . . . . . . . . . . . . .    6
        By Defendants'. . . . . . . . . . . . .   13
        Response by Plaintiff . . . . . . . . . .   15

Court's Ruling . . . . . . . . . . . . . . . .   16

Plaintiff's Motion in Limine . . . . . . . . . .   24

Defendants' Motion in Limine . . . . . . . . . .   34

Jury Questionnaire . . . . . . . . . . . . . .   68

Motion to Strike Experts . . . . . . . . . . .   71

Reporter's Certificate . . . . . . . . . . . .   77

EXHIBIT INDEX

| PLAINTIFF'S NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| A | Fourth Court Opinion | 8 | 11 |

(Exhibit not attached to transcript.)

(In open court.)

THE COURT: Court will come to order. This is the County Court of Kimble County, Texas. This is Joe Loving sitting by assignment of the Statutory Probate Judge of the State of Texas, Guy Herman, in and for the elected Judge of this county, Darryl(sic) Roberts, sitting in Cause No. 2284. That's the Estate of William H. McNutt, Deceased.

For the record this is a hearing based on the remand from the Eighth(sic) Court. The -- this Court rendered an opinion on July the 11th, 2011, which the Court made basically three distinct decisions. One was that there was no sufficient evidence to find that there was an oral gift of a ranch of 2,000 acres on the north side of I-10 as alleged by the Plaintiff in the case, Sherry McNutt.

The Court found that there was an oral gift of a house that had been described as the foreman's house that sat on the 2,000-acre piece of property on the north side of I-10. The Court further found that the gift of a house must by nature carry with it a reasonable amount or -- of property for the full use and enjoyment of that house.

The Appellate Court on May the 22nd, 2013, sustained the Court's finding that there was no oral

gift of property -- of the farm or the acreage ranch, I'll say.  Let me repeat that.

The Appellate Court found that there was no oral gift of the 2,000-acre ranch on the north side of I-10 to the Plaintiff, Sherry McNutt.  The Court did find that there was reason to remand the case for consideration on the further development of the two issues of whether there was the oral gift of a house by William H. McNutt to Sherry McNutt, and, if so, what amount of -- reasonable amount of property would be for the full use and enjoyment of that property -- of that house, rather.

So the case today is proceeding along after additional discovery and hearings relative to the pleadings by the counsel on a pretrial relative to a trial date of Tuesday, February the 17th?

MR. NICHOLS:  That's right.

MR. BUJNOCH:  Is that the Monday or the Tuesday?

MR. NICHOLS:  Tuesday is February 18th.

THE COURT:  Tuesday is February the 18th, I think.

MR. BUJNOCH:  That's what I thought, 18th.

THE COURT:  Yes.  Tuesday, February the

18th, 2014.

There have been difference of opinion as to what the Appellate Court ruling is, and so in recognition of that difference of agreement, the Court is going to let attorney, Mr. Nichols, who represents the Plaintiff in this case, Sherry McNutt, put on any representation you have relative to this Court's understanding of the Appellate Court's remand and the issues that will be tried at the jury trial on February the 18th -- beginning February 18th.

Mr. Nichols, do you wish to proceed?

MR. NICHOLS: Yes, I do, Your Honor. Your Honor, I am going to tender to the Court as -- for purposes of this pretrial conference, I will designate these documents as A, B, C, D as opposed to 1, 2, 3, 4 so they don't get confused with trial evidence documents, and I will tender to the Court --

MR. BUJNOCH: Can I get a copy of that?

MR. NICHOLS: This is the -- yeah.

MR. BUJNOCH: I mean --

MR. NICHOLS: This is just the opinion that was sent to me which I think was --

MR. BUJNOCH: Oh, your Court of Appeals' opinion?

MR. NICHOLS: This is the Court of

Appeals' opinion --

MR. BUJNOCH: I'm sorry. Excuse me, Your Honor.

MR. NICHOLS: -- that was rendered in this matter.

MR. BUJNOCH: I'm sorry.

MR. NICHOLS: And -- and, Your Honor, in all due respect, this -- this opinion was a two-to-one opinion with a dissent by Judge Sandee Bryan Marion, and there seems to be some difference as to the interpretation of what the Court -- the effect of the Court's ruling.

Our take is that -- on it was when it was reversed and remanded, it was reversed and remanded for development of any and all theories of the trial of the ownership or gift of the north side of the McNutt ranch. I understand the Court's pronouncements preliminarily here today that the Court feels that the opinion limits itself to basically a two-issue case, and that is, did William H. McNutt make an oral gift of the house that sits on the north side of the ranch to Sherry McNutt back in 1983, and if he did make an oral gift, what would be a necessary plot of land surrounding the house for the full use and enjoyment of the house. That's basically for this upcoming trial

would be a two-issue case, and those would be the two issues.

Issue number two or question number two would be predicated on a yes answer to question number one. Our feeling is that the issue number two could be anywhere from, you know, an acre surrounding the house all the way up to 1999 acres. It'd be depending on the finder of fact and of course the evidence supporting the jury's finding.

We do not think that the -- since this matter was reversed and remanded that there's a limitation on any finding by the jury as to what that amount of land would be. It would -- that would be based on the admitted evidence supporting the judgment.

So with that having been said, I would tender for the record Plaintiff's Exhibit No. A.

THE COURT: Any objection?

MR. BUJNOCH: Is that just the opinion itself, Your Honor?

MR. NICHOLS: Yes, it is.

MR. BUJNOCH: Could I take a look at that so --

MR. NICHOLS: That's all it is.

MR. BUJNOCH: The only problem I have with it is what format is this? Is this LexisNexis or

what?

I mean, I don't know if there's -- Judge, it just doesn't look like the opinion, and I'm not sure if this is the actual opinion or it might have been someone adding things to the -- I mean, I'm not trying to say Mr. Nichols is trying to pull a fast one, but if I was looking at the actual opinion, I'd feel comfortable just saying it's okay, but it looks like somebody's almost prepared -- as a matter of fact, I don't -- it just -- can we just -- I've got a copy of the opinion if the Court needs it, but I don't understand why we need to introduce a copy of the Court's opinion, and I'll object on that basis.

THE COURT: The opinion was sent to this Court --

MR. BUJNOCH: Yes, sir.

THE COURT: -- from -- I believe it's Eighth(sic) Court. I'm not looking at it, but the Court in San Antonio, Appellate Court in San Antonio, so it's before this Court as a matter of record anyway --

MR. BUJNOCH: Yes, sir.

THE COURT: -- so I -- and I believe they would have a copy of their opinion.

MR. BUJNOCH: Yes, sir.

THE COURT: So I don't know that the record here is dependent on the admissibility of that.

MR. BUJNOCH: Right.

THE COURT: And to the degree that you have objected to it by virtue of the format not seeming -- but let me look at it to be sure if I agree that the format is not the same.

MR. BUJNOCH: Yes.

THE COURT: Then obviously we maybe have a concern about it.

(Court reviewing exhibit.)

THE COURT: It may be a matter of -- I don't know that there's anything in error with it.

MR. BUJNOCH: Well, I wouldn't know that either, Your Honor, without reading it word for word, and also the fact that sections are being highlighted. I may be overcautious, and I apologize to the Court, but it's just -- if it was the Westlaw format or if we could just use what I'm looking at here looking over Mr. Nichols' shoulder, I wouldn't have a problem with that.

It's just that I'm not sure what's in there. I mean, if we look at the actual -- and if the Court already has a copy, I'm not -- again, I object on the basis why do we need it. Why do we need to let the

Court see this particular copy?

THE COURT: Well, let's find the basis -- the purpose for the admission of this.

MR. NICHOLS: Your Honor, I've merely identified the opinion because of the ongoing discussion that we've had in this hearing today, both off the record and now on the record, regarding everybody's take or interpretation of what the Court of Appeals was saying and -- and to what limitation, comma, if any, wasn't --

THE COURT: But to the degree that this is being offered, I'm going to admit it with the limitation that if there's anything in here that differs from the original opinion, we're going to then recognize the objection from Mr. Bujnoch.

MR. NICHOLS: That's --

THE COURT: But here today, to move it on along --

MR. BUJNOCH: Yes, sir.

THE COURT: Exhibit -- Plaintiff's Exhibit A is admitted.

MR. NICHOLS: Thank you. Your Honor, with that we have drafted with the Court's pronouncement regarding the -- the limitation on the actual issues to be tried on the 18th -- I had

previously drafted a Charge of the Court that had the -- the full panoply of issues that were in there, but with the limitation of this being this is the question that we're going to be trying at this particular trial, I have drafted or redrafted, which I have marked as Plaintiff's Exhibit No. B.

THE COURT: We're not quite ready for that issue.

MR. NICHOLS: Okay. All right.

THE COURT: At this point we're discussing the fact that the Court's opinion -- that this Court understands the Appellate Court's opinion to sustain the finding that there was no oral gift of the ranch in its entirety, and part of the motions in limine relative to the Eighth Amended Petition that has been filed is asking the Court to grant a denial of those portions of your Eighth Amended Petition that requests a finding relative to the entire 2,000 acres of land.

And so my reference to the fact that I had drawn the conclusion and was led -- and you have the opportunity to reflect upon the -- my conclusion, that the Eighth(sic) Court opinion limits you to the house and a reasonable amount of land, not what that reasonable amount of land might be, and so we're not to

that issue yet.

But, now, in -- in light of anything that Mr. Nichols has said, Mr. Bujnoch, do you or your co-counsel, Mr. Small, have anything for the Court?

MR. BUJNOCH: Your Honor, I'm going to pass that over to Mr. Small who has the appellate experience.

MR. SMALL: Your Honor, I'm going to present to the Court our Motion to Limit Trial on Remand to Sole Issues Stated in the Mandate or in the alternative a Motion for Continuance, and this is a motion that I would like to have file-stamped.

Mr. Nichols, there is a copy of that motion in the black binder that I gave you and the Court earlier today --

THE COURT: Well, let's let the court reporter mark it --

MR. SMALL: Okay.

THE COURT: -- and then identify -- see if there's an objection. Then we'll go forward with it.

MR. SMALL: Certainly.

(Defendants' Exhibit No. A marked.)

THE COURT: Back on the -- before we go any further, the Court did not, and I -- I will at this

time state further that the Defendants in this case -- which I did not put on the record and perhaps it would be more advisable to do that at this time, the McNutt Ranch, Ltd., David Boland, Executor of the Estate of William H. McNutt, DMK Ranching, L.L.C., and McNutt Management, L.L.C., the Central Partner of McNutt Ranch, Ltd.

So with that, now, proceed, Counsel.

MR. SMALL: Thank you. Your Honor, this motion asks the Court for this relief and -- and the Court has preliminarily indicated an intention to limit the trial to the specific language of the mandate and judgment on remand. Specifically we are asking the Court to limit the trial to the theory of an oral gift to Sherry D. McNutt of the house and an appropriate amount of acreage for full use and enjoyment of the house which is language quoted directly from the mandate and the judgment of the -- the San Antonio Court of Appeals.

It's my understanding that the Court's preliminary indication was that it was going to limit the consideration at trial to question one, was there an oral gift of the house, and question two, if so, what was the appropriate amount of acreage for the house. Now, I -- I'm not indicating that I agree with

the Court's formulation of the question to the jury, but what I am asking the Court to do is to discard and dismiss any other causes of action that would be outside of that explicit language.

Additionally, this motion asks the Court to recognize the law of the case, that being that the San Antonio Court of Appeals has explicitly found that there was no oral gift of the 2,000-acre north side part of the ranch, and the Court's earlier comments, I believe, indicate that -- that the Court is of that -- of that opinion; but just as a response to -- to counsel's argument, there should be no question other than was there an oral gift of the house and an appropriate amount of acreage.

THE COURT: Thank you. You have a response?

MR. NICHOLS: Yes, Your Honor. I don't know if he is -- is stating that in a one-question format in the conjunctive or in a two-question format as you had previously suggested. If he is suggesting that in a two-question format, I -- I can understand that, but if it's a one-question format, you're having the jury answer multiple subparts, I guess, without any designation, and I would rather it be a two-question format.

THE COURT: Well, the statement's been made, and we'll go on to something else, but before we do that, let -- in order for clarification of this record let the record reflect that there was an unusual amount of delay this morning because of icy conditions in several counties in the southwest portion of the State of Texas, not South Texas, but southwest -- the Hill Country, as it's commonly referred to. As a result, the attorney and the Court was ready, but there was not at that time an opportunity to put this matter on the record and begin the discussions at that time at 9:30 as originally intended.

However, since the Court and the attorneys were present, we got into some discussion off the record at that time, and in light of the issues that were coming up relative to motions in limine and the differences of opinion, this Court has already expressed to the attorneys, and they have made reference to that expression, that in my understanding of the case that was remanded to this Court, that the San Antonio Court of Appeals upheld the decision rendered by this Court that there was no oral gift of the 2,000-acre ranch, and, therefore, they sustained that. So that appears to this Court at this time to be a settled fact that is not to be retried.

The Court understands the remand to be on the issue previously found by this Court that when -- and was before the Appellate Court that there was an oral gift of the house, and that as the Court expressed either on the record or to the attorneys, the Court is not clear, but it believes it's in the record that since the lesser -- the greater would include the lesser, and that the pleadings before this Court at that time that had been made by the Plaintiff would justify a finding, even though the house was not a part -- separate pleading, that nevertheless since they have plead an oral gift of the ranch in its entirety and since the principal of the greater would include the lesser, that therefore the lesser gift of the house would have been covered by that pleading. So this Court went further at that time to make a definitive finding based on the evidence that there had been an oral gift of the house.

Recognizing an oral gift of the house -- and this is what I had explained to the attorneys earlier, so I'm just repeating what we have discussed earlier this morning -- that therefore it would seem to be necessary that there would be at least some amount of property that would be understood to go with the house for the full use and enjoyment of the house.

That being before the Appellate Court also, it's my understanding from the reading, or this Court, I'll say, of the appellate decision, that because those two issues, the gift of the house and the how much land, was not actually properly presented to the Court, that there should be additional evidentiary findings based on proper pleadings and presentation by counsel as to those two issues; and, therefore, this Court does not understand itself to have the opportunity to expand upon that appellate decision and go into issues that were not ruled upon -- that were not granted to this Court's authority to open up again additional issues.

Therefore, some of the motions in limine that have been filed by Mr. Bujnoch in relation to the pleadings by Mr. Nichols which relate to matters that would expand and go beyond the Court's understanding of the Eighth(sic) Court's opinion have to be addressed by this Court, and, therefore, I was giving Mr. Nichols the opportunity to show why he felt at this time that the appellate decision would have justified a greater interpretation than this Court is understanding it to have.

Having made all of that presentation, we will now go on to the issue as I have stated previously and will restate and both of you have indicated I've

stated. We are going to try the case, as far as I understand, on the remand by the San Antonio Court as to whether there was an oral gift of the house, and if so, what amount of land, if any, would be understood to be necessary for the full use and enjoyment of that house.

With that understanding, let's go forward to something else now.

MR. BUJNOCH: Yes, Your Honor.

THE COURT: I believe you had some motions in limine.

MR. BUJNOCH: Yes.

THE COURT: Do you want to take those up at this time?

MR. BUJNOCH: Yes, Your Honor.

MR. NICHOLS: Well, since I'm the Plaintiff, do I go first or second?

THE COURT: I haven't seen yours, and so I did not know you had some for me, but if you do have them, you're exactly correct and you may go forward.

MR. BUJNOCH: Your Honor, before he --

MR. NICHOLS: And let me say --

THE COURT: Well, let me see. Just a minute.

MR. BUJNOCH: I had an objection.

THE COURT: I'm sorry?

MR. BUJNOCH: I have an objection to his Motion in Limine.

THE COURT: Okay.

MR. BUJNOCH: And, Your Honor, it is that the Court in the pretrial order stated it had to be filed ten days in advance of this pretrial conference, and I had -- that's why I rushed mine up here by Federal Express to make sure that it was timely filed, but in the Court's order it says it shall be filed ten days prior to the conference, and that's my objection to his Motion in Limine, Your Honor.

MR. NICHOLS: Well, let me just say this: I -- I --

THE COURT: Well --

MR. NICHOLS: -- I prepared the Motion in Limine and sent it to opposing counsel, and it was only after I prepared mine and sent it to opposing counsel did I get his, so if -- if mine's out, his is out 'cause I did not get his until after I had already sent him mine.

MR. BUJNOCH: But -- I disagree with that, Your Honor, and I can dig it out and get the faxed statement on that --

MR. NICHOLS: Well --

MR. BUJNOCH: -- to show that -- and also --

THE COURT: The issue is the filing of it.

MR. BUJNOCH: Yes, Your Honor, and we did --

THE COURT: Not sending it to each other.

MR. BUJNOCH: Yes, Your Honor.

THE COURT: We signed a pretrial scheduling order.

MR. NICHOLS: We did.

THE COURT: I don't know that I have authority to just wink at what's in a pretrial scheduling order.

MR. NICHOLS: Uh-huh.

THE COURT: And if the pretrial scheduling order says that motions in limine must be filed ten days before the pretrial hearing, then it has to be filed ten days before the pretrial hearing. It has nothing to do with sending it to counsel and showing them what you're going to do and all of that.

MR. NICHOLS: Okay.

THE COURT: I cannot control anything

other than what we do before the Court, and the pretrial scheduling order, which I will refer to at this time, but I have read that order a number of times 'cause I use it in every case, and I'm satisfied in my own mind, but just for the record we will go back and review that and put on the record what the pretrial scheduling order requires in relation to the filing of motions in limine, and I'm sorry. Those -- those are the basis of which you -- I have to work on.

MR. NICHOLS: Okay. I understand the rules now.

THE COURT: Huh?

MR. NICHOLS: I understand the rules now.

THE COURT: Well, I think that's basic. It's not something I make up.

MR. SMALL: Is it -- it's in your notebook?

MR. BUJNOCH: Yeah, it's -- yeah. Here it is.

MR. NICHOLS: Well, Judge, if you're -- if you're in the process of going to strike that, I'd ask that you strike his too, because part and parcel of the --

THE COURT: If it was filed here

timely --

MR. NICHOLS: -- part and parcel of the --

THE COURT: No. If it was filed timely, Counsel, I can't strike something that was timely filed.

MR. NICHOLS: Well, then --

THE COURT: That's all there is to it. You can -- where is the copy of it? I don't mind --

MR. NICHOLS: It may have been filed, but it was never tendered to me.

THE COURT: No. We have it. I was looking at it the other day. I just don't have it right here. I think I grabbed the other. Let me go get the Court's file. We'll work off the Court's file. It may not have been. We'll make sure.

(Recess at 2:00 p.m. to 2:04 p.m.)

THE COURT: Back on the record. Proceed. I believe you were going to make a presentation to the Court, Mr. Nichols -- I mean, Mr. Bujnoch.

MR. BUJNOCH: No. It would be his Motion in Limine.

THE COURT: But -- but you objected to it earlier.

MR. BUJNOCH: Yes, Your Honor. We've -- between -- discussion between counsel, we've agreed to waive any objection to the filing of Mr. Nichols' motion in limine, Your Honor.

**PLAINTIFF'S MOTION IN LIMINE**

THE COURT: All right. With no objection, then we'll go forward with his. After the first one then we'll go forward with yours after that, and I apologize. I've not had a chance to read yours.

MR. NICHOLS: That's fine.

THE COURT: So I've not had a chance to consider them prior to this hearing. So we'll take them up one at a time. Proceed.

MR. BUJNOCH: Okay. John, are they the same?

THE COURT: Do y'all agree -- do y'all want a moment to see if you agree to any of these?

MR. BUJNOCH: If we could, Your Honor, it might -- well, or I'll start --

THE COURT: Make it quicker.

MR. BUJNOCH: Okay.

THE COURT: Let me just step out for a moment. You can talk.

MR. BUJNOCH: I can probably do it pretty quick, Judge.

THE COURT: Okay.

MR. BUJNOCH: No. 1 is agreed.

THE COURT: I'm sorry. One is agreed?

MR. BUJNOCH: Yes, Your Honor.

THE COURT: Okay.

MR. BUJNOCH: No. 2 is agreed. I don't remember that happening, but -- No. 3 is agreed. No. 4 is agreed. No. 5 is agreed. Okay. I don't understand No. 6. Maybe Mr. Nichols can explain it to me.

MR. NICHOLS: Well, there was evidence developed in the discovery process, Your Honor, about Sherry McNutt sometimes going missing for periods of time and so on and so forth. I don't see the relevance of it, but it had a connotation to it when it was discovered in the depositions that it was a negative connotation that she would disappear and no one would know where she was, so...

MR. BUJNOCH: My response to that, Your Honor, is a big part of the evidence that we're going to prove in this case is that she hasn't lived in the -- in the foreman's house now for at least eight years -- seven, eight years. We have photographs that show that no one's been living in that house.

The fact that she considers it her home and that's a place she wants to live for the rest of her

life, and I'm sure -- that's testimony that came out in the original trial, Your Honor. It was not -- and we did not introduce the photographs.

We did inform the Court that she never lives in that -- she hasn't lived that house in years, so I believe that it's relevant to -- as far as any mention that she did often going missing, she talks about this ranch as being hers, something she's always wanted to live on this house -- ranch for the rest of her life, but the evidence is going to show that she was gone for long periods of time, and so we believe that that should be admissible, Your Honor, for that fact, or those facts.

MR. NICHOLS: Judge, that's contrary to the evidence in this case. This Court has -- your predecessor in handling this matter had issued orders based on motions by us giving our client the exclusive use and possession of the house primarily because when she would come in from work, things would be missing, and so she was granted the exclusive use and possession of the house and in fact did occupy it. I know that for a personal fact because I went out there and visited, and all her belongings, clothing, everything else was there, so -- but if they want to bring this up, I'll withdraw No. 6, and -- and we'll just try it

wide open.

MR. BUJNOCH: As far as the missing from the house, yes.

THE COURT: You say you're withdrawing No. 6?

MR. NICHOLS: I'm withdrawing 6.

MR. BUJNOCH: Okay.

THE COURT: All right. Proceed.

MR. BUJNOCH: On No. 7, Your Honor, we would agree at this time to No. 7 --

THE COURT: Okay.

MR. BUJNOCH: -- with the option to approach the bench if it does become relevant.

MR. NICHOLS: Sure.

THE COURT: I think that's always proper --

MR. BUJNOCH: Thank you, Your Honor.

THE COURT: -- if you show later.

MR. BUJNOCH: Yes, sir. No. 8 we -- we do not agree to. The fact that Sherry McNutt did not file income tax returns for a number of years I think is very relevant in this case. It's a violation of a federal statute to start with which goes to her credibility, and I believe that's relevant for a jury to consider in this case.

Anything that has to do with her credibility, particularly if we're dealing with an oral gift, whether or not what she tells this jury is right or wrong, I mean, that's a violation -- that's a -- that's a criminal violation, Your Honor.

MR. NICHOLS: I don't have any response to that.

THE COURT: Then you are objecting. Let me make sure now.

MR. NICHOLS: Judge, let me --

THE COURT: Plaintiff's Motion in Limine, the Court orders Defendant and his counsel to...

MR. NICHOLS: See, I don't see how this --

THE COURT: Let me be sure I've -- huh?

MR. NICHOLS: I don't see how No. 8 would go to the issues we're going to be trying to the jury about the -- the oral gift of land and the ownership. There's a collateral --

THE COURT: You don't want me commenting on my rulings, do you?

MR. NICHOLS: No, I don't.

THE COURT: Okay. I'm not -- I will -- I will only make sure the -- after considering

Plaintiff's Motion in Limine, the Court orders Defendant Dawn McNutt Keller and all other witnesses to refrain from mentioning -- I'm going to deny that at this time. If you show later, I'll take it up later.

MR. BUJNOCH: Your Honor, on No. 9 we're in agreement on that as long as it goes both ways. Any mention that any party or witness is rich or poor.

Your Honor, No. 10 I would disagree with from the standpoint, and maybe I'm reading more into this than is evident in the paragraph, but I'd like to get into the fact all the judgments that are against Sherry McNutt and the fact that she has some -- the list of judgments, the fact that she hasn't been paying her bills, and I think -- I'm not sure if that gets into the assets, but it shows that she has negative assets at this point, and in that regard I'd like to -- I disagree or -- I object to No. 10.

THE COURT: And why do you think that's admissible for what --

MR. BUJNOCH: Her judgments? Her judgments, Your Honor?

THE COURT: That she owes money and as to whether Mr. McNutt back years before had orally gifted the property to her.

MR. BUJNOCH: With that understanding, Your Honor, I don't believe it is relevant. I agree to it.

THE COURT: I grant the objection.

MR. BUJNOCH: No. 11 is agreed as long as it goes both ways. No. 12, I mean, if it -- in regards to testimony in violation of the Dead Man's Rule, I guess we'll just have to handle that as it comes up. That Dead Man's Rule has been kind of watered down pretty much the last time I looked at it.

MR. NICHOLS: And that's true. Corroboration witnesses can testify. So I -- I will withdraw No. 12.

THE COURT: Okay.

MR. BUJNOCH: No. 13 is agreed. Okay. I agree to No. 14. Agree to No. 15. Agree to No. 16. Agree to No. 17.

Your Honor, on No. 18 I would disagree with that, because -- from the standpoint it goes to credibility, and again other lawsuits, particularly when she hasn't paid her bills and those sorts of things. I mean, just as an oral gift of land, again, Your Honor, we're talking about the oral testimony of Sherry McNutt, and I would -- I would disagree with No. 18.

MR. NICHOLS: I'll withdraw No. 18.

MR. BUJNOCH: No. 19 is agreed. Number -- can you elaborate on that for me, John, No. 20? You're saying I can't call somebody a liar or --

MR. NICHOLS: I'll withdraw that.

MR. BUJNOCH: I don't think -- does anyone have a contingency fee contract in this case?

MR. NICHOLS: Withdrawn.

MR. BUJNOCH: 21, okay.

Your Honor, No. 22, we will disagree with.

THE COURT: Wait a minute. I got lost on something. What -- you withdrew 20. What about 21?

MR. NICHOLS: Withdrew.

THE COURT: Both?

MR. NICHOLS: Both.

THE COURT: Okay. 20 and 22, okay -- I mean, 20 and 21. Okay. Now then, No. 22.

MR. BUJNOCH: No. 22 we disagree with because a major part of an oral gift of land is to show that the Plaintiff made substantial improvements to the property. We need -- we intend to show as the dissenting opinion pointed out in the Court of Appeals that Sherry McNutt received extensive contributions from her family and from her -- particularly from her father, William -- adopted father William H. McNutt,

and that's all --

MR. NICHOLS: I'll withdraw it.

MR. BUJNOCH: I think I'll agree to No. 23. I don't see any reason to that.

I agree with No. 24 'cause I don't think the Court is going to award any money in this case. I mean, if I understand right, there's not going to be any blanks for an amount of money; is that correct, Your Honor?

MR. NICHOLS: It's a two-issue case. Was there a gift, and, if so, how much.

MR. BUJNOCH: Okay.

MR. NICHOLS: And acreage, you're exactly right. There won't be a dollar figure in there for that.

THE COURT: So that's granted. I mean --

MR. BUJNOCH: Well, I would object on that basis --

THE COURT: I mean, denied. Wait a minute.

MR. BUJNOCH: Denied.

THE COURT: Any comment to the jury that the Court can reduce -- well, that --

MR. NICHOLS: I'll just withdraw it,

25.

MR. BUJNOCH: And 25 --

THE COURT: How are they going to rule on that anyway with the issues that we have?

MR. BUJNOCH: Yes, Your Honor.

THE COURT: That's not even before -- and then you say 25 is agreed to?

MR. BUJNOCH: Yes, Your Honor. He's withdrawn, and I agree to it.

THE COURT: Well, I know he withdrew 24.

Did you withdraw 25?

MR. NICHOLS: I did.

THE COURT: Oh, I didn't know that. Okay.

MR. BUJNOCH: Your Honor, I have -- since I've allowed Mr. Nichols to file his motion late, I have --

THE COURT: Well, let me sign this order --

MR. BUJNOCH: Yes, Your Honor.

THE COURT: -- before I do anything else.

MR. BUJNOCH: A little hyper. I'm sorry, Your Honor.

THE COURT: That's all right. I know we're trying -- I want to move it as quickly as possible too, but --

MR. BUJNOCH: I just feel bad --

THE COURT: -- if I don't sign it now, I'll forget to do it and --

MR. BUJNOCH: Yes, Your Honor. I was just -- I feel bad that I got here late. So I was just trying to push it along, Your Honor.

(Recess at 2:15 p.m. to 2:24 p.m.)

**DEFENDANTS' MOTION IN LIMINE**

THE COURT: Back on the record. We're now ready to take up the Defendants', as in plural, Defendants, Motion in Limine. You ready to proceed, Mr. Bujnoch?

MR. BUJNOCH: Your Honor, I believe Mr. Nichols is -- I mean, I can argue them but until he --

THE COURT: I mean, you're ready to go?

MR. BUJNOCH: Yes, Your Honor.

THE COURT: And are you ready, Mr. Nichols?

MR. NICHOLS: Yes, Your Honor.

THE COURT: Okay. Do you have -- first -- first do you have agreements?

MR. NICHOLS: Yes. I can read off the ones I agree to, Your Honor.

THE COURT: Proceed then.

MR. NICHOLS: All right. No. 1.

THE COURT: Okay.

MR. NICHOLS: No. 2, No. 3, No. 4.

THE COURT: Okay.

MR. NICHOLS: No. 5, No. 6, No. 7, No. 8.

THE COURT: Wait just a second. I've got to change pages. No. 8.

MR. NICHOLS: No. 9.

THE COURT: Okay.

MR. NICHOLS: No. 10.

THE COURT: Okay.

MR. NICHOLS: No. 11, No. 13.

THE COURT: Wait. 18?

MR. BUJNOCH: 13.

MR. NICHOLS: 13.

THE COURT: Oh, 13. So you don't agree to 12. Okay, 13.

MR. NICHOLS: 14.

THE COURT: 14.

MR. NICHOLS: I agree to 14, 16, 17, and that's it.

THE COURT: Okay. So now we'll go into the ones you don't agree with.

MR. NICHOLS: Right, and that first one would be No. 12.

THE COURT: Okay. You want to explain your position?

MR. NICHOLS: Yes, Your Honor. First of all, I'm having trouble understanding what this would actually apply to in this particular case. So that's -- I'm confused as to what -- what they really mean here. It says, Any reference to the financial status of either party to this suit and especially any reference to Plaintiff as a little person or a small or struggling business.

The fact of the matter is that she's off the ranch or out of the Will and everything, and her sister got everything. So -- she works as a caretaker for an elderly lady so -- and her sister has absolute control over a 5,000-acre ranch. Now, if they want to construe that as a violation of No. 12, then I have a problem with it.

MR. BUJNOCH: Your Honor, the objection would be, again, this is going to apply -- the Court's rule we're only going to talk about oral gift of a house and a reasonable amount of land to enjoy that

house, and Mr. Nichols is a very, very good trial attorney, and I'm sure he's going to do what I'd probably do under these circumstances if I was sitting in his chair, and that's going to be to -- to get the jury's sorrow -- make them feel sorry for his client, that she didn't get anything. Her sister got everything, and she got nothing.

And to influence the jury in regards to their answers, particularly on the house, well, at least she ought to have a house, and if we talk about control of a 5,000-acre ranch, then why don't we at least give her a thousand acres or something like that. I don't think that has anything -- any bearing on the issues in this case as to the personal wealth of the parties, Your Honor.

And -- and also if we do that, Your Honor, I should be able to talk about under the Will the amount of money that Ms. Sherry McNutt did get under the Will, but for Mr. Nichols -- and, again, he's a very capable attorney and I would expect him to do this -- to get up there and say Dawn Keller, her sister, got all these things and Sherry only got one -- this, I think that's very -- that's improper, irrelevant, and highly prejudicial, Your Honor, and I would -- I think the reference to anyone's financial worth is not relevant

in this case and will only prejudice a jury.

THE COURT: Final response?

MR. NICHOLS: I believe I've already stated it, Your Honor. This is basically a case between the haves and the have-nots, and I think a jury needs to understand that.

MR. BUJNOCH: Response, Your Honor?

THE COURT: Yes.

MR. BUJNOCH: Response is, again, that's exactly what I was afraid of, Your Honor, that it's the -- the big -- the big guy against the little guy, big -- big-lady-against-the-little-lady kind of thing, and that's not the issues to be decided by the -- by the jury. It's whether or not Mr. McNutt made an oral gift of that house, and as the Court said, a reasonable amount of land to enjoy the house. Otherwise it's just going to inflame the jury, prejudice the jury, and we will object to that.

THE COURT: (To the reporter) You saw me breathe, didn't you? I did start to say something, but then I thought I better think a little bit more.

I'm going to grant your objection the way you have phrased the objection, but I want to be very cautious about that. A disparitive gift to one child as compared to another when we're talking about an oral

gift, not the financial statuses and not that the smaller or larger person, I agree with that type of an approach.

But I don't want it to be misunderstood because y'all have made some statements that concern me that if he made gifts of property to some, it might go to confirm that he would make a gift of oral. It may not. That's for the jury to decide, but I can't say automatically here right now that that evidence is not going to be able to come in as to a gift of certain properties to some, which you mentioned, and a gift of this to her, but only to the degree of those gifts itself but not as to financial statuses and all. I don't think that's relevant.

So I will grant it with that limited amount of avenue that it's strictly limited to references of financial status via the property and any reference to the person being little and the other one big. I don't think that's appropriate.

Okay. No. 13 was agreed to. 14 is agreed to. 15 and 16, 17. Now 18.

MR. NICHOLS: Well, 15 I did not agree to.

THE COURT: Oh, you did not agree to 15?

MR. NICHOLS: I think what he's referring to on No. 15 is that -- all attorneys, parties, representatives of the attorneys refrain from showing disagreement, disbelief, approval. I don't know if someone made an incredulous statement from the stand and I -- and I took my glasses off and sat there and looked at them whether I'd be violating the Motion in Limine or not.

So, you know, it's -- it's an inherent nature of people to act or react to statements made by someone. Even jurors do that. So to, you know, lower your pencil down and get up and say, I can't believe she said that or something -- I understand that, but this --

MR. BUJNOCH: And that's what I'm looking for.

MR. NICHOLS: -- there is no limitation on that motion. That means I have to sit there with a totally bland face when someone says something that may be totally out of the park and -- or even if the jury reacts to it. As far as making gestures and -- and things like that and grimacing and rolling your eyes and so on and so forth, I -- I would agree to that. I think that's probably off base.

THE COURT: The only question I had on

this one, I'm going -- I had already decided I'd grant it to a degree, but that it runs one bit of a concern, and that is everyone -- y'all have a right to object to my ruling.

MR. BUJNOCH: Yes, Your Honor.

THE COURT: And technically if you strike this to a logical conclusion, that's showing a disagreement with the Court's ruling. If you --

MR. BUJNOCH: I see.

THE COURT: -- say, Your Honor, I -- I object to that and would like to --

MR. BUJNOCH: Your Honor, I'm just going to withdraw.

THE COURT: -- I understand that, but what I'm saying is, that is a disagreement with the Court's ruling.

MR. BUJNOCH: I'll just -- I'll withdraw No. 15, Your Honor.

MR. NICHOLS: All right.

THE COURT: And I think it's no question that we're not going to allow this case to deteriorate like the old cases did where -- like you just mentioned, you go, My goodness, you know. I can't believe that. We are not -- we'll try this case. I think both of you -- both of your sides are going to

try it the correct way. So let's not have a problem with 15 anyway.

No. 16?

MR. NICHOLS: Neither one of us want to end up in the Crossbar Hotel, Judge.

MR. BUJNOCH: Right. That's not a good place.

THE COURT: Any -- oh, you agreed to 16 and 17.

MR. NICHOLS: I had 16 and 17.

THE COURT: Now, 18. You didn't agree to 18, did you?

MR. NICHOLS: No.

THE COURT: Okay. You want to say why?

MR. NICHOLS: Yes. There can be the testimony, and some of the testimony from the prior trial as the Court may remember the witnesses say, I was out with Mr. McNutt, and, you know, I made a comment about the south side of the ranch is a lot prettier than the north side.

THE COURT: We're not trying the north side of the ranch.

MR. NICHOLS: Okay.

THE COURT: We're trying the house. So your questions have to be limited to -- the witnesses

that you're talking about to testimony relative to what they know about an oral gift of the house, statements that are -- that were in the record before that you're familiar with where individuals testified upon which I found that there was enough basis to conclude that there was an oral gift of the house.

Now, those are -- you can go into -- but you're not going to be able to go into all the fact that he was giving her the 2,000 acres. That's not before the Court. That's not -- the Appellate Court has already ruled on it. I'm going to grant that -- wait a minute. Yeah. I'm going to grant the motion.

MR. NICHOLS: Okay, Your Honor. Do I understand if someone gets on the witness stand and says, That's Sherry's. She can do with it what she wants to or an offhand comment like one of the witnesses that we put on -- one of the witnesses in the last trial commented about how nice the -- the south side was and -- and the north side wasn't as nice as the south side was, and -- and Mr. McNutt said, Well, the north side is Sherry's and the south side is mine, and Sherry can do with it whatever she wants to. Now, that -- that's a kind of a comment --

THE COURT: What was the confusion about what I said? What was confusing about what the

Appellate Court said? I'm bound by the Appellate Court. It's not what I would like to do.

MR. NICHOLS: Okay.

THE COURT: It's what the Appellate Court has already found.

The Appellate Court has already found that there was not an oral gift of 2,000 acres. Going into the 2,000 acres as a gift in and of itself, I'm not going to limit my -- what I'm saying -- explain to you what I mean by that saying. You listen very carefully what I say, and then you go from there, and if you get into something else, we'll take it up at the trial.

My statement is, you cannot go into statements, and I'll sustain his objection in the Motion in Limine to any of your witnesses bringing up the fact that -- like they did at the trial which we found was not sufficient evidence to support an oral gift of the 2,000 acres. So any effort to show that that was given to her -- now, you've expanded some of the statement. I'm not ruling on anything other than what I've just said. Okay?

MR. NICHOLS: Well, Judge, on the one hand I understand what your ruling is, but on the other hand if the jury is -- what is a reasonable amount or plot of land to sustain the house and the living there

and so on and so forth, you had indicated earlier that could be any number that the jury wants to put in there.

THE COURT: But not to the point that they are saying that William H. McNutt gave her the 2,000 acres.

MR. BUJNOCH: Your Honor, in my --

THE COURT: Otherwise the Appellate Court's decision would have been meaningless.

MR. BUJNOCH: Your Honor, I just wanted to point out one statement Mr. Nichols said, and that is "to sustain the house." I don't believe that's going to be the issue before the Court. It's just going to be to enjoy -- I mean, for the jury, to enjoy the house.

THE COURT: Enjoy the house. Right.

MR. BUJNOCH: Enjoy the house, and I just wanted to make -- before that comes up, I just wanted to make sure that there wasn't going to be any mention that --

MR. NICHOLS: Well --

MR. BUJNOCH: -- to have the house, she would need a pasture and hunting lease and all these things that -- I mean, all of that is just a --

THE COURT: I'm not going to limit to

-- now -- now, you're going into something else, Counsel.

MR. NICHOLS: That's my whole point.

MR. BUJNOCH: All right.

THE COURT: No. Just a minute. What can be brought out to show what would be reasonable and necessary for enjoyment of a ranch in this county is not something I'm going to decide here today, and if there's testimony that bears on that issue, then that's proper, whether it be 2,000 acres or 50,000 acres or one acre, and that's between you two attorneys to convince the jurors. That's not for me to rule today and limit anything.

The jury is going to have to make a decision based on the evidence as to whether there's a house that was given, number one, and if so, what amount of land; and if there's testimony that relates simply to the amount of land necessary for the full use and enjoyment of that property, then I'm going to allow it to come in, but I'm not going to allow it to come in on the basis of an oral gift of that land by Mr. McNutt.

MR. BUJNOCH: I'm sorry, Your Honor. So she would have -- they would have to show an oral gift of -- I'm --

THE COURT: No. They -- an oral gift

of what?

MR. BUJNOCH: Well, I mean, they would have to show --

MR. SMALL: You're saying, Your Honor, as I understand it, that they have to show an oral gift of the house and the acreage to enjoy the house.

THE COURT: That's exactly right.

MR. NICHOLS: Okay.

THE COURT: But I'm saying I can't limit the testimony from a person as to what the amount of land would be because I already ruled on it and the Appellate Court said in essence that there was no basis for that.

MR. SMALL: I understand, Your Honor.

THE COURT: And so, therefore, in essence they say you go back and have another trial on the issues of the oral gift of the house and how much land should be. So I don't know how I'm limited to say, Well, you can't show that there's going to need to be this much land. Where am I limited in that?

MR. SMALL: I understand, Your Honor.

THE COURT: If someone can show me, I'll be glad -- I don't mind, but I just don't see it, but anyway --

MR. NICHOLS: Your Honor --

THE COURT: -- my ruling is that I grant that.

MR. NICHOLS: This is number --

THE COURT: Now, No. 19.

MR. NICHOLS: Okay. Now, what about No. 18?

THE COURT: That's what I granted.

MR. BUJNOCH: Granted.

MR. NICHOLS: Okay.

THE COURT: Now, 19, any mention, reference, or statement from Plaintiff or any of the witnesses, and do not mention, reference, or state the north side --

(Mr. Small stepped out.)

THE COURT: -- of the ranch was Sherry's side. That's just like the 18 one.

MR. NICHOLS: Your Honor, the --

THE COURT: That's the same issue.

MR. NICHOLS: -- the testimony at the trial -- the prior trial of this matter was that -- that my client lived in Colorado. She had her own business.

THE COURT: I know all that testimony. That has nothing to do with this --

MR. NICHOLS: But he says, if you come

back, you can have the north side, so she shut down her business and moved back here and moved onto the north side. Now, there -- there has to be, at least I would think in the jurors' minds, what was the impetus for her to give up her business and come back and move in and start working on the ranch.

THE COURT: Well, it may be, and it may be you can re-establish it, but this is not the time for it. As it reads right now, that's my ruling.

MR. NICHOLS: All right.

THE COURT: Now, if you can show a reason at the time of trial that you're about to go into some evidence that necessitates --

MR. NICHOLS: I will approach.

THE COURT: Right now, I'm going to grant it.

Now then, No. 20.

MR. NICHOLS: Now, any reference to the personal habits of William H. McNutt. This is going to get into something that's pretty sticky. The testimony that would be elicited in this -- in the trial in this matter was that Mr. McNutt on numerous occasions made sexual advances toward my client which were rebuffed by her --

(Mr. Small returned to the courtroom.)

MR. NICHOLS: -- which made him angry and ultimately resulted in my client being totally cut out of his Will because she didn't give into his sexual demands.

Now, that's -- people can wonder, well, why would he give one child or one daughter the north side of the ranch and then in a series of events later change his Will and say everything goes to Dawn. So I think it's -- it's relevant to show what the relationship was between father and daughter.

MR. BUJNOCH: Can I respond, Your Honor?

THE COURT: Well, let me ask one question before you do that.

MR. BUJNOCH: Yes, sir.

THE COURT: You've mentioned the basis for doing it for William H. McNutt. How have you shown any basis for Beth McNutt, Dawn Keller, David Boland, Marvin Keller or Cassidy Keller?

MR. NICHOLS: I -- I -- I don't have -- I don't know why they were in there. My reference in this regard would be to Mr. McNutt.

THE COURT: With that understanding let me -- go ahead. You may still have something you want to tell me.

MR. BUJNOCH: Yes, Your Honor. The deal with -- as far as Mr. McNutt is concerned, Your Honor, that is something that occurred long before -- if it ever did occur, long before this movement -- she moved back from Colorado, that sort of thing. It's highly prejudicial, highly inflammatory, and really has nothing to do with the facts of this case, Your Honor.

It's just simply a way to inflame the jury. There's no evidence to support or corroborate this particular -- these so-called actions on the part of Mr. McNutt, and we would definitely object on that basis, Your Honor. Again, it has to do with whether or not he made an oral gift of the -- of the foreman's house and a necessary amount of land to enjoy that house. That's the only issues before this Court, and we would object to any of this testimony about any allegations of sexual abuse.

MR. SMALL: Your Honor, the -- if I might add, there's -- there's no issue here of the difference between what Mr. McNutt gave to Dawn and what Mr. McNutt gave to Sherry. The one and only question is, did Mr. McNutt intend to give Sherry a gift of the house and an appropriate amount of acreage to enjoy that house. That's the only question.

The differential between the gifts is -- is

irrelevant. It's just simply not an issue. The one question is the gift to Sherry or not.

MR. BUJNOCH: Judge, if we open the door to something like this, I mean, we're -- we're guaranteeing an appeal of the case. It's so highly inflammatory. It really has nothing to do with any of the issues as the Fourth Court has defined those issues, Your Honor.

And there's no evidence to support this, other than Sherry McNutt's statements, but there's nothing to support any -- any position that that had anything to do, if it did occur, with Mr. McNutt's actions in this case, and I would just -- the highly inflammatory, prejudicial nature of that evidence, Your Honor, we would object, and it's just -- that's something that --

MR. NICHOLS: Well, you know --

MR. BUJNOCH: I don't know how else to put it, Your Honor.

THE COURT: What -- what I'm going to do on that one, I'm not going to allow you to go into it at this time, but you can approach the bench at the right time if you think you want to go into it.

MR. NICHOLS: All right. Okay.

THE COURT: And I'll see if the

development of this case is such as to justify it at that time. However, you can't run the risk of highly prejudicial statements that destroy, and -- and so at this time with the limited opportunity -- well, I think you always have the opportunity anyway to approach the bench and say, We want to come into this right now, but I'm going to grant it at this time, and then at the proper time you want to offer that evidence --

MR. NICHOLS: Yes.

THE COURT: -- you can approach the bench and show me.

MR. NICHOLS: Okay.

THE COURT: Now, you -- you didn't agree to 21?

MR. NICHOLS: No. I didn't agree with 21 because --

THE COURT: You agreed to it when he -- you had it in yours. Oh, you -- you -- I'm sorry. That was the other -- that might have been other people's statements. You're right.

MR. NICHOLS: Yeah.

THE COURT: Yeah. His was -- his was framed differently.

MR. NICHOLS: Right.

THE COURT: So why do you think that

the -- his should be denied?

MR. NICHOLS: They would not be hearsay, Your Honor, if -- if there -- if you have a corroboration witness under Texas Rules of Evidence 601(b) in the case of *Fraga vs. Drake*, 276 S.W. 3d 55, jump cites 56, by the El Paso Court of Appeals in 2008, and the case of *Quitta*, Q-u-i-t-t-a, *versus Fossati*, F-o-s-s-a-t-i, 808 S.W. 2d 636, jump cite 641, writ denied out of the Corpus Christi Court of Appeals in 1991 provides that corroborating witnesses can testify to statements by the decedent.

THE COURT: I'll deny that one.

MR. BUJNOCH: As long as the -- he meets the requirements of the Rules, Your Honor?

THE COURT: Well, you have to.

MR. NICHOLS: Well, yeah, 601(b).

MR. BUJNOCH: Yeah. Okay.

MR. NICHOLS: 22 is -- I guess shades and phases of 20.

THE COURT: I'm sorry?

MR. NICHOLS: I think No. 22 is just shades and phases of No. 20 about the personal habits of Mr. McNutt.

THE COURT: So what are we saying? You --

MR. NICHOLS: This one says, Any mention, reference, statement from the -- from Sherry McNutt or any of her witnesses by any alleged --

THE COURT: Well, I granted 20. Are you saying go ahead and grant 22?

MR. NICHOLS: No, I'm not. I'm just --

THE COURT: Well, you said the same as 22.

MR. NICHOLS: I'm not saying that. I'm just saying it's shades and phases of it, but it is a direct reference to what I was referring to earlier about sexual conduct --

THE COURT: Anyway, I'll grant that. Yeah.

MR. NICHOLS: Okay.

THE COURT: Same thing.

MR. NICHOLS: And I will approach.

Okay. Judge, this -- the granting of this means I can't prove an oral gift of that house because --

THE COURT: I --

MR. BUJNOCH: Well, Your Honor, I wanted it as far as the north side. That's what my objection was to.

THE COURT: Well -- but you're saying

that he can't introduce evidence of what she was doing while she was on the place, making improvements --

MR. BUJNOCH: Uh-huh.

THE COURT: -- spending money, performing labor --

MR. BUJNOCH: Uh-huh.

THE COURT: -- and I -- I don't think that's proper.

MR. NICHOLS: That's denied. Okay. Thank you.

THE COURT: So I deny your objection.

MR. NICHOLS: All right. Got that out of the way.

THE COURT: I could say a limited grant. I agree to you that he can't introduce it to show an oral gift of the north side. Okay.

MR. BUJNOCH: Your Honor, I -- I wanted to bench file --

THE COURT: Now, you want a separate order, though, don't you? You have yours in a separate order?

MR. BUJNOCH: Yes, Your Honor.

THE COURT: And you don't have "agreed" on it so -- you want to submit it?

MR. BUJNOCH: No, or -- or I could

57

submit it or I just have the Court sign and -- and -- underneath that order.

THE COURT: "Granted" or "denied" is all you have on it.

MR. BUJNOCH: Right.

THE COURT: You want one that says "agreed"?

MR. BUJNOCH: Well, wouldn't granted mean if it was agreed, it's granted?

THE COURT: I guess you could say that --

MR. BUJNOCH: Yes, sir.

THE COURT: -- but I don't want it to look like I did the statements.

MR. BUJNOCH: Oh, okay.

THE COURT: No. That's all right if that's what you want. Do you have a separate one for me --

MR. BUJNOCH: Yes, Your Honor.

THE COURT: -- 'cause this has -- okay. Let me go back through this.

MR. SMALL: Dennis, what did the Court do on No. 19?

MR. BUJNOCH: No. 19? Let me see. Where's my copy?

THE COURT: Let me go back through here and make my marks.

MR. NICHOLS: Court granted it.

THE COURT: So agreed is granted. Right?

MR. BUJNOCH: Right.

THE COURT: Okay. Granted on 1. Make sure I do this -- now, y'all go through with me.

MR. BUJNOCH: Okay.

THE COURT: Granted on 2.

MR. BUJNOCH: I had one of them.

THE COURT: Granted on 3. Granted on 4, actually down through 17 I think, but granted on 5, 6, and 7 granted. 8, 9, 10, 11, okay -- 11 -- all the way through 11. Now, 12 was denied. No. I granted it. He didn't agree to it, but it was granted, and 13 and 14 were agreed to.

MR. NICHOLS: 15 was withdrawn.

THE COURT: 15 -- see, you don't have a withdrawal.

MR. BUJNOCH: Okay.

THE COURT: I'll just write "withdrawn" in here.

MR. BUJNOCH: All right, Your Honor.

THE COURT: Okay. Now, that's 15. 16

is agreed.  17 is agreed.  18 was granted.  19 is granted.  20 is granted.  21 is denied.  22 is granted, and 23 is denied.

MR. NICHOLS:  Your Honor, may I take a --

THE COURT:  And I don't see 24 through 27.

MR. BUJNOCH:  Yes, Your Honor.  I was going to make a bench filing of those additional ones.

MR. NICHOLS:  May I take a short break to go to the restroom?

THE COURT:  I'm sorry?

MR. NICHOLS:  Can I go to the restroom?

THE COURT:  Yes.  That's fine.

(Recess at 2:55 p.m. to 3:02 p.m.)

THE COURT:  Back on the record.  You say you have other motions?

MR. BUJNOCH:  Yes, Your Honor, I had a supplemental motion I wanted to add.  I think that the Court has pretty much ruled on all of that, but -- do you have another copy of that, Jeff?

MR. NICHOLS:  Is this 24, 25, 26, and 27?

MR. BUJNOCH:  Yeah.

THE COURT:  23, 24, 25, 26, 27.

MR. BUJNOCH: Yes, sir. I think we've already done 23 and 24. Yeah.

MR. NICHOLS: We've done 23. We haven't done 24.

THE COURT: What was 23?

MR. BUJNOCH: 23, I believe the Court denied that.

MR. NICHOLS: Yeah.

THE COURT: Was what?

MR. BUJNOCH: I think you denied that.

MR. NICHOLS: I think you denied 23.

THE COURT: But you said we've done it?

MR. BUJNOCH: We did it, yes, Your Honor.

THE COURT: Add on?

MR. BUJNOCH: Well, no. This will be No. 24, Your Honor. This was a bench brief that we filed -- I mean, a bench -- it'd be 25 -- excuse me --

THE COURT: What about 24?

MR. BUJNOCH: It's ones I added in a supplemental filing, Your Honor. I believe the --

THE COURT: I deny that.

MR. BUJNOCH: On the caging of animals, Your Honor, No. 24?

THE COURT: Right.

MR. NICHOLS: Thank you.

THE COURT: It depends on how it comes up, but I can't right now say that that's automatically going to be --

MR. NICHOLS: Yeah.

THE COURT: -- granted because it shows a -- I don't know what their testimony is going to be, but if their testimony is there was no oral gift --

MR. BUJNOCH: Uh-huh.

THE COURT: -- it goes into their credibility because they had an altercation with her. It just -- you're asking me to rule on evidence first of all that -- now, if you want to ask the -- well, I don't know how -- I just deny it. That's all.

MR. BUJNOCH: Yes, Your Honor. Okay.

THE COURT: I can't --

MR. BUJNOCH: Yes, Your Honor.

THE COURT: I've got to give as much of an understanding of what the case may develop, and you know full well that that may very well come in as to why they would be saying there was no oral gift, and if there was an altercation, that might show the basis for it. Might not, and it's up to a jury to decide that, not me.

MR. BUJNOCH: And the reason I say

that, Your Honor, it's Martin Keller. It's not Mr. McNutt.

THE COURT: It's what?

MR. BUJNOCH: It's Martin Keller. It's Mr. McNutt's grandson in this altercation. It's not William H. McNutt.

THE COURT: Oh, I'm sorry. I misread that. That's why I like to have these ten days early --

MR. BUJNOCH: Yes, sir.

THE COURT: -- so I can really read them --

MR. BUJNOCH: Yes, Your Honor.

THE COURT: -- instead of shooting off my hip here today.

Regarding Martin Keller's altercation --

MR. BUJNOCH: Uh-huh.

THE COURT: -- with Sherry McNutt, now, I don't even know what that altercation was about.

MR. BUJNOCH: Yes -- well, but it has nothing to do with an oral gift of land. That's why I was --

THE COURT: Well, I don't know whether it does or not. I have nothing --

MR. BUJNOCH: Okay.

THE COURT: I have no way of saying. Is he going to stand up there and give testimony that he knows that there was no oral gift? Then it goes to his credibility. Now, as of today, it should be granted, but if he testifies to something, then you ought to be able to bring it out.

MR. NICHOLS: I will.

MR. BUJNOCH: Okay.

THE COURT: It depends. These -- all these are depending on certain situations that may occur --

MR. BUJNOCH: Right.

THE COURT: -- during the trial of a case, so I can't say either right now for sure but --

MR. NICHOLS: All right.

THE COURT: -- obviously right now I grant that.

MR. BUJNOCH: Yes, Your Honor.

THE COURT: Okay. Now, number -- I see what you're saying. I misread that.

MR. BUJNOCH: Okay.

THE COURT: 25, Any mention or statement from Plaintiff and from any witness regarding promissory estoppel. Oh, I've already ruled on that. I grant that, unless there's something else in there

that I'm not reading. Adverse possession, fiduciary duty -- now, wait --

MR. BUJNOCH: Your Honor, if I could speed it up --

THE COURT: Are you talking about the pleadings that you have filed previously that went into these as a basis of a cause of action?

MR. NICHOLS: Actually this is a -- I think this is a live pleading at this point.

MR. BUJNOCH: And Mr. Nichols had produced some special issues that he wanted submitted to the Court that covered all these.

MR. NICHOLS: Your Honor, you've made it clear the two issues that you want to submit.

MR. BUJNOCH: Okay.

THE COURT: So I don't think there's any question 25 is not applicable in this case at this time.

MR. BUJNOCH: Your Honor, No. 26 is just the shade of No. 22 about the sexual abuse, and that --

THE COURT: Yeah. I don't -- I grant that.

MR. NICHOLS: That's the approach one.

THE COURT: Huh? Then 27, any

reference, statement --

MR. BUJNOCH: To the Sherry McNutt ranch, which as in the first trial had to do with the north side.

THE COURT: Any reference, statement, inference or allusion to the Sherry McNutt ranch.

MR. NICHOLS: Yes, Your Honor.

THE COURT: Now, wait a minute. How much land does it take to have a ranch?

MR. BUJNOCH: Well, in the first trial, Your Honor, they called the north side her ranch.

THE COURT: I know, but we're -- we're saying they can't get into the whole north side as a ranch.

MR. BUJNOCH: Right.

THE COURT: But how much land does it take to have -- make a ranch?

MR. BUJNOCH: According to my wife, it needs -- you have to have more than 70 acres, but --

THE COURT: Do you?

MR. BUJNOCH: That's what she says.

THE COURT: I have no idea.

MR. NICHOLS: Is she going to testify?

THE COURT: I can't take judicial notice how much land is --

MR. NICHOLS: And if she -- if his wife testifies, Judge, am I limited to my cross-examination of her?

THE COURT: I don't know. I can't say how --

MR. NICHOLS: Be careful now. Be careful.

THE COURT: -- unless you get some evidence in here as to what a definition of a ranch is, if she wants to call that a house and whatever land is necessary for the use and enjoyment of it as her ranch --

MR. BUJNOCH: Right.

THE COURT: -- I don't know what she can say, This is my ranch. It may be one acre.

MR. NICHOLS: Judge, I'm inclined to rename any one I ever get to one I saw driving by New Braunfels, the highway going -- leading to New Braunfels the other day that said it's the Rancho Not So Grande.

THE COURT: Yeah.

MR. BUJNOCH: No. It's just that --

THE COURT: See what I'm saying though?

MR. BUJNOCH: Yes, Your Honor.

THE COURT: I can't say that right now.

MR. BUJNOCH: Right.

THE COURT: I will limit it to where they can't refer to the north 2,000 acres as her ranch --

MR. NICHOLS: Yeah.

MR. BUJNOCH: Okay.

THE COURT: -- but, now, I don't know how that statement is going to come in of any reference, statement, inference, or allusion to the Sherry McNutt ranch and what degree are they alluding to the Sherry McNutt Ranch. If they mean by that the 2,000 acres, I'd have to sustain the objection, and if it comes out, I'd have to order the jury to disregard the statement, but just to say that they can't refer to --

MR. BUJNOCH: Well, I was -- again, it has to do with, like, Sherry's side is the north side. Sherry's side is the 2,000 acres.

THE COURT: Yeah. Those -- those sort of things, you're right.

MR. BUJNOCH: Right. Okay.

THE COURT: I don't want that -- that shouldn't come out --

MR. BUJNOCH: Right.

THE COURT: -- but -- under the

rulings, but you understand that you don't want to go into anything about the 2,000 acres as her ranch.

MR. NICHOLS: I'm pretty clear about it.

MR. BUJNOCH: Okay.

THE COURT: I'm just going to deny it the way it's phrased right now.

MR. BUJNOCH: Okay.

THE COURT: Okay. Now, you have places for y'all to agree, but you might also agree to it as to form --

MR. BUJNOCH: Okay.

THE COURT: -- not as to my rulings, 'cause I don't think either one of you have agreed with all my rulings. I've never seen someone have one that's agreed to by attorneys as to motions in limine when the Judge grants some and denies some.

### JURY QUESTIONNAIRE

MR. NICHOLS: Judge, the next thing is -- and I don't know what your -- your practice has been, but -- whether you have in the past used jury questionnaires, but the Supreme Court of Texas has come out with cases that are shades and phases of that old case that said about having a fixed opinion, you know, being a disqualifier for a juror.

THE COURT: You're going to read my jury charge. If you have any objections to the jury charge at the time I give it, I'll be glad to hear it. Let's not go into what the jury charge is going to be. I can't really one hundred percent tell you what the jury charge -- here's the -- I've signed one Motion in Limine. This is another order. I don't know what these two are. I don't know if they're exhibits or motions to limit trial on --

THE CLERK: This is your order.

THE COURT: That's my order, yeah.

MR. SMALL: Your Honor, those are the motions and bench briefs that I submitted to you earlier and that we already discussed.

THE COURT: They're mine then.

MR. SMALL: Yeah -- well, no. Those are -- those go in the file.

THE CLERK: Yes, sir.

THE COURT: Okay.

THE CLERK: And I've already filed them in.

THE COURT: Okay. Good. Now then, what --

MR. NICHOLS: What I had previously submitted to the other side was, and I would submit to

the Court, is a jury questionnaire. I don't know if you have used jury questionnaires before, but I've -- I've used them quite a bit, and the Texas Supreme Court has come out with cases that say, you know, if a juror has an uncheckable conviction about a certain point, that would be a disqualifier, and what I --

THE COURT: Now, that's not -- that's on your voir dire examination.

MR. NICHOLS: It is. It is.

THE COURT: Well --

MR. NICHOLS: But this would be submitted to the jury ahead of time to -- so that I could voir dire the jury on -- on these points.

THE COURT: I don't ever do that.

MR. NICHOLS: Okay. All right. I'll withdraw the questionnaire then.

THE COURT: As far as I'm concerned -- off the record.

(Recess at 3:12 p.m. to 3:23 p.m.)

THE COURT: Okay. Back on the record. Anything further that we --

MR. NICHOLS: No.

THE COURT: I apologize. I was presented by Mr. Nichols a jury questionnaire. I will take this back to -- and consider it at the time of

the -- we get ready for jury trial and see what I may rule on in this and so with that --

MR. NICHOLS: And, Your Honor, and I can handle --

THE COURT: That's it. Let's go forward with another motion.

MR. NICHOLS: I can handle it in oral examination.

MR. BUJNOCH: Judge, can I respond then to the jury questionnaire? I thought the Court wasn't going to allow it.

THE COURT: I'm not -- well, at this time I'm not saying any way -- one way or the other. Yes. You'll have plenty of time before I make a decision, but I'm just not going to do it today. Let's go on with it.

**MOTION TO STRIKE EXPERTS**

MR. BUJNOCH: All right, Your Honor, it has to do with the Motion to Strike Experts, and that has to -- it primarily has to do with Mr. Nichols being listed as an expert on attorney's fees, because there's no -- that is an issue not to be considered in this trial based on the Fourth Court's opinion; and additionally, there's nothing, no statute or any cause of action he has cite -- that the Court is going to

allow that allows attorney's fees.

THE COURT: Where do you think, Mr. Nichols, under the provisions for attorney's fees that you're entitled to attorney's fees?

MR. NICHOLS: Judge, being perfectly honest here, that's something I just always put in my pleadings, and if I'm not entitled to them, I'm not going to urge it.

THE COURT: Well, unless you show me you're entitled to them, I --

MR. NICHOLS: All right.

THE COURT: There has to be some -- either -- probate law is pretty clear, but this comes outside the probate case.

MR. NICHOLS: It does and --

THE COURT: This is a private, personal case between your client and --

MR. NICHOLS: Right.

THE COURT: -- and the Estate and all the Defendants, and so unless you show me some authority for attorney's fees --

MR. NICHOLS: In my review of the authorities in the -- in this particular issue, I -- I haven't read anything where attorney's fees ever even came up, so it's -- it's not been addressed --

THE COURT: Well, unless you can show me something --

MR. NICHOLS: -- unless it's outside --

THE COURT: -- at the time when we get to it, then I'm going to grant that.

MR. NICHOLS: Okay.

MR. BUJNOCH: And, Your Honor, also objecting to Sherry McNutt as an expert in this case.

THE COURT: Yes, and I considered that, and I am going to deny that at this time.

MR. NICHOLS: Thank you.

MR. BUJNOCH: Okay, and is that in regards to just her working on the ranch, Your Honor? I mean --

THE COURT: Y'all sure like to pin me down on my rulings.

MR. BUJNOCH: Well, I'm sorry, Your Honor. It's just -- it has to do with the fact, what's a reasonable amount of land around the house, and I don't know if she's an expert in that regard or not.

THE COURT: Well, I've denied the motion.

MR. BUJNOCH: Okay, Your Honor. Let me --

THE COURT: Do you know why?

TAB 5

| | | |
|---|---|---|
| THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| | § | OF |
| | § | |
| WILLIAM H. McNUTT, DECEASED | § | KIMBLE COUNTY, TEXAS |

## THIRTEENTH AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Sherry McNutt, Plaintiff, filing her Thirteenth Amended Petition, showing the Court as follows:

### 1. *Discovery Level*

This is a Level 2 discovery matter.

### 2. *Parties*

The parties to this matter are:

(1)     Plaintiff, Sherry McNutt;

(2)     Defendant, Estate of William H. McNutt, Deceased, and as Limited Partner of McNutt Ranch, Ltd.;

(3)     Defendant, McNutt Ranch, Ltd., and

(4)     Defendant, McNutt Management, LLC, the General Partner of McNutt Ranch, Ltd., and as Limited Partner of McNutt Ranch.

## 3. *Service of Process*

No service is necessary. All parties have appeared and answered this suit.

## 4. *Jurisdiction and Venue*

This Court has subject matter jurisdiction over this matter and personal jurisdiction over the parties. Venue is proper in Kimble County, Texas because the acts or omissions complained of herein occurred in Kimble County, Texas, and venue of this matter is mandatory in Kimble County, Texas.

## 5. *Causes of Action* - **Oral Gift of the Foreman's House and the Surrounding Five (5) Acres and Pasture 9**

Sherry McNutt invokes the "discovery rule," under *Gaddis v. Smith*, 417 S.W.2d 577 (Tex. 1967) and *Little v. Smith*, 943 S.W.2d 414 (Tex. 1997), the doctrine of "relation back," under *Tex. Civ. Prac. & Rem. Code* §16.068, and the doctrine of "continuing tort" under *Twyman v. Twyman*, 790 S.W.2d 819, 821 (Tex. App.–Austin 1990), reversed on other grounds, 855 S.W.2d 619 (Tex. 1993). The original date of filing of this suit is October 11, 2007, of which Plaintiff, Sherry McNutt, asks the court to take judicial notice of the "Plaintiff's Original Petition." Hereinafter, in this Thirteenth Amended Petition, Sherry McNutt alleges an outright "oral gift of the foreman's house and the surrounding five (5) acres and a specific amount of land, being Pasture 9, for the full use and enjoyment of the house," on the north side of the McNutt Ranch in Kimble County, Texas. The claims made herein are within the applicable statute of limitations, discovery rule, and doctrines of "relation back" and "continuing tort." The causes of action alleged against the parties to this matter are: oral gift of the foreman's house and the surrounding five (5) acres, and a specific amount of land, being Pasture 9, for the full use and enjoyment of the house.

Primarily, Sherry McNutt alleges a cause of action for an outright "oral gift of the foreman's house and the surrounding five (5) acres of land and a specific amount of land, being Pasture 9, for the full use and enjoyment of the house," from William H. McNutt, Deceased, to Sherry McNutt, which Sherry McNutt asserts and refers to herein to be located on the north side of the McNutt Ranch, approximating specific acreage appropriate for the full use and

enjoyment of the house, as hereinafter stated. William H. McNutt adopted Sherry McNutt when she was a small child. Sherry McNutt is presently over sixty (60) years of age.

In the Spring of 1983, William H. McNutt ("Bill McNutt") called his daughter, Sherry McNutt, in Denver, Colorado, where she lived and operated her business, and told her that because Mr. Erwin Wahrmund, the ranch foreman of thirty-eight (38) years and four (4) months, had died in February 1983, he and her mother, Johnnie Beth McNutt, wanted and needed Sherry McNutt to assume the responsibility of running the McNutt Ranch ("Ranch"), where Sherry McNutt had lived practically all of her life. Bill McNutt told his daughter, Sherry McNutt, then about age 30, that if she came back to Texas and took over the day-to-day responsibilities of running the Ranch, he would gift the "foreman's house and a specific amount of land for the full use and enjoyment of the house" on the north side of the Ranch to her, which Sherry McNutt alleges to be five (5) acres surrounding the house, and Pasture 9, also on the north side of the McNutt Ranch.

Sherry McNutt placed her trust and confidence in her father, in his statement to her, and accepted her father's offer and gift, and in reliance thereon, Sherry McNutt moved back to the Ranch and began what would be approximately a twenty-five (25) year commitment to her parents, Beth and Bill McNutt, and the McNutt Ranch.

Sherry McNutt personally worked on the McNutt Ranch on a daily basis, managed the ranching and hunting operations, and supervised the work of others. All work done on the McNutt Ranch by Sherry McNutt, including the permanent and valuable improvements, were done in addition to the oral gift of the foreman's house and surrounding five (5) acres, and Pasture 9 as outlined above, and done with the knowledge and consent of her father, Bill McNutt, as well as her mother, Beth McNutt. A list of day-to-day ranch work and jobs performed on the south side of the McNutt Ranch by Sherry McNutt and permanent improvements made on the McNutt Ranch by Sherry McNutt is attached hereto as *Exhibit 1*, and incorporated by reference as though fully set forth herein.

As outlined above, Sherry McNutt took possession of the specific ranch property on the North side of I-H10, and for 25 years continually exercised acts of ownership of the oral gift of land, stated above, with the full knowledge, acceptance, and blessing of Bill and Beth McNutt. Sherry McNutt demonstrated her ownership of the foreman's house and the

surrounding five (5) acres, and Pasture 9, by making valuable and permanent improvements thereon, managing her own hunting and ranching operations, and making day-to-day, as well as long-term, management decisions without prior approval from, or consultation with, anyone. A list of permanent improvements made to the foreman's house and surrounding five (5) acres, and Pasture 9, are attached hereto as *Exhibit 2,* and incorporated by reference as though fully set forth herein, and support an oral gift of land, as specifically stated herein, under Texas law.

Through the years Bill McNutt openly showed and voiced his approval of Sherry McNutt's hard work and accomplishments and encouraged her dedication. He bragged to others about Sherry McNutt's dedication and accomplishments as set out in Exhibit 2, relating to the oral gift of land.

As a true "Steward of the Land," and in reliance on the oral gift of the foreman's house and surrounding five (5) acres of land, as well as Pasture 9, Sherry McNutt dedicated her life to the McNutt Ranch. Being a devoted caretaker of the McNutt Ranch, Sherry McNutt expended time, toil, talent and effort for approximately the past 25 years on the McNutt Ranch, including the numerous and valuable permanent improvements, which were made in good faith, trust, and in reliance of the gift of the foreman's house and surrounding five (5) acres of land, and Pasture 9, given to her by Bill McNutt. Bill McNutt and his legal representatives are legally and equitably estopped from asserting that there was no oral gift of the foreman's house and land (5 acres surrounding the house and Pasture 9) to Sherry McNutt, above described.

See *Thompson v. Dart*, 746 S.W.2d 821 (Tex. App. – San Antonio 1988, no writ), which provides for an oral gift of land when there is proof that there was: (1) a present gift of the property by William H. McNutt to Sherry McNutt, (2) possession of the property by Sherry McNutt with William H. McNutt's consent, and (3) permanent and valuable improvements, i.e., the existence of such facts as would make it actual or constructive fraud upon Sherry McNutt not to enforce the gift. See also *Troxel v. Bishop*, 201 S.W.3d 290 (Tex. App. – Dallas 2000, no pet.), and *Nichols v. Nichols*, 170 S.W.2d 558 (Tex. Civ. App. – El Paso 1942, no writ). Neither the doctrine of estoppel nor the statute of frauds applies to an oral gift of land if all elements of a parol gift of the foreman's house and surrounding five (5) acres, and Pasture 9, are proven. Sherry McNutt did not waive any rights acquired under the

oral gift of the house and land since she occupied this land on the McNutt Ranch contemporaneously therewith when the gift of the foreman's house and surrounding five (5) acres of land, and Pasture 9, were made, and she complied with all requirements and elements of an oral gift of the foreman's house and surrounding five (5) acres, and Pasture 9.

Sherry McNutt filed suit against her father, William H. McNutt, on October 11, 2007. She was previously stripped of her power and authority to occupy and possess the property orally gifted to her by her dad by persons alleged to be speaking for, on behalf of, and with the approval of William H. McNutt. Shortly after filing this suit on October 11, 2007, the Defendants formed, on November 6, 2007, a limited liability corporation named "McNutt Management, LLC" with J. David Boland acting as Registered Agent and "Manager," along with Dawn McNutt Keller and Martin Keller, also being named as Managers. Additionally, the Defendants on November 6, 2007, contemporaneously therewith, formed a limited partnership named McNutt Ranch, Ltd., with J. David Boland acting as Registered Agent. The Defendants also formed and signed a limited partnership agreement on November 6, 2007, naming McNutt Management, LLC (Boland, Keller and Keller), General Partner and naming Dawn McNutt Keller / J. David Boland, President of McNutt Management, LLC, and conveying the McNutt Ranch into the limited partnership. Finally, on November 6, 2007, the Defendants formed another corporation called DMK Ranching, LLC, with J. David Boland also as it's registered agent. All Defendants are jointed herein and represented by attorney Craig White of San Antonio, Texas.

Sherry McNutt seeks a finding and determination by the finder-of-fact that William H. McNutt made an "oral gift of the foreman's house and surrounding five (5) acres of land, and Pasture 9," to be determined by the finder-of-fact.

## 6. *Prayer*

A. Sherry McNutt seeks judgment and damages against Defendants, jointly and severally, in conformity with the pleadings herein.

B. Sherry McNutt has paid a jury fee and requests trial by jury.

C.  Sherry McNutt seeks such other and further relief, at law or in equity, general or special, to which she may show herself justly entitled.

Respectfully submitted,

NICHOLS LAW

_____
John Nichols, Sr.
State Bar No. 14996000
Traditions Bank Plaza
5020 Montrose, Suite 400
Houston, Texas 77006
Tel: (713) 654-0708
Fax: (713) 654-0706
www.nicholslaw.com

Attorneys for Plaintiff, Sherry McNutt

## CERTIFICATE OF SERVICE

I certify that a true copy of the above was served on the following attorney of record or party in accordance with Tex. R. Civ. P. 21a, on the 27th day of October, 2014.

Judge Joe H. Loving
310 An County Road 4493
Palestine, Texas 75803
*Via Facsimile: (903) 549-2037*

Craig L. White
The Law Office of Craig White
111 West Olmos Drive.
San Antonio, Texas 78212
*Via Facsimile: (210) 930-9353*

_____
John Nichols, Sr.

# EXHIBIT 1

RANCH WORK, JOBS, AND PERMANENT IMPROVEMENTS PERFORMED ON
THE SOUTH SIDE OF THE McNUTT RANCH BY SHERRY McNUTT
(*Exhibit 1*)

A.   General Ranch
1.   Manage and operate commercial cattle operation.
2.   Manage and operate commercial hunting operation.
3.   General maintenance of pasture fences, windmills, houses, yards, barns, pens, offices, hunting lodges, shooting ranges.

B.   Cattle
1.   Check windmills and water supply for all pastures.
2.   Clean and maintain water troughs regularly three times a week.
3.   Repair any water trough or fixtures when broken or not functioning.
4.   Thaw pipes with hot water or fire and drip faucets when cold weather approaching.
5.   Put out special mineral salt mix in all six pastures.
6.   Feed cotton seed cubes every other day during dry winter months and some years will feed year-round if dry conditions exist.
7.   Feed alfalfa hay in dry months or when necessary and also special feedings during extra cold or freezing conditions.
8.   Locate and order alfalfa hay.
9.   Receive and unload one or two 18 wheeler truck loads of hay into 2nd story barn.
10.  Locate, order, travel to pick up oat or sudan round bales and haul to ranch and unload into barns.
11.  Roundup and work cattle.
12.  Record all information on special lists after all work is done.
13.  Constant care of cattle–check cattle for overall health, possible injury, snake bite, porcupine quills, newborn calf or sickness.
14.  Treat animal if sick..
15.  Treat animals for intestinal parasites.
16.  If needed, keep animal in isolation and treat daily.
17.  Mix and spray cattle for tics, lice, flies and grubs.

18. Gather fecal samples of cows to test for intestinal parasites.

19. Roundup cattle and work in chutes to palpate for pregnancy, then separate according to due dates or haul to sale or locker plant or separate into different pastures to be with bull.

20. Replace eartag if needed by clipping hair around ear and reading personal tattoo in ear.

21. Work calves in chutes and on calf table to clip ears and insert new eartag(white or yellow depending on sex) and then tattooing personal number and ranch brand in ears, dehorn by cauterizing with hot electrical iron.

22. Work calves at weaning time (205 days old) to weigh and wean and decide to sell or keep.

23. Keeper bulls were separated and fed out to sell as breeder bulls.

24. Keeper heifers were separated and kept in separate pasture and at 16 to18 months were pelvic tested and decision to sell or keep to breed and put with bull.

25. Nurse sick cattle.

26. Check cows when calving.

27. Pull calves if cow having problem. If I cannot handle, call vet and assist.

28. Daily care for cows that are sick or down from calving. (Possible prolapsed uterus to re-insert and sew up).

29. Feed and water daily any sick animal. Change positions, clean feces away, possibly spray for flies, extract milk if necessary for calf or bury calf.

30. Haul cattle to auction when necessary.

31. Replace eartag if lost or unreadable. (I would stencil these eartag front and back with special personal number that I could read off of the tattoo and paint the number with special paint pen.

32. Inject cattle with Vitamin A during dry months. (500 head)

33. Meet buyers and conduct sell of bull. Load for buyer or deliver to buyers ranch.

34. Retrieve animals if found in neighbors pasture.

35. Do extensive bookwork for keeping records on each individual cow, calf and bull.

36. Hour and hours of bookwork for record keeping. Very detailed— List of herd kept up to date, list and location of animals at all times, list of bulls by age, list of heifers by age, list of calves by cow, fertility tests of bulls, list of calves by chronological birth with date of birth, dam, sire, tattoo, date to wean, date actually weaned, adjusting weaning weight (had to figure by special adjusted weaning weight

formula), pasture lists, notes to whether bulls or cows jumped fences or got mixed up (would have to call double sire for calf), record for black leg vaccinations, records of changing of pastures, records of when bulls were put in and taken out of pastures, records of gestation periods of cows. Keep all records up to date.

37. Pick up feed weekly, daily or when necessary.

38. Hauled cattle to London lease (40 miles) and checked on them weekly.

40. Meet with vet and discuss problems and how to improve herd, etc.


B. Fences

1. Constant repairing of miles of existing low fences of net wire and barb wire.

2. Clearing cedar and other trees and bushes out of fence lines with chain saws or machetes. (Four miles)

3. Tearing down and replacing old low fences with new netting 48" high with barb wire 8" to 19" above.

4. Built high fence 8' tall enclosing about 500 acres.
   When I say build high fence 8' tall I mean:
   a. research cost analysis.
   b. plan time efficiency for pickup. (Traveled to Louisiana to pick up some pipe.)
   c. tear down the old existing fence.
   d. clean the right of way with bulldozer, bobcat, chainsaw or all three (12' on both sides of fence)
   e. mark the line by stretching single wire from point A to point B(must know survey points) and mark braces, line posts and t-posts.
   f. dig holes by hand with crowbar or mechanical auger 3' to 4' for brace posts and 2' for line posts and t-posts. (Some holes later were hired done and some were dug with my bobcat and t-posts were dig with rockdrill)
   g. mix cement with cement mixer and often times in a wheelbarrow by hand and cement all pipe and t-posts.
   h. weld double cross bar H braces and kickers(a pipe angled from top of brace post to bottom of next pipe.
   i. cap each pipe by welding special metal cap on top or by forming wire in an "S" shape form and hanging inside the pipe and stuffing the top with paper and then filling with cement and rounding off to keep water out.
   j. clean pipe with steel brushes.

      k.  paint pipe with ospho then with special metal paint.

      l.  paint t-posts if unpainted.

     m. roll wire out. (Possibly 660' at a time and tie together)

     n.  double wrap and tie wire to brace post.

     o.  stretch wire netting with bulldozer and come-along.

     p. tie off by double wrapping and tying.

     q. tie every rung on every pipe post and t-post with stay wire

     r.  repeat with second netting.

     s. double wrap and tie barb wire to brace post.

     t.  unroll and stretch barb with bulldozer and come-along.

     u. tie off by double wrapping and tying.

     v. tie with stay wire to all posts and t-posts.

     w. repeat barb wire stretch 6" above.

5. Repair and replaced water gaps numerous times when had large rains.

6. Began building high fence to enclose complete acreage on south side.

7. Built new and replaced numerous 8' x 16' plus gates.(welded 1 ½" square tubing with 4" metal mesh.)

8. Built special break-away fencing for water gaps.

9. Built new low fence.(several miles)

10. Welded new cattle guard of pipe.

C. Water

1. Repair water troughs of leaks, replace floats and part.

2. Mix and pour cement over rocks gather and placed around water troughs to build skirts.

3. Chop ice during extra cold weather.

D. Deer

1. Advertise for deer leases.

2. Show property to potential lessees.

3. Negotiate season lease.

4. Fill spin feeders (13) year-round.

5. Repair, replace batteries and re-charge old batteries.

6. Built large net wire feeder pens. (approximately 100' x 100' x 4' high)

7. Built new deer blinds of wood. (4' x 4' x 8' high with 3 windows,1 door) and repaired old deer blinds.

8. Cleared cedar with bulldozer, bobcat with cedar shearers and chainsaw for 100 yards around deer blinds

9. Built and set up new blind locations in high fence, pasture 3.

10. Built barrel spin feeders and set up in new locations in p. 3.

11. Set up new gravity flow protein feeders (4) in p. 3.

12. Built and set up new bow stands in p. 3.

13. Filled protein feeders with 16% special protein deer formula.

14. Fill corn feeders as needed.

15. Haul round bales of oat or sudan hay (1200 pounds) for deer.

16. Built 8' high fence around watering area, windmill and pump.

17. Cleaned large water tank.

18. Hauled water when this tank went dry.

19. Booked and guided hunts in high fence.

20. Booked and guided hunts in low fence.

21. Hosted corporate hunt.(Cooked, cleaned, prepared lodge, buy groceries, photographed hunters with deer, got liability forms signed, received money on behalf of ranch, paid guides.)

22. Trap and dart exotics in low fence and move to high fence.

23. Dart injured animals in high fence and doctor.

24. Travel to buy exotics at auctions. (Fredericksburg, San Antonio, Tyler, Lambasts, Seguin, Harper)

25. Travel to buy exotics from private ranches or from different trappers.

26. Trapped 100 whitetail deer, received special permit and released in p. 2.

27. Processed meat or hauled to locker plant to have processed.


E. House

1. Constant maintenance, mowing, watering of yards and areas around main residence, hunting lodge and three shooting ranges.

2. Clean large water tank every year.

3. Remodeled main residence:

   a.. pulled out walls, replace walls, tore out and replaced ceilings with new insulation.

   b. rebuilt bathroom cabinets in 4 bathrooms, plumbed, textured walls.

        c. replaced 5 flat gravel roofs with sloped metal trusses and covered with r-panel and special flashing.

        d. hired company to come in and treat house of mold.

        e. installed new gutters and trim work.

4. Built rock walls around patio.

5. Welded wrought iron railing on deck and around patio.

6. Painted cinder block on new 4 car garage.

7. Built new framework and put new insulation and new r-panel on office roof.

8. Put new gutters on new metal roofs.

9. Excavated with bulldozer and bobcat for new location of 3 bedroom addition.

10. Built new framework of pipe and metal roof on 4-car garage.

11. Landscaped around new buildings, sodded and hauled in new red granite for driveway.

12. Built cabinets, installed bathroom doors, painted walls, in 3 new bedrooms and 2 offices.

F. Barn

1. Rebuilt front and back walls of shearing barn.

2. Built new 8' x10' wooden doors.


G. Hunting Lodge

1. Ditched and laid new 1" PVC pipe from pump house. (300 yards)

2. Painted hunting lodge.

3. Replace screen on deer hanging house.

4. Framed and poured slab for cleaning deer and set large pipe and racks for skinning deer.


H. Shooting Ranges

1. Poured cement floor for silhouette range and running deer range.

2. Cut plywood and pasted deer target.

3. Repaired and maintained locomotive.

4. Cleaned track of debris, grass and weeds.

5. Welded and built small 2 sided barn cover for locomotive with target.

6. Built pipe rail fence around running target.

7.	Built fence around silhouette range.

8.	Sewed awning fabric to fit carport structure.

I.	Additional Residence

1.	Ditched and installed new 2" PVC waterline ½ mile to new dwelling.

2.	Installed new french drains on three sides of house.

3.	Excavated area for new dwelling with bulldozer and bobcat.

4.	Framed and poured all footings . (16" x 30' x 12")

5.	Built retaining wall and added water drains and faucets where needed.

J.	Personnel

1.	Hired and fired extra help when necessary.

H.	General

1.	Cut numerous acres of cedar with bobcat shearers.

2.	Cut firewood.

3.	Service vehicles.(change oil, antifreeze, fix flats)

4.	Shredded thistles where needed.

# EXHIBIT 2

A.      Fences

1.      Constant repairing of miles of existing low fences of net wire and barb wire.

2.      Clearing cedar and other trees and bushes out of fence lines with chain saws or machetes. (Four miles)

3.      Tearing down and replacing old low fences with new netting 48" high with barb wire 8" to 19" above.

4.      Built high fence 8' tall enclosing about 7 acres.
        When I say build high fence 8' tall I mean:

      a.      research cost analysis.

      b.      plan time effeciency for pickup. (Traveled to Louisiana to pick up some pipe.)

      c.      tear down the old existing fence.

      d.      clean the right of way with bulldozer, bobcat, chainsaw or all three (12' on both sides of fence)

      e.      mark the line by stretching single wire from point A to point B(must know survey points) and mark braces, line posts and t-posts.

      f.      dig holes by hand with crobar or mechanical augar 3' to 4' for brace posts and 2' for line posts and t-posts. (Some holes later were hired done and some were dug with my bobcat and t-posts were dig with rockdrill)

      g.      mix cement with cement mixer and often times in a wheelbarrow by hand and cement all pipe and t-posts.

      h.      weld double cross bar H braces and kickers(a pipe angled from top of brace post to bottom of next pipe.

      i.      cap each pipe by welding special metal cap on top or by forming wire in an "S" shape form and hanging inside the pipe and stuffing the top with paper and then filling with cement and rounding off to keep water out.

      j.      clean pipe with steel brushes.

      k.      paint pipe with ospho then with special metal paint.

  l. paint t-posts if unpainted.

  m. roll wire out. (Possibly 660' at a time and tie together)

  n. double wrap and tie wire to brace post.

  o. stretch wire netting with bulldozer and come-along.

  p. tie off by double wrapping and tying.

  q. tie every runge on every pipe post and t-post with stay wire

  r. repeat with second netting.

  s. double wrap and tie barb wire to brace post.

  t. unroll and stretch barb with bulldozer and come-along.

  u. tie off by double wrapping and tying.

  v. tie with stay wire to all posts and t-posts.

  w. repeat barb wire stretch 6" above.

5. Repair and replaced water gaps numerous times when had large rains.

6. Built high fence for garden and yard.

7. Built new and replaced numerous 8' x 16' plus gates.(welded 1 ½" square tubing with 4" metal mesh.)

8. Built special break-away fencing for water gaps.

9. Built new low fence.(several miles)

10. Welded gates at entrance.

11. Built new low fence.

12. Built and welded new 8' pipe pens with net wire and lined with wooden guard rail posts.

13. Built and welded 8' metal gates with 4" mesh for pasture gates and entrance gates.

14. Repaired and built new water gaps with break-away fencing.

15. Built and welded new 8' working pens and pipe chutes for cattle and deer.

16. Cleared with chainsaw large live oak tree in pens that was cracking large water tank. Repaired by scraping inside of tank and painting with special tank coat paste.

17. Built and welded new metal canopy over working chutes.


B. Water

  1. Ditched and installed water lines to house, garden, water troughs, and hunting house.

  2. Mix and pour cement over rocks gathered and placed around water troughs to build skirts.

  3. Installed water system for garden

4. Repair and replace water lines to water troughs.
5. Repair and replace broken fixtures in troughs.
6. Excavated for small pond..

C. Hunting

1. Built large net wire feeder pens. (approximately 100' x 100' x 4' high)
2. Built and set up deer blinds of wood. (4' x 4' x 8' high with 3 windows,1 door) and repaired old deer blinds.
3. Cleared cedar with bulldozer, bobcat with cedar shearers and chainsaw for 100 yards around deer blinds
4. Built and set up barrel spin feeders.
5. Built and welded bow stands and set up in trees.
6. Set up mobile home for hunting house.
7. Formed and poured slab for cleaning deer.
8. Welded metal pipe racks for hanging and cleaning deer.
9. Built and welded steel railings and steps both front and back of hunting house.
10. Landscaped around hunting house.
11. Had electrical services added and special amperages for RV's.

D. House

1. Remodeled residence:
   a.. pulled out walls, replace walls, tore out and replaced ceilings.
   b. built bathroom cabinets in 2 bathrooms, plumbed, new dry walls.
   c. taped, floated and painted.
   d. built new cabinets in kitchen and bathrooms.
   e. installed new sinks in kitchen and bathrooms
2. Built new rock patio and rock firering.
3. Sodded and landscaped yard.
4. Put in red granite driveway.

E. Barn

1. Repaired old barns. (Add new metal, reinforced structure.
2. Built and welded  new 24' x 50' x 12' for equipment and storage
3. Built and welded new 12' x'30' x 8' metal dog kennel with slab.

# TAB 6

NO. 2,284

| | | |
|---|---|---|
| THE ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| WILLIAM H. McNUTT | § | OF |
| | § | |
| DECEASED | § | KIMBLE COUNTY, TEXAS |

## JUDGMENT

Be it remembered that on the 11th day of July 2011, came on to be considered the sole issue for determination by the court, sitting without a jury with the agreement of the parties, of an alleged parol or oral gift of land by William H. McNutt to his daughter, Sherry D. McNutt in the 1980's. John Nichols, Sr. appeared for the Plaintiff, Sherry D. McNutt. Ken Nunley appeared for the Defendants, Keaton Blackburn, Independent Executor for the Estate of William H. McNutt, Deceased, McNutt Ranch Ltd. Partnership, McNutt Ranch, L.L.C. All parties announced "Ready" for trial.

The court proceeded to hear evidence until all parties rested on July 12, 2011, when the court took this mater under advisement and announced in open court, on the record, that it would render judgment on the pleadings, evidence and briefs of the parties on July 13, 2011 at 10:00 a.m.

On July 13, 2011 at 10:00 a.m. the court reconvened the proceedings on the record, with Robin Brame reporting, and announced its findings and judgment, which is ORDERED, ADJUDGED, AND DECREED as follows:

1.  **Jurisdiction** - This court has personal jurisdiction over the parties and subject matter jurisdiction over the issue of an alleged parol or oral gift of land, being of the McNutt Ranch the North Side on Interstate 10 in Kimble County, Texas.

2.  **Parol or Oral Gift of Land** - The elements of an oral gift of land have been proved under the quantum of proof required under Texas law; provided however, the court finds that the parol or oral gift of land by William H. McNutt to his daughter Sherry D. McNutt was limited to a permanent residence structure existing on five (5) acres of land, with water, ~~and ingress and egress through a gate marked "McNutt Ranch,"~~ ~~and described by metes and bounds as set out in Appendix 1, attached hereto and~~ 𝓮𝓟 ~~incorporated by reference as though fully set forth herein.~~ _The Five (5) Acre Tract. Includes Access to the Highway I-10_ 𝓟𝓯 _Service Road._

𝓟𝓯
𝟹-𝓐

830

3.	**Costs of Court** - Costs of court are adjudicated by the party incurring same.

4. ALL other ReLiefs PRAyed For Are hereby denied. JL

SIGNED this _28_ day of _November_ , 2011.

_Joe Loving_
Judge Joe Loving, Presiding

**AGREED:**

NICHOLS LAW, P.L.L.C.

John Nichols, Sr.
State Bar No. 14996000
john@nicholslaw.com
Traditions Bank Plaza
5020 Montrose, Suite 400
Houston, Texas 77006
(713) 654-0708
(713) 654-0706 (fax)
www.nicholslaw.com

Attorney for Plaintiff
Sherry McNutt

THE NUNLEY FIRM

J. Ken Nunley
State Bar No: 15135600
Dennis Bujnoch
State Bar No: 03319500
1580 South Main, Suite 200
Boerne, Texas 78006
(830) 816-3333
(830) 816-3388 (fax)

Attorneys for Defendants
Keaton Blackburn, Independent Executor for
the Estate of William H. McNutt, Deceased,
McNutt Ranch Ltd. Partnership, and McNutt
Ranch, L.L.C.

Filed Nov 28, 2011
at 10:26 o'clock A M
_Haydee Torres_
Haydee Torres, County Clerk, Kimble County, Texas

831

TAB 7



# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-11-00924-CV

**IN RE ESTATE OF** William H. **MCNUTT**, Deceased

From the County Court, Kimble County, Texas
Trial Court No. 2,284
Honorable Joe Loving, Jr., Judge Presiding

Opinion by: Catherine Stone, Chief Justice
Dissenting opinion by: Sandee Bryan Marion, Justice

Sitting: Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Rebeca C. Martinez, Justice

Delivered and Filed: May 22, 2013

REVERSED AND REMANDED

As the trial court acknowledged at a hearing in which it announced its findings after a two-day bench trial, "[w]e originated th[is] case with the understanding that I would be deciding [whether] there was an oral gift of 2000 acres and the improvements thereon or there was not an oral gift of that property to Sherry D. McNutt by her father William H. McNutt." Despite acknowledging the legal theory under consideration, the trial court entered a judgment based on its findings that the elements of an oral gift of land had been proven by appellant, Sherry D. McNutt, as to "a permanent residence structure existing on (5) five acres of land, with water.

The five (5) acre tract includes access to the Highway I-10 service road."[1] On appeal, Sherry argues she proved the elements of an oral gift of land to the 2,000-acre "north side" of the almost 3,700-acre McNutt Ranch. Appellees are the Estate of William H. McNutt, Deceased; McNutt Ranch, Ltd.; and McNutt Management, LLC, the General Partner of McNutt Ranch, Ltd. (collectively, "appellees"). In their cross-appeal, appellees assert the evidence is legally insufficient to support the trial court's finding of an oral gift of the house and an undefined five-acre parcel. Because the trial court's judgment is based on a legal theory that was not fully developed at trial, we reverse the trial court's judgment and remand the cause in the interests of justice.

To establish an oral gift of an interest in real property, a party must show: (1) a gift in praesenti or a gift at the present time; (2) possession under the gift by the donee with the donor's consent; and (3) permanent and valuable improvements made on the property by the donee with the donor's knowledge or consent or, without improvements, the existence of such facts as would make it a fraud upon the donee not to enforce the gift. *Thompson v. Dart*, 746 S.W.2d 821, 825 (Tex. App.—San Antonio 1988, no writ). As the trial court recognized, the legal theory on which the case was tried was an oral gift of the 2,000-acre north side of the ranch. With regard to this legal theory, we believe the trial court found no oral gift on the basis that the evidence was insufficient to establish Sherry's possession as to the 2,000 acres. In reviewing this finding, "we consider only the circumstances relative to [her] possession which evidence a surrender of ownership and control by [William]." *Sharp v. Stacy*, 535 S.W.3d 345, 350 (Tex. 1976). At

---

[1] Although the trial court's judgment refers to a five-acre tract, the trial court actually describes the gift as "the house and the necessary plot of land on which that house sits," noting "it must be commonly understood and the Court can understand some common issues that a person must have a significant enough plot of land surrounding the house to enjoy the full aspect of the house. What would be a significant amount of land in the rural setting or an urban set[ting] are entirely perhaps different." In a second hearing, the trial court described the gift of the house as including "an appropriate amount of acreage for the full use and enjoyment of the house," which "includes access to water, sufficient evidence relative to the well, but only the fact that there is access to the water and that it includes access to highway ten, I-10 service road."

trial, the evidence established that William continued to run cattle on the north side of the ranch, funded significant improvements to the north side of the ranch, paid taxes and other expenses relating to the north side of the ranch, and was involved with and received the income from the hunting leases for the north side of the ranch for a significant period of time after Sherry moved into the house on the north side of the ranch. Accordingly, we agree with the trial court's finding that Sherry failed to meet her burden of proving an oral gift as to the 2,000 acres.

The difficulty with this case, however, is the trial court's second finding that the evidence established an oral gift as to the house and five acres of land. As the trial court expressly recognized, this legal theory was not fully developed at trial.

Appellate courts have broad discretion to remand for a new trial in the interests of justice. *Fanning v. Fanning*, 847 S.W.2d 225, 226 (Tex. 1993); *Scott Bader, Inc. v. Sandstone Products, Inc.*, 248 S.W.3d 802, 822 (Tex. App.—Houston [1st Dist.] 2008, no pet.). "As long as there is a probability that a case has, for any reason, not been fully developed, an appellate court has discretion to remand for a new trial rather than render a decision." *Ahmed v. Ahmed*, 261 S.W.3d 190, 196 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *see also Scott Bader, Inc.*, 248 S.W.3d at 822; *In re S.E.W.*, 168 S.W.3d 875, 886 (Tex. App.—Dallas 2005, no pet.). "Moreover, remand is appropriate if a case needs further development … to establish and present evidence regarding an alternative legal theory." *Ahmed*, 261 S.W.3d at 196. In this case, the trial court evaluated the oral gift as one of a house and an appropriate amount of acreage for the full use and enjoyment of the house, but "the parties neither argued nor developed evidence regarding [this theory]." *Id*. Thus, we believe remanding this case for a new trial on the theory of an oral gift of the house and an appropriate amount of acreage for the full use and enjoyment of the house is in the interests of justice. *Ahmed*, 261 S.W.3d at 196; *Westgate, Ltd. v. State*, 843 S.W.2d 454, 455 (Tex. 1992) (noting remand in the interests of justice is appropriate "where it

appears from the record that the losing party might be able to recover under some other established legal theory that was not developed at the first trial").

For the reasons stated above and in the interests of justice, we reverse the trial court's judgment and remand the cause to the trial court for a new trial on the legal theory of an oral gift of a house and the necessary plot of land surrounding the house for the full use and enjoyment of the house.[2]

Catherine Stone, Chief Justice

---

[2] As previously noted, the elements required to establish an oral gift of an interest in real property are: (1) a gift in praesenti or a gift at the present time; (2) possession under the gift by the donee with the donor's consent; and (3) permanent and valuable improvements made on the property by the donee with the donor's knowledge or consent or, without improvements, the existence of such facts as would make it a fraud upon the donee not to enforce the gift. *Thompson v. Dart*, 746 S.W.2d at 825. The dissenting opinion appears to recognize that the evidence is sufficient to support the trial court's finding as to the second and third elements of Sherry's claim, noting that "Sherry lived in and made improvements to the house on the 'north side.'" The dissenting opinion concludes, however, that the evidence is legally insufficient to support the trial court's finding of an oral gift based on the dissenting justice's interpretation of a letter Bill's attorney wrote to Sherry twenty-two years after she moved back to the ranch. The dissenting opinion argues that the letter's reference to Bill's intent to evict Sherry if she did not follow his rules was contrary to any conclusion that he relinquished dominion and control over the house. Interpreting Bill's intent from this letter and the other evidence presented, however, was the role of the factfinder, and, in this case, the factfinder interpreted the letter in a different manner. The factfinder's interpretation is supported by the letter referring to the house as "your home" and all of the other testimony in the record establishing that Bill repeatedly acknowledged that the house belonged to Sherry. Although Bill may have wanted to reclaim the house twenty-two years after he had given the house to Sherry, his desire does not prevent a factfinder from finding that the elements of an oral gift were established by the evidence, thereby legally precluding Bill from taking back what he gave away.

# DISSENTING OPINION

No. 04-11-00924-CV

**IN RE ESTATE OF WILLIAM H. MCNUTT**, Deceased

From the County Court, Kimble County, Texas
Trial Court No. 2,284
Honorable Joe Loving, Jr., Judge Presiding

Opinion by:    Catherine Stone, Chief Justice
Dissenting opinion by:  Sandee Bryan Marion, Justice

Sitting:    Catherine Stone, Chief Justice
            Sandee Bryan Marion, Justice
            Rebeca C. Martinez, Justice

Delivered and Filed:  May 22, 2013

In this appeal all parties challenge the trial court's judgment in which the court found that the elements of an oral gift of land had been proven by appellant, Sherry D. McNutt, but it limited the gift to "a permanent residence structure existing on (5) five acres of land, with water."  On appeal, Sherry argues she proved the elements of an oral gift of land to the 2,000-acre "north side" of the almost 3,700-acre McNutt Ranch.  Appellees are the Estate of William H. McNutt, Deceased; McNutt Ranch, Ltd.; and McNutt Management, LLC, the General Partner of McNutt Ranch, Ltd. (collectively, "appellees").  In their cross-appeal, appellees assert the trial court erred in awarding Sherry an undefined five-acre parcel.

The majority reverses and remands in the interests of justice because the trial court rendered a judgment based on a legal theory not developed at trial.  However, this legal theory— that Sherry was entitled to the house and five acres—was not developed because Sherry argued she was entitled to the entire 2000-acre "north side" of the ranch, which includes the house and five acres.  Because I believe the evidence does not support a finding that any oral gift was made, I would affirm.

## BACKGROUND

William ("Bill") McNutt, who died during the pendency of the underlying lawsuit, owned a working ranch of almost 3,700 acres called the McNutt Ranch. The ranch is bisected by Interstate 10, and the parties referred to the acreage north of I-10 as the "north side" and the acreage to the south of I-10 as the "south side." Bill and his wife, Beth, have two daughters, Sherry McNutt and Dawn McNutt Keller. The following is Sherry's account of why she is entitled to the 2,000-acre "north side."

According to Sherry, in 1983, her father asked her to move to the ranch from Colorado where she was living. The ranch foreman had died and her parents were unable to manage the ranch on their own. Sherry testified that in exchange for moving back home to run the ranch, her father gave her the "north side." She resided on the "north side" in the house formerly lived in by the foreman. In addition to overseeing and personally taking part in regular ranching activities, Sherry booked hunts on both the "north side" and "south side" of the property. Her parents received payments from the hunters for use of the "south side" and Sherry received payments from the hunters for use of the "north side." In 2000, Bill gave to Beth and Sherry the "south side" hunting compensation, and, after a time, Sherry also shared the "north side" compensation with her mother. About five years later, a misunderstanding about the division of the hunting compensation caused a rift between Sherry and her father. This rift eventually led to Sherry filing this suit against her father (and later his estate). In her petition, Sherry alleged a cause of action for oral gift of land and she asked for a judgment "for title to the north side of the McNutt Ranch." In the course of the lawsuit, the parties negotiated a temporary injunction under which Sherry agreed to temporarily limit herself to the use of and access to the house in which

she had been living on the "north side" pending final resolution of the lawsuit. After a two-day

bench trial, the trial court rendered the judgment that is the basis of this appeal.

## ORAL GIFT OF LAND

In her first issue, Sherry asserts the trial court correctly held that she proved an oral gift

of land, but incorrectly limited the gift to only the house and five acres of the 2,000-acre "north

side." In their cross-issue on appeal, appellees assert there is no evidence of an oral gift of the

house and five acres to Sherry. I agree with the majority's conclusion that Sherry failed to meet

her burden of proving an oral gift as to the 2,000 acres. Because I believe Sherry did not satisfy

her burden at trial as to either the 2,000 acres or the house and five acres, I respectfully dissent.

For the purpose of explaining why I dissent, following is a more detailed discussion of the

evidence at trial.

At trial, the sole issue was whether Bill made an immediate present oral gift of the 2,000-

acre "north side" to Sherry. Sherry did not allege, in the alternative, that her father made her a

present oral gift of only the house and five acres. The trial court, prior to announcing its

decision, acknowledged a five-acre gift was never raised or argued by any party. However, in its

judgment, the trial court found as follows:

> The elements of an oral gift of land have been proved under the quantum of proof
> required under Texas law; provided however, the court finds that the parol or oral gift
> by [Bill to Sherry] was limited to a permanent residence structure existing on five (5)
> acres of land, with water. The five (5) acre tract includes access to the Highway I-10
> service road.

A gift of real property may be made in two ways: either by deed or by oral gift.

Generally, a conveyance of real property must "be in writing" and "subscribed and delivered by

the conveyor" or his agent. TEX. PROP. CODE ANN. § 5.021 (West 2004) ("Instrument of

Conveyance"); *see also* TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(4) (West 2009) ("Statute

of Frauds"). To establish an oral gift of an interest in real property, a party must show: (1) a gift

in praesenti, that is, a present gift; (2) possession under the gift by the donee with the donor's consent; and (3) permanent and valuable improvements by the donee with the donor's consent or other facts demonstrating that the donee would be defrauded if the gift were not enforced. *Thompson v. Dart*, 746 S.W.2d 821, 825 (Tex. App.—San Antonio 1988, no writ).  To be a gift in praesenti, the donor must, at the time he makes it, intend an immediate divestiture of the rights of ownership out of himself and a consequent immediate vesting of such rights in the donee.  *Id.* Three elements are necessary to establish the existence of a gift: (1) intent to make a gift; (2) delivery of the property; and (3) acceptance of the property.  *Id.*  Further, the owner must release all dominion and control over the property.  *Id.*  The person claiming the gift bears the burden of establishing these elements.  *Id.*  Therefore, the threshold issue Sherry had to establish was the existence of a gift.  More specifically, she had to establish that Bill released all dominion and control over the 2,000-acre "north side."

On appeal, Sherry agrees with the ruling that she proved the elements of an oral gift but she disagrees with the subsequent qualification that the gift was limited to five acres.  Therefore, she asks this court to reverse only the ruling as to the five acres, and affirm the ruling that she proved all the elements of an oral gift.  Sherry correctly states in her brief that "the evidence regarding the oral gift of land—for and against—addressed the entire 2,000 acres, not just the residence and five acres."  Therefore, Sherry interprets the judgment as partially granting her claim (as to the house and five acres) and partially denying her claim (as to the entire 2,000 acres).  The appellees, on the other hand, argue this court may affirm or reverse only the court's award to Sherry of an oral gift of the house and five acres.

A judgment should be construed as a whole toward the end of harmonizing and giving effect to all the court has written.  *Constance v. Constance*, 544 S.W.2d 659, 660 (Tex. 1977).  In

this case, it is apparent the trial court found the evidence did not establish that Sherry satisfied the elements of an oral gift of the entire 2,000-arce "north side," but the evidence did establish the elements of an oral gift of the house and five acres.

When the party who had the burden of proof at trial complains of the legal insufficiency of an adverse finding, that party must demonstrate the evidence establishes conclusively (*i.e.*, as a matter of law) all vital facts in support of the finding sought. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). A reviewing court must examine the record for evidence supporting the adverse finding, ignoring all evidence to the contrary. *Id.* If more than a scintilla of evidence supports the adverse finding, the issue is overruled. *Id.* If there is no evidence to support the adverse finding, the entire record must be examined to determine whether the contrary proposition is established as a matter of law. *Id.* The issue is sustained only if the contrary proposition is conclusively established. *Id.* The ultimate test for legal sufficiency is whether the evidence would enable a reasonable and fair-minded fact finder to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

When a party attacks the factual sufficiency of an adverse finding on an issue on which she had the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem.*, 46 S.W.3d at 242. A reviewing court considers all the evidence and will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Under either standard of review, the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *see also City of Keller*, 168 S.W.3d at 819.

Here, Sherry had the burden to establish all the elements necessary to show Bill made her a present oral gift of the 2,000-acre "north side." Therefore, as to her legal sufficiency challenge, Sherry must demonstrate the evidence establishes as a matter of law all vital facts in support of a finding that Bill made her a present oral gift of the "north side." However, if more than a scintilla of evidence supports the implied adverse finding—that Bill did not make her a present oral gift of the "north side"—Sherry's legal sufficiency challenge must be overruled. As to her factual sufficiency challenge, Sherry must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.

In their cross-issue, appellees assert there is no evidence of an oral gift of the house and five acres to Sherry. I agree with appellees. When reviewing a legal sufficiency or "no evidence" challenge, a reviewing court must determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827; *Rosas v. Comm'n for Lawyers Discipline*, 335 S.W.3d 311, 316 (Tex. App.—San Antonio 2010, no pet.). Because appellees challenge the legal sufficiency of the evidence to support a finding on which they did not have the burden of proof at trial, they must demonstrate on appeal that no evidence exists to support the adverse finding. *Rosas*, 335 S.W.3d at 316. A legal sufficiency or "no evidence" challenge is sustained when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.*

**B.      The "North Side"**

On appeal, Sherry asserts the evidence establishes the conveyance of the 2,000 acres as a matter of law.  Alternatively, she asserts the judgment of five acres is so against the great weight and preponderance of the evidence that it is manifestly unjust and "a new trial is necessary to solve the problems posed by this surprise judgment."  According to Sherry, the evidence that established the elements of an oral gift of five acres also proved the elements of an oral gift of the 2,000 acres of which the five acres is a part.  Sherry's case rested on her testimony, the testimony of seven witnesses (live and by affidavit), and two exhibits listing improvements made by Sherry to the "north side" and the "south side" of the ranch.

Sherry testified her father made a present oral gift of the "north side" to her in 1983 when he called and asked her to return to the ranch to help run the ranch.  Sherry said she returned to the ranch in 1983, took over the foreman duties, and continued to reside on the "north side" for the next thirty-plus years.  Sherry testified she worked both sides of the ranch without compensation until about 1989 when she began to receive compensation for her work on the "south side."  She thought she received about $1,200 net per month until about 2000.  The ranch had a gaming operation, with Sherry receiving lease payments for hunting on the "north side" and her parents receiving lease payments for hunting on the "south side."  Her compensation stopped in 2000 when Bill gave Sherry and her mother the lease payments for the "south side."

Sherry produced two exhibits, each showing a list of improvements, one entitled "Permanent Improvements Made On The Sherry McNutt Ranch By Sherry McNutt" and the other entitled "Ranch Work, Jobs, And Permanent Improvements Performed On The Bill McNutt Ranch By Sherry McNutt."  She said improvements were paid for by her father, her mother, or herself.  However, she could not provide proof of the amount of money she spent on the

improvements as compared to the amount paid by her parents. Sherry testified her father's accountant told her she did not need to keep receipts. Sherry also produced seven witnesses, all of whom had known the McNutt family for many years and often visited the ranch. Each witness testified that Bill often referred to the "north side" as "Sherry's side" or as "Sherry's." One of the witnesses testified Bill said the "north side" was Sherry's and that Sherry and Dawn would have to "fight" over the "south side." Another witness said Bill told him he wanted Sherry to hurry and finish some work on the "south side," but as to "her side," he did not care what she did, she could sell it or divide it up. These same witnesses testified they knew Sherry worked both sides of the ranch and made many improvements to the ranch.

Sherry's evidence establishes she took possession of the "north side" and made improvements to both sides of the ranch. But, the mere taking of possession or making improvements of insignificant value is not sufficient to establish a present oral gift of land. *See Wooldridge v. Hancock*, 70 Tex. 18, 6 S.W. 818, 822 (1888). Without extrinsic evidence of the necessary elements, "the proof establishing the donor's intent to give would, to a certain extent, be rendered solely on parol evidence." *Hernandez v. Alta Verde Indus., Inc.*, 666 S.W.2d 499, 504 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.). As stated above, one of the elements on which Sherry bore the burden of proof was that Bill released all control and dominion over the "north side." In determining whether Sherry's possession of the "north side" satisfied this required element, "we consider only the circumstances relative to [her] possession which evidence a surrender of ownership and control by [her] parents." *Sharp v. Stacy*, 535 S.W.2d 345, 350 (Tex. 1976). "Circumstances that may be explained quite separate and apart from a surrender of ownership and control by [Sherry's] parents will not be considered." *Id.*

In addition to the above evidence adduced by Sherry, appellees presented the testimony of three witnesses, James David Boland, Martin Keller, and Kasey Keller, as well as several exhibits. Boland testified Bill hired him in January 1987, and he worked for Bill as his CPA until Bill's death. According to Boland, Bill's tax returns took into account improvements made on the "north side" and the "south side," but no distinction was ever made between the two "sides." Bill submitted copies of checks to Boland that indicated the purpose of the check. For example, a check with the notation "Sherry McNutt, exotic game" indicated Bill reimbursed Sherry for the purchase of exotic game for the ranch's hunting operation. Bill and Beth ran their cattle on both the "north side" and the "south side." Bill paid all property taxes for each year on the ranch. Finally, no gift tax return reflecting an oral gift from Bill to Sherry was ever filed.

From 1990 through 2000, Bill paid Sherry a total net payroll amount of $142,957.80. From 1989 through 2004, Bill paid Sherry's medical and auto insurance, gifts, labor, and miscellaneous items totaling $197,272.23. From 1989 through 2004, Bill reimbursed Sherry $576,404.74 for third-party day labor, exotic animals, trailer, hunting, and other expenses. All ranch expenses, including these expenses, were reported on Bill's tax returns. The expenses were not broken down into "north side" and "south side." Through 2000, most expenses reimbursed to Sherry did not include receipts. In 2000, Boland explained to Bill and his wife the need to substantiate expenses taken as tax deductions. Boland thought Bill started to refuse Sherry's request for reimbursement in 2000 because the expenses started to decrease at about that time. Boland said that on the checks Bill would refer to the house in which Sherry lived sometimes as the "tenant house" and sometimes as "Sherry's house."

Although Bill gave the "south side" hunting compensation to his wife and Sherry in 2000, he remained active in negotiating the leases. Sherry admitted that along with herself and

her mother, her father sought out lessees, he negotiated the hunting leases for both sides of the ranch, and he set the terms and prices for hunting on both sides of the ranch. In 2005, a $5,000 check resulting from a lease was made payable to both Sherry and Bill. Sherry considered the check as belonging to her and her mother; therefore, she endorsed the check with her name and her father's. She admitted she did not have Bill's permission to sign his name. Later, when Bill discovered this, Sherry paid him $27,000 "to make peace with the family." She said the family "turned on" her and ordered her off the ranch.

On October 18, 2005, Bill's lawyer wrote a letter to Sherry advising her of certain "rules." The letter informed Sherry that Bill would have her evicted if she did not adhere to the following:

1. No guests on the ranch, except at her house.
2. No hunters allowed on the ranch by her invitation or by payment to her.
3. She was not to participate in the ranch management in any manner, either with regards to hunting or operations.
4. She was not to interfere with anyone who may be hired to perform certain jobs on the ranch including but not limited to the trapping or sale of domestic or exotic animals.
5. She was to stay in the area of her home or her mother's home for visits to her mother.

In either November or December 2007, for estate tax purposes, Bill transferred the entire 3,707 acres of the ranch to McNutt Ranch Ltd, except for Bill's house and approximately five acres with access to Interstate 10. Bill owned ninety-nine percent of McNutt Ranch Ltd. and the remaining one percent is owned by McNutt Ranch LLC, which is the general partner of McNutt Ranch Ltd. McNutt Ranch LLC is owned by Dawn McNutt Keller and her two children, Martin and Kasey Keller. Although Sherry filed her lawsuit in October 2007, Boland said the planning for the transfer of the ranch to McNutt Ranch Ltd. began at least as early as the Summer of 2007. Boland testified that Bill and his wife wanted the ranch to exist through the lifetimes of their

grandchildren, Martin and Kasey. To that end, in Bill's Will the ranch was initially left in a trust for Sherry and Dawn, with the ranch eventually residing in the hands of Martin and Kelsey, who would have ultimate disposition of the ranch in their lifetime. However, in 2005, Bill changed his Will because he did not want Sherry to have any part of the ranch; he wanted the ranch left in trust for Dawn and subsequently her two children.

After reviewing the record, I believe Sherry did not establish as a matter of law that Bill gave Sherry a present oral gift of the 2000-acre "north side." I also believe the implied adverse finding (that Bill did not make such a gift) is supported by legally sufficient evidence, and this adverse finding is not against the great weight and preponderance of the evidence. Any "substantial and permanent improvements that [Sherry] made or arranged for upon the land might be considered referable to [Sherry's] status as owner, except that many if not most of the improvements were paid for by [her] parents." *See Sharp*, 535 S.W.2d at 351. "The making of improvements by a transferee does not evidence a surrender of ownership and control if the transferor is also making improvements or paying for them." *Id.* Neither does the fact that Sherry received payments for leasing the "north side" to hunters "exclusively evidence a surrender of ownership and control because [her] parents continued to" use the "north side" for their own purposes. *Id.* "Finally, testimony that the ["north side"] was referred to as '[Sherry's]' . . . did not constitute any evidence that [Sherry] occupied the ["north side'] as owner." *Id.* "This is exactly the type of evidence that *Hooks v. Bridgewater* meant to exclude from consideration. The 'reason for the requirement of possession is that without it the existence of the contract rests altogether in parol evidence, which common experience has shown to be too unstable and uncertain to be permitted to work a divestiture of title to real property.'" *Id.* (quoting *Hooks v. Bridgewater*, 111 Tex. 122, 229 S.W. 1114, 1117 (1921)).

**C.     The House and Five Acres**

In addition to the above evidence that Sherry lived in and made improvements to the house on the "north side," the record contains the letter written by Bill's lawyer to Sherry setting out the "rules." The letter refers to the house in which Sherry lived on the "north side" as "your home." However, the letter ends with the following statement: "If the foregoing rules are not adhered to, copiously by you, your father will have no choice but to have you evicted from the ranch." Bill's intent to have Sherry evicted if she did not follow his rules is contrary to any conclusion that he relinquished dominion and control over the house. As to the five acres, the trial court relied on evidence that when Bill conveyed the ranch to the partnership, he excepted the surrounding 5.78 acres on which his own house sat. Nothing in the record indicates Bill made a similar present oral gift of any acreage surrounding the house on the "north side." I believe the evidence is legally insufficient to support the trial court's award to Sherry of "a permanent residence structure existing on (5) five acres of land, with water."

## CONCLUSION

I agree with the majority that there is no evidence to support an oral gift by Bill to Sherry of the 2,000-acre "north side." Similarly, I believe that the evidence is also legally insufficient to support the trial court's finding of an oral gift by Bill to Sherry of the house and five acres. Therefore, I would reverse the trial court's judgment in favor of Sherry and render a take-nothing judgment in favor of appellees.


                                                        Sandee Bryan Marion, Justice



# Fourth Court of Appeals
## San Antonio, Texas

### JUDGMENT

No. 04-11-00924-CV

**IN RE ESTATE OF** William H. **MCNUTT**, Deceased

From the County Court, Kimble County, Texas
Trial Court No. 2,284
Honorable Joe Loving, Jr., Judge Presiding

BEFORE CHIEF JUSTICE STONE, JUSTICE MARION, AND JUSTICE MARTINEZ

In accordance with this court's opinion of this date, the judgment of the trial court is REVERSED, and the cause is REMANDED to the trial court for a new trial on the theory of whether William H. McNutt made an oral gift to Sherry D. McNutt of the house and an appropriate amount of acreage for the full use and enjoyment of the house. Costs of the appeal are taxed against the parties who incurred them.

SIGNED May 22, 2013.

Catherine Stone, Chief Justice

TAB 8

# *In re Estate of McNutt*

Court of Appeals of Texas, Fourth District, San Antonio

May 22, 2013, Delivered; May 22, 2013, Filed

No. 04-11-00924-CV

**Reporter**
405 S.W.3d 194; 2013 Tex. App. LEXIS 6235; 2013 WL 2446467

IN RE ESTATE OF William H. **_MCNUTT_**, Deceased

**Subsequent History:** Released for Publication August 30, 2013.

**Prior History:** **[**1]** From the County Court, Kimble County, Texas. Trial Court No. 2,284. Honorable Joe Loving, Jr., Judge Presiding.

**Disposition:** REVERSED AND REMANDED.

## Core Terms

gift, ranch, north side, acres, trial court, south side, appellees, hunting, permanent, legal theory, expenses, donor's, lease, no evidence, trial court's judgment, interest of justice, legal sufficiency, burden of proof, real property, vital fact, witnesses, acreage, ownership and control, trial court's finding, legal insufficiency, acres of land, matter of law, new trial, surrender, includes

## Case Summary

### Procedural Posture

Appellant donee challenged a decision from the County Court, Kimble County, Texas, which determined that she had received an oral gift of a house and five acres of land, but had not received an oral gift as to 2,000 acres. Appellees, an estate, a ranch, and a general partner, filed a cross appeal.

### Overview

The trial court determined that there was an oral gift of a house on five acres of land. The donee contended that she proved the elements of an oral gift of land to a 2,000 acre tract. In reversing, the appellate court determined that there were three elements that had to be established to show an oral gift of an interest in real property. The donee failed to prove an oral gift as to the 2,000 acre tract because the donor continued to run cattle on the ranch, funded significant improvements, paid taxes and expenses for the ranch, and received income for hunting leases for a significant time after the donee moved into the house. However, the legal theory relating to the house and the five acres was not fully developed at trial. As such, a remand was necessary.

### Outcome

The decision was reversed, and the case was remanded for a new trial on the legal theory of an oral gift of a house and the necessary plot of land surrounding the house for the full use and enjoyment of the house.

## LexisNexis® Headnotes

Estate, Gift & Trust Law > ... > Personal Gifts > Elements of Valid Gifts > General Overview

Real Property Law > Ownership & Transfer > Transfer Not By Deed > General Overview

*HN1* To establish an oral gift of an interest in real property, a party must show: (1) a gift in praesenti or a gift at the present time; (2) possession under the gift by the donee with the donor's consent; and (3) permanent and valuable improvements made on the property by the donee with the donor's knowledge or consent or, without improvements, the existence of such facts as would make it a fraud upon the donee not to enforce the gift. Courts consider only the circumstances relative to a donee's possession

which evidence a surrender of ownership and control by the donor.

Civil Procedure > Appeals > Remands

**HN2** Appellate courts have broad discretion to remand for a new trial in the interests of justice. As long as there is a probability that a case has, for any reason, not been fully developed, an appellate court has discretion to remand for a new trial rather than render a decision. Moreover, remand is appropriate if a case needs further development to establish and present evidence regarding an alternative legal theory.

**Counsel:** For APPELLANT: John F. Nichols, Houston, TX; Robinson C. Ramsey, Joyce W. Moore, Langley & Banack, Inc., San Antonio, TX.

For APPELLEE: Dennis P. Bujnoch, Bujnoch Law Offices, PLLC, Boerne, TX.

**Judges:** Opinion by: Catherine Stone, Chief Justice. Dissenting opinion by: Sandee Bryan Marion, Justice. Sitting: Catherine Stone, Chief Justice, Sandee Bryan Marion, Justice, Rebeca C. Martinez, Justice.

**Opinion by:** Catherine Stone

# Opinion

 **[*196]**  REVERSED AND REMANDED

As the trial court acknowledged at a hearing in which it announced its findings after a two-day bench trial, "[w]e originated th[is] case with the understanding that I would be deciding [whether] there was an oral gift of 2000 acres and the improvements thereon or there was not an oral gift of that property to Sherry D. **McNutt** by her father William H. **McNutt**." Despite acknowledging the legal theory under

consideration, the trial court entered a judgment based on its findings that the elements of an oral gift of land had been proven by appellant, Sherry D. **McNutt**, as to "a permanent residence structure existing on (5) five acres of land,  **[**2]** with water. The five (5) acre tract includes access to the Highway I-10 service road."[1] On appeal, Sherry argues she proved the elements of an oral gift of land to the 2,000-acre "north side" of the almost 3,700-acre **McNutt** Ranch. Appellees are the Estate of William H. **McNutt**, Deceased; **McNutt** Ranch, Ltd.; and **McNutt** Management, LLC, the General Partner of **McNutt** Ranch, Ltd. (collectively, "appellees"). In their cross-appeal, appellees assert the evidence is legally insufficient to support the trial court's finding of an oral gift of the house and an undefined five-acre parcel. Because the trial court's judgment is based on a legal theory that was not fully developed at trial, we reverse the trial court's judgment and remand the cause in the interests of justice.

**HN1** To establish an oral gift of an interest in real property, a party must show: (1) a gift in praesenti or a gift at the present time; (2) possession under the gift by the donee with the donor's consent; and (3) permanent and valuable improvements made on the property by the donee with the donor's knowledge or consent or, without improvements, the existence of such facts as would make it a fraud upon the donee not to enforce the gift. *Thompson v. Dart, 746 S.W.2d 821, 825 (Tex. App.—San Antonio 1988, no writ)*. As the trial court recognized, the legal theory on which the case was tried was an oral gift of the 2,000-acre north side of the ranch. With regard to this legal theory, we believe the trial court found no oral gift on the basis that the evidence was insufficient  **[**4]** to establish Sherry's possession as to the 2,000 acres. In reviewing this finding, "we consider only the circumstances relative to [her] possession which

---

[1]  Although the trial court's judgment refers to a five-acre tract, the trial court actually describes the gift as "the house and the necessary plot of land on which that house sits," noting "it must be commonly understood and the Court can understand some common issues that a person must have a significant enough plot of land surrounding the house to enjoy the full aspect of the house. What would be a significant amount of land  **[**3]** in the rural setting or an urban set[ting] are entirely perhaps different." In a second hearing, the trial court described the gift of the house as including "an appropriate amount of acreage for the full use and enjoyment of the house," which "includes access to water, sufficient evidence relative to the well, but only the fact that there is access to the water and that it includes access to highway ten, I-10 service road."

evidence a surrender of ownership and control by [William]." *Sharp v. Stacy, 535 S.W.2d 345, 350 (Tex. 1976)*. At trial, the evidence established that William continued to run cattle on the north side of the ranch, funded significant improvements to the north side of the ranch, paid taxes and other expenses relating to the north side of the ranch, and was involved with and received the income from the hunting leases for the north side of the ranch for a significant period of time after Sherry moved into the house on the north side of the ranch. Accordingly, **[*197]** we agree with the trial court's finding that Sherry failed to meet her burden of proving an oral gift as to the 2,000 acres.

The difficulty with this case, however, is the trial court's second finding that the evidence established an oral gift as to the house and five acres of land. As the trial court expressly recognized, this legal theory was not fully developed at trial.

*HN2* Appellate courts have broad discretion to remand for a new trial in the interests of justice. *Fanning v. Fanning, 847 S.W.2d 225, 226 (Tex. 1993)*; **[**5]** *Scott Bader, Inc. v. Sandstone Products, Inc., 248 S.W.3d 802, 822 (Tex. App.—Houston [1st Dist.] 2008, no pet.)*. "As long as there is a probability that a case has, for any reason, not been fully developed, an appellate court has discretion to remand for a new trial rather than render a decision." *Ahmed v. Ahmed, 261 S.W.3d 190, 196 (Tex. App.—Houston [14th Dist.] 2008, no pet.)*; *see*

*also Scott Bader, Inc., 248 S.W.3d at 822*; *In re S.E.W., 168 S.W.3d 875, 886 (Tex. App.—Dallas 2005, no pet.)*. "Moreover, remand is appropriate if a case needs further development ... to establish and present evidence regarding an alternative legal theory." *Ahmed, 261 S.W.3d at 196*. In this case, the trial court evaluated the oral gift as one of a house and an appropriate amount of acreage for the full use and enjoyment of the house, but "the parties neither argued nor developed evidence regarding [this theory]." *Id*. Thus, we believe remanding this case for a new trial on the theory of an oral gift of the house and an appropriate amount of acreage for the full use and enjoyment of the house is in the interests of justice. *Ahmed, 261 S.W.3d at 196*; *Westgate, Ltd. v. State, 843 S.W.2d 448, 455 (Tex. 1992)* **[**6]** (noting remand in the interests of justice is appropriate "where it appears from the record that the losing party might be able to recover under some other established legal theory that was not developed at the first trial").

For the reasons stated above and in the interests of justice, we reverse the trial court's judgment and remand the cause to the trial court for a new trial on the legal theory of an oral gift of a house and the necessary plot of land surrounding the house for the full use and enjoyment of the house.[2]

Catherine Stone, Chief Justice

**Dissent by:** Sandee Bryan Marion

---

[2] As previously noted, the elements required to establish an oral gift of an interest in real property are: (1) a gift in praesenti or a gift at the present time; (2) possession under the gift by the donee with the donor's consent; and (3) permanent and valuable improvements made on the property by the donee with the donor's knowledge or consent or, without improvements, the existence of such facts as would make it a fraud upon the donee not to enforce the gift. *Thompson v. Dart, 746 S.W.2d at 825*. The dissenting opinion appears to recognize that the evidence is sufficient to support the trial court's finding as to the second and third elements of Sherry's claim, noting **[**7]** that "Sherry lived in and made improvements to the house on the 'north side.'" The dissenting opinion concludes, however, that the evidence is legally insufficient to support the trial court's finding of an oral gift based on the dissenting justice's interpretation of a letter Bill's attorney wrote to Sherry twenty-two years after she moved back to the ranch. The dissenting opinion argues that the letter's reference to Bill's intent to evict Sherry if she did not follow his rules was contrary to any conclusion that he relinquished dominion and control over the house. Interpreting Bill's intent from this letter and the other evidence presented, however, was the role of the factfinder, and, in this case, the factfinder interpreted the letter in a different manner. The factfinder's interpretation is supported by the letter referring to the house as "your home" and all of the other testimony in the record establishing that Bill repeatedly acknowledged that the house belonged to Sherry. Although Bill may have wanted to reclaim the house twenty-two years after he had

# Dissent

## [*198] DISSENTING OPINION

In this appeal all parties challenge the trial court's judgment in which the court found that the elements of an oral gift of land had been proven by appellant, Sherry D. **McNutt**, but it limited the gift to "a permanent residence structure existing on (5) five acres of land, with water." On appeal, Sherry argues she proved the elements of an oral gift of land to the 2,000-acre "north side" of the almost 3,700-acre **McNutt** Ranch. Appellees are the Estate of William H. **McNutt**, Deceased; **McNutt** Ranch, Ltd.; and **McNutt** Management, LLC, the General Partner of **McNutt** Ranch, Ltd. (collectively, "appellees"). In their cross-appeal, appellees assert the trial court erred in awarding Sherry an undefined five-acre parcel.

The majority reverses and remands in the interests of justice because the trial court rendered a judgment based on a legal theory not developed at trial. However, this legal theory—that Sherry was entitled to the house and five acres—was not developed because Sherry argued she was entitled to the entire 2000-acre "north side" of **[**9]** the ranch, which includes the house and five acres. Because I believe the evidence does not support a finding that any oral gift was made, I would affirm.

## BACKGROUND

William ("Bill") **McNutt**, who died during the pendency of the underlying lawsuit, owned a working ranch of almost 3,700 acres called the **McNutt** Ranch. The ranch is bisected by Interstate 10, and the parties referred to the acreage north of I-10 as the "north side" and the acreage to the south of I-10 as the "south side." Bill and his wife, Beth, have two daughters, Sherry **McNutt** and Dawn **McNutt** Keller. The following is Sherry's account of why she is entitled to the 2,000-acre "north side."

According to Sherry, in 1983, her father asked her to move to the ranch from Colorado where she was living. The ranch foreman had died and her parents were unable to manage the ranch on their own. Sherry testified that in exchange for moving back home to run the ranch, her father gave her the "north side." She resided on the "north side" in the house formerly lived in by the foreman. In addition to overseeing and personally taking part in regular ranching activities, Sherry booked hunts on both the "north side" and "south side" of the property. **[**10]** Her parents received payments from the hunters for use of the "south side" and Sherry received payments from the hunters for use of the "north side." In 2000, Bill gave to Beth and Sherry the "south side" hunting compensation, and, after a time, Sherry also shared the "north side" compensation with her mother. About five years later, a misunderstanding about the division of the hunting compensation caused a rift between Sherry and her father. This rift eventually led to Sherry filing this suit against her father (and later his estate). In her petition, Sherry alleged a cause of action for oral gift of land and she asked for a judgment "for title to the north side of the **McNutt** Ranch." In the course of the lawsuit, the parties negotiated a temporary injunction under which Sherry agreed to temporarily limit herself to the use of and access to the house in which she had been living on the "north side" pending final resolution of the lawsuit. After a **[*199]** two-day bench trial, the trial court rendered the judgment that is the basis of this appeal.

## ORAL GIFT OF LAND

In her first issue, Sherry asserts the trial court correctly held that she proved an oral gift of land, but incorrectly limited the **[**11]** gift to only the house and five acres of the 2,000-acre "north side." In their cross-issue on appeal, appellees assert there is no evidence of an oral gift of the house and five acres to Sherry. I agree with the majority's conclusion that Sherry failed to meet her burden of proving an oral gift as to the 2,000 acres. Because I believe Sherry did not satisfy her burden at trial as to either the 2,000 acres or the house and five acres, I respectfully dissent. For the purpose of explaining

given the house to Sherry, his desire does not prevent a factfinder from finding that the elements of an oral gift were established **[**8]** by the evidence, thereby legally precluding Bill from taking back what he gave away.

why I dissent, following is a more detailed discussion of the evidence at trial.

At trial, the sole issue was whether Bill made an immediate present oral gift of the 2,000-acre "north side" to Sherry. Sherry did not allege, in the alternative, that her father made her a present oral gift of only the house and five acres. The trial court, prior to announcing its decision, acknowledged a five-acre gift was never raised or argued by any party. However, in its judgment, the trial court found as follows:

> The elements of an oral gift of land have been proved under the quantum of proof required under Texas law; provided however, the court finds that the parol or oral gift by [Bill to Sherry] was limited to a **[\*\*12]** permanent residence structure existing on five (5) acres of land, with water. The five (5) acre tract includes access to the Highway I-10 service road.

A gift of real property may be made in two ways: either by deed or by oral gift. Generally, a conveyance of real property must "be in writing" and "subscribed and delivered by the conveyor" or his agent. *TEX. PROP. CODE ANN. § 5.021* (West 2004) ("Instrument of Conveyance"); *see also TEX. BUS. & COM. CODE ANN. § 26.01(a)*, *(b)(4)* (West 2009) ("Statute of Frauds"). To establish an oral gift of an interest in real property, a party must show: (1) a gift in praesenti, that is, a present gift; (2) possession under the gift by the donee with the donor's consent; and (3) permanent and valuable improvements by the donee with the donor's consent or other facts demonstrating that the donee would be defrauded if the gift were not enforced. *Thompson v. Dart, 746 S.W.2d 821, 825 (Tex. App.—San Antonio 1988, no writ)*. To be a gift in praesenti, the donor must, at the time he makes it, intend an immediate divestiture of the rights of ownership out of himself and a consequent immediate vesting of such rights in the donee. *Id*. Three elements are necessary **[\*\*13]** to establish the existence of a gift: (1) intent to make a gift; (2) delivery of the property; and (3) acceptance of the property. *Id*. Further, the owner must release all dominion and control over the property. *Id*. The person claiming the gift bears the burden of establishing these elements. *Id*.

Therefore, the threshold issue Sherry had to establish was the existence of a gift. More specifically, she had to establish that Bill released all dominion and control over the 2,000-acre "north side."

On appeal, Sherry agrees with the ruling that she proved the elements of an oral gift but she disagrees with the subsequent qualification that the gift was limited to five acres. Therefore, she asks this court to reverse only the ruling as to the five acres, and affirm the ruling that she proved all the elements of an oral gift. Sherry correctly states in her brief that "the evidence regarding the oral gift of land—for and against—addressed the entire 2,000 acres, not just the residence and five acres." Therefore, Sherry interprets **[\*200]** the judgment as partially granting her claim (as to the house and five acres) and partially denying her claim (as to the entire 2,000 acres). The appellees, on the **[\*\*14]** other hand, argue this court may affirm or reverse only the court's award to Sherry of an oral gift of the house and five acres.

A judgment should be construed as a whole toward the end of harmonizing and giving effect to all the court has written. *Constance v. Constance, 544 S.W.2d 659, 660 (Tex. 1977)*. In this case, it is apparent the trial court found the evidence did not establish that Sherry satisfied the elements of an oral gift of the entire 2,000-arce "north side," but the evidence did establish the elements of an oral gift of the house and five acres.

When the party who had the burden of proof at trial complains of the legal insufficiency of an adverse finding, that party must demonstrate the evidence establishes conclusively (*i.e*., as a matter of law) all vital facts in support of the finding sought. *Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001)*. A reviewing court must examine the record for evidence supporting the adverse finding, ignoring all evidence to the contrary. *Id*. If more than a scintilla of evidence supports the adverse finding, the issue is overruled. *Id*. If there is no evidence to support the adverse finding, the entire record must be examined to determine **[\*\*15]** whether the contrary proposition is established as a matter of law. *Id*. The issue is sustained only if the contrary

proposition is conclusively established. *Id*. The ultimate test for legal sufficiency is whether the evidence would enable a reasonable and fair-minded fact finder to reach the verdict under review. *City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005)*.

When a party attacks the factual sufficiency of an adverse finding on an issue on which she had the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem., 46 S.W.3d at 242*. A reviewing court considers all the evidence and will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)*. Under either standard of review, the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986)*; *see also* *City of Keller, 168 S.W.3d at 819*.

Here, Sherry had the burden to establish all the elements necessary to show Bill made **[**16]** her a present oral gift of the 2,000-acre "north side." Therefore, as to her legal sufficiency challenge, Sherry must demonstrate the evidence establishes as a matter of law all vital facts in support of a finding that Bill made her a present oral gift of the "north side." However, if more than a scintilla of evidence supports the implied adverse finding—that Bill did not make her a present oral gift of the "north side"—Sherry's legal sufficiency challenge must be overruled. As to her factual sufficiency challenge, Sherry must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.

In their cross-issue, appellees assert there is no evidence of an oral gift of the house and five acres to Sherry. I agree with appellees. When reviewing a legal sufficiency or "no evidence" challenge, a reviewing court must determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller, 168 S.W.3d at 827*; *Rosas v. Comm'n for Lawyer Discipline, 335 S.W.3d 311, 316 (Tex. App.—San Antonio 2010, no pet.)*. Because **[*201]** appellees

challenge the legal sufficiency of the evidence to support **[**17]** a finding on which they did not have the burden of proof at trial, they must demonstrate on appeal that no evidence exists to support the adverse finding. *Rosas, 335 S.W.3d at 316*. A legal sufficiency or "no evidence" challenge is sustained when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*.

## B. The "North Side"

On appeal, Sherry asserts the evidence establishes the conveyance of the 2,000 acres as a matter of law. Alternatively, she asserts the judgment of five acres is so against the great weight and preponderance of the evidence that it is manifestly unjust and "a new trial is necessary to solve the problems posed by this surprise judgment." According to Sherry, the evidence that established the elements of an oral gift of five acres also proved the elements of an oral gift of the 2,000 acres of which the five acres is a part. Sherry's case rested on her testimony, the testimony **[**18]** of seven witnesses (live and by affidavit), and two exhibits listing improvements made by Sherry to the "north side" and the "south side" of the ranch.

Sherry testified her father made a present oral gift of the "north side" to her in 1983 when he called and asked her to return to the ranch to help run the ranch. Sherry said she returned to the ranch in 1983, took over the foreman duties, and continued to reside on the "north side" for the next thirty-plus years. Sherry testified she worked both sides of the ranch without compensation until about 1989 when she began to receive compensation for her work on the "south side." She thought she received about $1,200 net per month until about 2000. The ranch had a gaming operation, with Sherry receiving lease payments for hunting on the "north side" and her parents receiving lease payments for hunting on the "south side." Her compensation stopped in 2000 when Bill gave

Sherry and her mother the lease payments for the "south side."

Sherry produced two exhibits, each showing a list of improvements, one entitled "Permanent Improvements Made On The Sherry *McNutt* Ranch By Sherry *McNutt*" and the other entitled "Ranch Work, Jobs, And Permanent Improvements **[**19]** Performed On The Bill *McNutt* Ranch By Sherry *McNutt*." She said improvements were paid for by her father, her mother, or herself. However, she could not provide proof of the amount of money she spent on the improvements as compared to the amount paid by her parents. Sherry testified her father's accountant told her she did not need to keep receipts. Sherry also produced seven witnesses, all of whom had known the *McNutt* family for many years and often visited the ranch. Each witness testified that Bill often referred to the "north side" as "Sherry's side" or as "Sherry's." One of the witnesses testified Bill said the "north side" was Sherry's and that Sherry and Dawn would have to "fight" over the "south side." Another witness said Bill told him he wanted Sherry to hurry and finish some work on the "south side," but as to "her side," he did not care what she did, she could sell it or divide it up. These same witnesses testified they knew Sherry worked both sides of the ranch and made many improvements to the ranch.

Sherry's evidence establishes she took possession of the "north side" and made improvements to both sides of the ranch. **[*202]** But, the mere taking of possession or making improvements **[**20]** of insignificant value is not sufficient to establish a present oral gift of land. *See Wooldridge v. Hancock, 70 Tex. 18, 6 S.W. 818, 822 (1888)*. Without extrinsic evidence of the necessary elements, "the proof establishing the donor's intent to give would, to a certain extent, be rendered solely on parol evidence." *Hernandez v. Alta Verde Indus., Inc., 666 S.W.2d 499, 504 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.)*. As stated above, one of the elements on which Sherry bore the burden of proof was that Bill released all control and dominion over the "north side." In determining whether Sherry's possession of the "north side" satisfied this required element, "we consider only the circumstances relative to [her]

possession which evidence a surrender of ownership and control by [her] parents." *Sharp v. Stacy, 535 S.W.2d 345, 350 (Tex. 1976)*. "Circumstances that may be explained quite separate and apart from a surrender of ownership and control by [Sherry's] parents will not be considered." *Id*.

In addition to the above evidence adduced by Sherry, appellees presented the testimony of three witnesses, James David Boland, Martin Keller, and Kasey Keller, as well as several exhibits. Boland **[**21]** testified Bill hired him in January 1987, and he worked for Bill as his CPA until Bill's death. According to Boland, Bill's tax returns took into account improvements made on the "north side" and the "south side," but no distinction was ever made between the two "sides." Bill submitted copies of checks to Boland that indicated the purpose of the check. For example, a check with the notation "Sherry *McNutt*, exotic game" indicated Bill reimbursed Sherry for the purchase of exotic game for the ranch's hunting operation. Bill and Beth ran their cattle on both the "north side" and the "south side." Bill paid all property taxes for each year on the ranch. Finally, no gift tax return reflecting an oral gift from Bill to Sherry was ever filed.

From 1990 through 2000, Bill paid Sherry a total net payroll amount of $142,957.80. From 1989 through 2004, Bill paid Sherry's medical and auto insurance, gifts, labor, and miscellaneous items totaling $197,272.23. From 1989 through 2004, Bill reimbursed Sherry $576,404.74 for third-party day labor, exotic animals, trailer, hunting, and other expenses. All ranch expenses, including these expenses, were reported on Bill's tax returns. The expenses were **[**22]** not broken down into "north side" and "south side." Through 2000, most expenses reimbursed to Sherry did not include receipts. In 2000, Boland explained to Bill and his wife the need to substantiate expenses taken as tax deductions. Boland thought Bill started to refuse Sherry's request for reimbursement in 2000 because the expenses started to decrease at about that time. Boland said that on the checks Bill would refer to the house in which Sherry lived sometimes as the "tenant house" and sometimes as "Sherry's house."

Although Bill gave the "south side" hunting compensation to his wife and Sherry in 2000, he

remained active in negotiating the leases. Sherry admitted that along with herself and her mother, her father sought out lessees, he negotiated the hunting leases for both sides of the ranch, and he set the terms and prices for hunting on both sides of the ranch. In 2005, a $5,000 check resulting from a lease was made payable to both Sherry and Bill. Sherry considered the check as belonging to her and her mother; therefore, she endorsed the check with her name and her father's. She admitted she did not have Bill's permission to sign his name. Later, when Bill discovered this, Sherry **[**23]** paid him $27,000 "to make peace with the family." **[*203]** She said the family "turned on" her and ordered her off the ranch.

On October 18, 2005, Bill's lawyer wrote a letter to Sherry advising her of certain "rules." The letter informed Sherry that Bill would have her evicted if she did not adhere to the following:

> 1. No guests on the ranch, except at her house.
>
> 2. No hunters allowed on the ranch by her invitation or by payment to her.
>
> 3. She was not to participate in the ranch management in any manner, either with regards to hunting or operations.
>
> 4. She was not to interfere with anyone who may be hired to perform certain jobs on the ranch including but not limited to the trapping or sale of domestic or exotic animals.
>
> 5. She was to stay in the area of her home or her mother's home for visits to her mother.

In either November or December 2007, for estate tax purposes, Bill transferred the entire 3,707 acres of the ranch to *McNutt* Ranch Ltd, except for Bill's house and approximately five acres with access to Interstate 10. Bill owned ninety-nine percent of *McNutt* Ranch Ltd. and the remaining one percent is owned by *McNutt* Ranch LLC, which is the general partner of *McNutt* Ranch Ltd. *McNutt* Ranch **[**24]** LLC is owned by Dawn *McNutt* Keller and her two children, Martin and Kasey Keller. Although Sherry filed her lawsuit in October 2007, Boland said the planning for the transfer of the ranch to *McNutt* Ranch

Ltd. began at least as early as the Summer of 2007. Boland testified that Bill and his wife wanted the ranch to exist through the lifetimes of their grandchildren, Martin and Kasey. To that end, in Bill's Will the ranch was initially left in a trust for Sherry and Dawn, with the ranch eventually residing in the hands of Martin and Kelsey, who would have ultimate disposition of the ranch in their lifetime. However, in 2005, Bill changed his Will because he did not want Sherry to have any part of the ranch; he wanted the ranch left in trust for Dawn and subsequently her two children.

After reviewing the record, I believe Sherry did not establish as a matter of law that Bill gave Sherry a present oral gift of the 2000-acre "north side." I also believe the implied adverse finding (that Bill did not make such a gift) is supported by legally sufficient evidence, and this adverse finding is not against the great weight and preponderance of the evidence. Any "substantial and permanent improvements **[**25]** that [Sherry] made or arranged for upon the land might be considered referable to [Sherry's] status as owner, except that many if not most of the improvements were paid for by [her] parents." *See Sharp, 535 S.W.2d at 351*. "The making of improvements by a transferee does not evidence a surrender of ownership and control if the transferor is also making improvements or paying for them." *Id*. Neither does the fact that Sherry received payments for leasing the "north side" to hunters "exclusively evidence a surrender of ownership and control because [her] parents continued to" use the "north side" for their own purposes. *Id*. "Finally, testimony that the ["north side"] was referred to as '[Sherry's]' . . . did not constitute any evidence that [Sherry] occupied the ["north side'] as owner." *Id*. "This is exactly the type of evidence that *Hooks v. Bridgewater* meant to exclude from consideration. The 'reason for the requirement of possession is that without it the existence of the contract rests altogether in parol evidence, which common experience has shown to be too unstable and uncertain to be permitted to work a divestiture of title to real property.'" *Id*. (quoting **[*204]** *Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 1117 (1921))*.

## C. **[**26]** The House and Five Acres

In addition to the above evidence that Sherry lived in and made improvements to the house on the "north side," the record contains the letter written by Bill's lawyer to Sherry setting out the "rules." The letter refers to the house in which Sherry lived on the "north side" as "your home." However, the letter ends with the following statement: "If the foregoing rules are not adhered to, copiously by you, your father will have no choice but to have you evicted from the ranch." Bill's intent to have Sherry evicted if she did not follow his rules is contrary to any conclusion that he relinquished dominion and control over the house. As to the five acres, the trial court relied on evidence that when Bill conveyed the ranch to the partnership, he excepted the surrounding 5.78 acres on which his own house sat. Nothing in the record indicates Bill made a similar present oral gift of any acreage surrounding the house on the "north side." I believe the evidence is legally insufficient to support the trial court's award to Sherry of "a permanent residence structure existing on (5) five acres of land, with water."

## CONCLUSION

I agree with the majority that there is no evidence [**27] to support an oral gift by Bill to Sherry of the 2,000-acre "north side." Similarly, I believe that the evidence is also legally insufficient to support the trial court's finding of an oral gift by Bill to Sherry of the house and five acres. Therefore, I would reverse the trial court's judgment in favor of Sherry and render a take-nothing judgment in favor of appellees.

Sandee Bryan Marion, Justice